Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

NIRAV THAKKER, an individual,  )
      Plaintiff,   )
               )
               )
               )
v.            ) CASE NO.: 1:15-cv-10109
               )
               ) District Judge
OCWEN LOAN SERVICING, LLC,  ) John J. Tharpe, Jr.
a Delaware limited liability   )
company, and          )
ALTISOURCE SOLUTIONS, INC.,  )
a Delaware corporation,     )
      Defendants.   )

November 9, 2017   10:00 a.m.   Atlanta, Georgia

This is the 30(b)(6) video-recorded deposition of
PATRICIA MCTAGGART, taken at 1201 West Peachtree
Street, Fourteenth Floor, Atlanta, Georgia 30309;
testimony is given before J. Robin Sawyer, Certified
Court Reporter, #4882-9574-0787-9168.

Read and Sign.

Janice Baker & Associates
235 Peachtree Street, North Tower, Ste 400
Atlanta, Georgia 30303
(404)969-1206

Page 2

APPEARANCES

For the Plaintiff:
Nicholas H. Wooten, Esquire
Nick Wooten, LLC
4935 Bay Hill Drive
Conway, Arkansas 72034
(334)887-3000
nick@nickwooten.com

Ross M. Zambon, Esquire
Zambon Law, LTD./Sulaiman Law Group, LTD., of counsel
2500 South Highland Avenue, Suite 200
Lombard, Illinois 60148
(630)575-8181
rzambon@sulaimanlaw.com

For the Defendants:

Eric Martin, Esquire, for Altisource and Ocwen
Bryan Cave LLP
211 North Broadway, Suite 3600
St. Louis, Missouri 60601
(314)259-2324
eric.martin@bryancave.com
Also Present:  Robert Buckley, In-house counsel for
Altisource Solutions.

Nathan P. Karlsgodt, Esquire, for Green Group
MKP, LLC
117 North Jefferson Street, Suite 301
Chicago, Illinois 60661
(312)463-9400
nkarlsgodt@mkplawyers.com

Page 3

APPEARANCE CONTINUED

Kevin C. Rasp, Esquire, for Baxol
O'Hagan Meyer Attorneys
One East Wacker Drive, Suite 3400
Chicago, Illinois 60601
(312)422-6145
krasp@ohaganmeyer.com

Kathrin M. Deutschle, Esquire, for Laudan Properties
Litchfield Cavo, LLP
303 West Madison Street, Suite 300
Chicago, Illinois 60606
(312)781-6551
deutschle@litchfieldcavo.com

Lance Davies, videographer.

Page 4

INDEX TO PROCEEDINGS

PAGE

Cross-Examination by:

Mr. Wooten:         8

Further Cross-Examination by:

Mr. Rasp:        142

Mr. Karlsgodt:     159

Ms. Deutschle:    172

Further Examination by:
Mr. Martin:       175

Disclosure: Page 179

Certificate: Page 180

Errata:   Page 181

TRANSCRIPT CODES
--      denotes interruption/change in thought
. . .    denotes incomplete thought
[sic]    denotes word/phrase written verbatim
(ph)    denotes word spelt phonetically
(unintelligible)  denotes word cannot be understood

EXHIBIT B TO SOF

Page 5

INDEX TO EXHIBITS

Exhibits                                              Page
(Electronically provided by Mr. Wooten)

Exhibit No. 39, Documents 875-885:           9

Exhibit No. 40, Documents 1001, 1002:       61

Exhibit No. 41, Documents 1003-1005:        70

Exhibit No. 42, Documents 1029-1041:        76

Exhibit No. 43, email:                      98

Exhibit No. 44, Documents 7848-7853:       100

Exhibit No. 45, Document 7854:             106

Exhibit No. 46, Documents 7962, 7963:      110

Exhibit No. 47, Documents 8086-8099:       112

Exhibit No. 48, Documents 8162-8164:       116

Exhibit No. 49, Documents 8212-8214:       122

Exhibit No. 50, Documents 8250-8251:       126

Exhibit No. 51, Documents 8282, 8288, 8289:  128

Page 6

INDEX TO EXHIBITS CONTINUED

Exhibits                                    Page

Exhibit No. 52, Document 8296:             129

Exhibit No. 53, Documents 8297-8300, 8304:  129

Exhibit No. 54, Documents 8309-8314:       130

Exhibit No. 55, Laudan vendor application:  135

Exhibit No. 56: (skipped number, no exhibit.)

Exhibit No. 57, privileged logs:           136

Exhibit No. 58, privileged logs:           139

(Hard copy provided by Mr. Rasp)

Exhibit No. 59, Deposition notice:         143

(Reporter's disclosure presented to counsel.)

Page 7

Page 8

```
 1              P R O C E E D I N G S
 2                    10:38 a.m.
 3         THE VIDEOGRAPHER:  We are on the record to begin the
 4    video-recorded deposition of Patricia McTaggart in the
 5    matter of Nirav Thakkar versus Ocwen Loan Servicing, et al.
 6         Today's date is November 9, 2017, and the time
 7    approximately 10:38.
 8         This case is filed in US District Court for the
 9    Northern District of Illinois, Eastern Division, under
10    Civil Action Number 1:15–cv–10109.
11         This deposition was requested by Nick Wooten, counsel
12    for the plaintiff.  We are in the offices of Bryan Cave,
13    located at One Atlantic Center, 1201 W. Peachtree Street,
14    Atlanta, Georgia.
15         This deposition is taken before Robin Sawyer, a court
16    reporter with the offices of Janice Baker & Associates.  My
17    name is Lance Davies, and I am the videographer for the day
18    and also with Janice Baker & Associates.
19         At this time, if all counsel present could please
20    introduce yourselves and state who you represent.
21         MR. WOOTEN:  Nick Wooten and Ross Zambon for Mr.
22    Thakkar.
23         MR. RASP:  Kevin Rasp on behalf of the defendant,
24    Baxol.
25         MR. KARLSGODT:  Nathan Karlsgodt, K-a-r-l-s-g-o-d-t,
```

Page 9

1   on behalf of The Green Group, referring to The Green Group.
2       MS. DEUTSCHLE:  Kathrin Deutschle on behalf of
3   defendant Laudan Properties.
4       MR. MARTIN:  Eric Martin on behalf of Altisource
5   Ocwen, and I'm joined by Robert Buckley, in-house counsel
6   for Altisource.
7       THE VIDEOGRAPHER:  Thank you.  At this time the
8   witness may now be sworn in.
9   Whereupon,
10       PATRICIA MCTAGGART
11   was given the oath and testified as follows:
12       THE VIDEOGRAPHER:  Thank you.  At approximately 10:40,
13   please proceed.
14       CROSS-EXAMINATION
15   BY MR. WOOTEN:
16   Q  Good morning, Ms. McTaggart.  How are you?
17   A  Good morning.  I'm fine, thank you.
18   Q  I apologize for all the little pre-game troubles we
19   had this morning with my technology.  Thank you for being
20   patient.
21       I'm not going to spend a lot of time talking about all the
22   things we talked about when we did your first installment in
23   this deposition about a year ago.  But I know you've looked at
24   it and kind of remember the case; right?
25   A  I do.

Page 10

1   Q  Okay.  So with that said, rather than waste any time,
2   we're just going to jump into the documents and things we need
3   to take care of today.  And I've got a screen in front of you
4   that I'm going to display to, and we've shared the documents
5   electronically with the other counsel.
6       The first document we're going to look at is -- we've got
7   labeled for this deposition is Exhibit 39.
8       (Exhibit No. 39 was marked for identification.)
9       And this Bates-range is 875 through 885.  Now, when I was
10   looking at these documents -- and I've got this showing to you
11   as sort of two pages side by side, I have page 875 beside page
12   878.  Do you see that?
13   A  Yes.
14   Q  And -- hold on just a second.  Page 878 appears to
15   have dates on the line, and I've raised that out so you can see
16   those dates a little bit better; is that correct?
17   A  Yes.
18   Q  Do those dates and time stamps -- as you look at those
19   two pages beside each other, do they appear to correlate to the
20   entries that are the substantive entries on page 875?
21   A  Without seeing the actual document in my hand, I --
22   it's very difficult for me to say that page 878 go --
23   corresponds with 875.
24   Q  Okay.  I pulled out a portion of 875, and the first
25   entry there says "This has been assigned to litigation team for

Page 11

1   further actions, and we were advised to close this case, hence,
2   case closed." Did I read that correctly?
3   A  Yes, you did.
4   Q  Okay.  And the first date entry on page 878 is January
5   6 of 2015; is that right?
6   A  Yes.
7   Q  Do you know if that is approximately in the range of
8   time that the lawsuit was filed in this case?
9   A  Which lawsuit are we talking about here?
10   Q  Mr. Thakkar's claim that --
11   A  Mr. -- Mr. Thakkar's?  Approximately.
12   Q  Okay.  Does it make sense that if -- if Altisource
13   became aware that a file had become a litigated matter, a
14   lawsuit had been filed, that you would close out this process
15   and send it over to the legal department?
16   A  That is correct.
17   Q  Okay.  Now, as we're looking at these dates, I'm going
18   to call those back out again.  Let me try to -- no.  Well, now
19   it doesn't want to work, so . . .
20       Those dates appear to be from, at least my viewing of them,
21   going in what I'll call reverse chronological order.  In other
22   words the most recent date -- and I'm going to try to blow that
23   up again a little bit bigger.  There we go.
24       Are you able to see those dates a little bit better now?
25   A  Yes.

Page 12

1   Q  Do they appear to be going -- the upper most entry on
2   the page is the most recent date and time, and then they appear
3   to be going in reverse chronological order downward?
4   A  Correct.
5   Q  Do you recognize that as of the format that
6   Altisource's documents in this particular program would have
7   performed?
8   A  Our Vendor Management System of Records; yes.
9   Q  So it would have -- it would have gone in reverse
10   chronological order; right?
11   A  Yes.  The most recent would be at the top; yes.
12   Q  Okay.  So if we continue on this document, if we flip
13   the page to the left to Document 876 and the page on the right
14   to 879, are you able to tell just in viewing that document if
15   it -- if those lines and columns appear to line up with each
16   other?
17   A  It appears so.
18   Q  Okay.  And you do recognize these documents as
19   printouts from Vendor Management System; right?
20   A  They were extracted from our Vendor Management System;
21   yes.
22   Q  And when they're extracted into a form that can either
23   be made into a digital document or printed paper, is this the
24   format that you're used to seeing them in?
25   A  Correct.

Page 13

1    Q   Okay. So if we look at the dates on — that's just
2  not going to work. I'm going to pull those up again.
3       If we look at the dates on the page to the right, the upper
4  most date entry is April 11, 2014, and the lower is October 11
5  of 2013; right?
6    A   Correct.
7    Q   And, again, that is page 879 of Altisource's
8  production; right?
9    A   Correct.
10   Q   And, again, flipping up again one more time, if you
11 flip up on the left side to 877 and the right side to 880, does
12 it appear that those two pages line up as far as the date
13 entries and timestamps with the informational entries that are
14 on the document at 877?
15   A   It appears so.
16   Q   Now, normally, I'm assuming, that you would probably
17 have this document printed in such a fashion that these columns
18 would all be on one page?
19   A   VMS is our Vendor Management System of Records.
20   Q   Right.
21   A   It's not a — a system that you can just go and press
22 a button in order to extract it. A script have to be written.
23 It takes a lot of time for the VMS support system to pull or
24 extract this information and work -- send it over to our legal
25 department in order for them to get -- work with them to get it

Page 14

1  into this form.
2    Q   Okay. So when you're looking at this information,
3  you're typically viewing this at a computer screen is what
4  you're explaining; right?
5    A   I'm -- I'm viewing -- I don't just view all the cases.
6  I can't do that. It's a -- if I'm looking at a case, it's on a
7  case-by-case basis.
8    Q   Okay.
9    A   I can't look at all these cases together --
10   Q   All right.
11   A   -- in VMS.
12   Q   Okay. So I -- I'll represent to you, and I'm going
13 to -- having covered these documents side-by-side, I want to go
14 back to sort of single phase. Let me just go back and get the
15 right document up.
16      You would agree with me when the -- when we were looking at
17 it as the documents beside each other that the substantive note
18 entries were in the column of the page that we had on the left
19 which began with page number 875; right?
20   A   Yes.
21   Q   Okay. So I'm going to open up 875 again. And these
22 would have been -- the top entry that I read to you a moment
23 ago, that would have been the last entry before this file was
24 closed in VMS; right?
25   A   Yes.

Page 15

1    Q   Okay. So the earliest entry would be on page 877;
2  right?
3    A   Yes.
4    Q   So I have highlighted a portion and pulled it out for
5  you to see. It looks like the initial entry says "transferred
6  to pre-foreclosure." Did I read that correctly?
7    A   Yes, you did.
8    Q   Okay. And there's a — it appears to be a case or
9  ticket number on the left that appears to be EC 575345; is that
10 right?
11   A   Yes.
12   Q   Can you explain to me what that numbering is?
13   A   That's a number that's assigned if a case, a claim, or
14 a notification, an inquiry comes in, it's assigned to that
15 particular individual.
16   Q   All right. Now, going back into the sort of dual-pane
17 mode that we were in for a moment, and the lowest entry or the
18 earliest entry in this -- these notes is October 9 of 2013; is
19 that right?
20   A   That's correct.
21   Q   Okay. Do you recognize that as being approximately in
22 the time frame of when Mr. Thakkar complained of the first entry
23 into his property?
24   A   That sounds right.
25   Q   Okay. All right. Going back to the notes that were

Page 16

1  on 877, it looks like the first entry that seems to be recording
2  a conversation with Mr. Thakkar was the second entry in the
3  system that I highlighted; is that correct?
4    A   That's correct.
5    Q   Okay. And this appears to be an indication that
6  someone had called upset because the property was winterized and
7  they needed the water back on and they claimed they were not
8  behind on their payments; is that about right?
9    A   That's what the note states; yes, sir.
10   Q   And this note would have been entered by an employee
11 of Altisource; right?
12   A   That is correct.
13   Q   Okay. So they would have been more or less taking
14 down sort of what they were hearing from Mr. Thakkar for the
15 notes here in VMS?
16   A   That's correct. Whoever is calling in that's -- they
17 are speaking to.
18   Q   All right. Now, right above that entry, I've
19 highlighted another portion. There is another entry in
20 Altisource's notes that says "the property is current on RS and
21 the loan number is still reflecting as active on VMS." Did I
22 read that correctly?
23   A   Yes, you did.
24   Q   Okay. Explain what that sentence is telling us.
25   A   I think it's self-explanatory that whoever is -- wrote

Page 17

1   this statement, looked into -- and RS means Real Servicing.
2       Q    Okay.  That's an Ocwen system; right?
3       A    That's an Ocwen system, yes.
4       Q    So an Altisource employee peeked into Ocwen's system,
5   Real Servicing, and determined that the loan was current
6   according to Real Servicing; is that right?
7       A    That is correct.
8       Q    However, the loan was still reflecting as active on
9   VMS; right?
10      A    That is correct.
11      Q    Now, I believe you told me before that VMS was the
12  system that Altisource was using to manage the foreclosure
13  process for a loan that had been activated on its system.
14      A    No.  I believe I explained that VMS, Vendor Management
15  System, is our system of records.
16      Q    Okay.
17      A    And it's also used as a conduit to communicate with
18  our vendors as well as communicate back with our client.
19      Q    Okay.  All right.  So is this indicating that Mr.
20  Thakkar's loan should not have been active on VMS at this time?
21      A    Based on the comments here, yes, it should have been
22  moved to -- it should be moved to inactive.
23      Q    Okay.  Were you ever able to ascertain or did you
24  inquire as to how the loan was listed as current on Real
25  Servicing but was still active on VMS?

Page 18

1       A    My understanding -- my understanding is that this loan
2   moved to active and inactive status multiple times.
3       Q    Do we know why it moved multiple times?
4       A    I believe that based on the information that I was
5   able to -- find, Mr. -- the -- the loan -- Mr. Thakkar would
6   make a payment but it -- it wasn't sufficient to cover the
7   current month.  So, in essence, it wasn't paid in full.
8       Q    Okay.  Let me --
9           MR. MARTIN:  You may need to speak up just a little
10  bit for our court reporter.
11          THE DEPONENT:  Oh, I'm sorry.
12  BY MR. WOOTEN:
13      Q    All right.  Let me put these documents back side-by-
14  side.  This would be 877 and 880, which I believe you testified
15  a moment ago looked to you like those columns and timestamps
16  entries all lined up; is that right?
17      A    Correct.
18      Q    So in 877, where -- and I'm going to blow this up for
19  you a little bit if I can.  This entry that talks about Mr.
20  Thakkar calling in seems to correlate with the 10/9/2013
21  timestamp, 9:53 a.m.; right?
22      A    Would you -- would you mind just putting --
23      Q    Yeah.
24      A    -- it back.  I think I'll -- I will be able to view
25  it.  Yes.

Page 19

1       Q    Okay.  All right.  And then the next time -- the next
2   entry we discussed on that page on the left at 877 where it said
3   that the property was current on Real Servicing but still it's
4   reflecting as active on VMS, that entry seems to correlate to a
5   timestamp of 10/9/2013 at 6:46; is that right?
6       A    Correct.
7       Q    All right.  Going back to the notes, there's an entry
8   towards the top of this page of 877 that says "case reopened."
9   Do you know what the terminology there is reflecting is
10  occurring within Altisource's system?
11      A    Something happened that caused -- I think that was
12  Perquashka Calpana (ph.) to re-open that case.
13      Q    When you say "re-open the case", are you talking
14  about -- is that with respect to the foreclosure case, or is
15  that with respect to it being active in VMS?
16      A    No.  That's just pertaining to the case history.
17      Q    Okay.
18      A    Yes.
19      Q    So that would be -- if we go back to the single
20  document, that would be with respect to this case number that's
21  over to the left, the EC 575356?
22      A    It is possible.
23      Q    And I --
24      A    Would you -- would you mind let me just take a quick
25  peek at this document side-by-side?

Page 20

1       Q    Yes.  And you want to see the date over there?
2       A    Yeah.  I just wanted to see.
3       Q    Let me pull it out for you.
4       A    Okay.  So 10/24/2 -- okay.  Thank you.
5       Q    All right.  And I'll -- I can do this.  I can take
6   those top three dates right there and pull those up.  And then
7   go over here and take what I hope is those top three entries.
8       A    You know, it's okay.  I think I'll -- I'll see it
9   just --
10      Q    All right.
11      A    -- in -- in the smaller format.
12      Q    All right.
13      A    Okay.
14      Q    Now, right below the entry, which would have been an
15  earlier-in-time entry below the case reopen entry --
16      A    Uh-huh.
17      Q    -- there's an entry that says "stop recurrence and
18  stop preservation as completed; hence, close the case."  Did I
19  read that correctly?
20      A    Yes, you did.
21      Q    Okay.  And then the case was reopened in the next
22  entry, and then the top entry on that page says "spoke to Barber
23  Varesh of Thakkar, and he confirmed they were able to turn on
24  the water at the property and mentioned they don't have any more
25  concerns; case closed."  Did I read that correctly?

Page 21

1    A   Yes, you did.
2    Q   Now, to move forward in time, we would have to go up
3  to Document 876; right?  And I will put that other date --
4  document right over there by it.  And those -- Document 879
5  appears to line up with the entries on Document 876; right?
6    A   It -- it appears so.
7    Q   Okay.  So --
8    A   But --
9    Q   All right.  Go ahead.
10   A   -- would you mind going back to the first -- to the
11  other two, 877?
12   Q   Yeah; 877 and 880?
13   A   Okay.  Okay.
14   Q   All right.
15   A   We can go forward.
16   Q   Now, looks like the earliest entry on page 879 would
17  be an entry on October 11, 2013, at 5:04 p.m.; right?
18   A   Yes.
19   Q   And --
20   A   Yes.
21   Q   -- the latest entry would be April 11, 2014, at 9:04
22  a.m.; right?
23   A   Correct.
24   Q   All right.  Now, let's start with -- let me go back
25  and check one thing.

Page 22

1       I flipped back to page 880 for a moment to look at those
2  dates.  And it looks like there were entries all the way to
3  October 25 of '13, on page 880; right?
4    A   Correct.
5    Q   But on page 879, there are three entries that precede
6  October 25 of 2013; right?
7    A   Based on this, it appears so, yes.
8    Q   Would you normally expect those entries to be in the
9  correct chronological order?
10   A   If I'm looking in the system, yes.  But, again, you
11  got to keep in mind that it's not printed directly from the
12  screen.  A script was -- was -- was run.
13   Q   All right.  All right.  So let's look at the bottom
14  entry on page 876.  That appears to be an entry:  "Mr. Thakkar
15  called in to report that the property was broken into."  And it
16  appears that someone informed Mr. Thakkar to call Ocwen; is that
17  right?
18   A   That's what it states; yes.
19   Q   Who was responsible for providing property
20  preservation services to Ocwen during this time frame?
21   A   Altisource.
22   Q   Okay.
23   A   Well, let me explain.  Altisource is contracted
24  with -- with Ocwen to provide management system -- management of
25  these properties.

Page 23

1    Q   Okay.  And so the way that typically works, similar to
2  this scenario, is wherever those services are needed, Altisource
3  would have a vendor, such as Baxol, who would typically serve a
4  region or an area.  And then they would typically either have
5  employees or, further, subcontractors who would actually go out
6  and physically do the work that was required.  Is that typically
7  how that transaction works?
8    A   So the way that my knowledge of it is that Altisource
9  contracts with a vendor, such as Baxol.  Baxol may have
10  employees or subcontractors, but our contract is solely with a
11  vendor.
12   Q   Right.  In other words, there are no Altisource
13  employees going out and doing this work physically on any
14  person's property; right?
15   A   No, sir.
16   Q   Okay.  Now, do you know whether there was a
17  contractual requirement between Altisource and Ocwen for
18  complaints of the nature being made here on page 876 about
19  someone taking property from the home if Altisource was supposed
20  to steer consumers back to Ocwen?
21       MR. MARTIN:  Object that it calls for a legal
22  conclusion.
23       You can answer to your knowledge.
24  BY MR. WOOTEN:
25   Q   And I -- and one thing I will not do today is ask you

Page 24

1  for any legal conclusions.  I'm asking you to explain to me
2  factually how this worked if you can do that.
3    A   So if -- if you put me in a position to answer this,
4  I -- I'm not sure what that conversation was that was taking
5  place between the individual claiming to be Mr. Thakkar and the
6  party taking the notes.  For them to refer over to Ocwen,
7  that -- my assumption is that something occurred about the loan.
8       Usually we take -- you know, we address complaints of, you
9  know, broken -- anything that is damage to the property,
10  Altisource, we take care of that with our -- we address that
11  with our vendors.
12   Q   Okay.  And that's what I -- I thought you would say
13  based on my understanding of how your agreements worked.  My
14  understanding is that typically when a complaint like this comes
15  in that Altisource will attempt to address it rather than push
16  it back to Ocwen.
17   A   We do if it's anything pertaining to the maintenance
18  of that property.  If it's anything to the loan, then we direct
19  them back to -- to Ocwen.
20   Q   So in -- in this instance where he's complaining that
21  someone has broken into the property and there's jewelry, cash,
22  electronics, clothing taken, patio door broken, that's typically
23  the type of complaint that Altisource would be trying to
24  address; right?
25   A   That is correct.

Page 25

1    Q   Okay.  Now, the next entry on that page seems to be --
2    and tell me if I'm wrong.  Before I even get into this, let me
3    try to make sure I've covered this ground.  I still see this
4    entry on the side that says EC and then has a series of a six-
5    digit number.  Is that like a ticketing or tracking system for
6    Vendor Management System?
7    A   That's for cases.
8    Q   Okay.  So that's a -- and when you say case, you're
9    talking about cases within the Vendor Management System?
10   A   Within our Vendor Management System.
11   Q   Right.  And I don't want to imply anything by you
12   saying case.
13   A   No.
14   Q   That's just a term of art you guys use with your --
15   your program; right?
16   A   Yes, that's our program.
17   Q   Okay.  So do you open a case whenever there's, like, a
18   call or complaint or inquiry?
19   A   That is correct.
20   Q   Okay.  All right.  And so that -- that's why I was
21   asking, because there's this case number at the bottom that is
22   EC 577998, and then right above it there's an EC 639468; right?
23   A   That's correct.
24   Q   And -- if I'm reading this correctly, there's
25   three lines of notes below the EC 577998.  Would -- would all

Page 26

1    those notes go with that ticket or that case?
2    A   (No response.)
3    Q   Or do you know if the notes are going forward in time
4    so that that next entry would be part of that?
5    A   Would you mind scrolling down for me a bit?
6    Q   Yeah.  I'm assuming since going up the page goes
7    forward in time that the entries above that case number would be
8    associated with that case number.  But I -- I don't know your
9    system.  I'm trying to figure that out.
10   A   Again, the -- the ca -- this is not a screenshot --
11   Q   Right.
12   A   -- of the system.
13   Q   I'm with you.
14   A   This -- this is all extracted from the system.
15   Q   Okay.  Are you able to tell by looking at this?
16   A   Can you put it side by side for me, please?
17   Q   Do you want to -- do you want to see the dates --
18   A   Yes.
19   Q   -- beside that?
20   A   Yes; uh-huh.
21   Q   Okay.  All right.  Let me do that for you right quick.
22   So you need me to enlarge the dates?
23   A   No.  It's fine right there.  Yeah.  So it would be
24   going up.
25   Q   Okay.  So where we see this ticket entry on 877, the

Page 27

1    first one that is EC 575345, the entries above it going up the
2    page until we see the next ticket number or case number, they
3    would be associated with the Case Number EC 575345?
4    A   Yes.
5    Q   Okay.  So going back to 876, about the middle of 876
6    there is an entry that begins with "Mike, Detective."  And I
7    think I've called that out for you.  Do you see that entry?
8    A   I do.
9    Q   So based on that, it looks to me like this is a note
10   indicating that a policeman contacted Altisource trying to find
11   out the name of the vendor who secured Mr. Thakkar's property;
12   right?
13   A   That is right.
14   Q   Okay.  Did Altisource provide that information to the
15   detective?
16   A   I don't believe we did at that point.
17   Q   Do you know if Altisource ever provided the vendor's
18   name to the police?
19   A   I believe we requested for them to file a report or
20   subpoena that information.
21   Q   Oh.  And I think we'll get to that entry in a moment,
22   but it looks like from the entry I just highlight that is above
23   Case Number EC 639468, there are a series of entries discussing
24   communications with the police department; is that fair?
25   A   Yes.

Page 28

1    Q   Okay.  Now, a little bit above the part we just looked
2    at, there's an entry that says "FC's are not supposed to contact
3    police officers" -- or contact the police officer; is that
4    correct?
5    A   Yes.
6    Q   What is an FC?
7    A   Follow-up coordinators.
8    Q   Okay.  And what do follow-up coordinators do with
9    respect to these types of situations that we're discussing here?
10   A   Usually, if it's assigned or if they're working on
11   that case, they will make calls.
12   Q   Okay.  Do they have any authority to act, to remediate
13   any harm that a consumer may have experienced from an issue with
14   the property preservation?
15   A   I need you to be a bit more specific.
16   Q   How -- do they have the ability to resolve any
17   concerns that the borrower might have about a problem with their
18   property preservation at their home, or do they just simply
19   gather information?
20   A   I still need you to be a little bit more specific.
21   Q   All right.  So we're -- we're talking about FCs or
22   foreclosure or follow-up coordinators; right?
23   A   Uh-huh.
24   Q   Okay.  And, you know, I think you said that they
25   typically were making phone calls?

Page 29

1    A   Uh-huh.
2    Q   Are they making phone calls just to random people, or
3  are they only dealing with people who have filed complaints
4  about property preservation?
5    A   Is I stated earlier, if they're assigned to a
6  particular case, they can call that person.
7    Q   Okay.  So in this instance where Mr. Thakkar's called
8  in with his complaint, who could the follow-up coordinator speak
9  to under Altisource's policies and procedures?
10   A   They could have spoken to their leaders, their
11 managers, or the compliance division.
12   Q   What about externally from Altisource, could they
13 speak to the borrower?
14   A   Obviously, if the borrower calls in or whoever calls
15 in, they would be -- they would speak to them.
16   Q   So they could speak to the person who made the
17 complaint?
18   A   Making the complaint.
19   Q   Okay.  What about in this instance were law-
20 enforcement's become involved?  Do they have the authority to
21 speak to law enforcement?
22   A   At the time, no.
23   Q   Okay.  So --
24   A   Well, let me correct that.  They can gather the
25 information from the law enforcement and take that to their

Page 30

1  manager or the compliance division.  They would handle that.
2    Q   Okay.
3    A   And it also depends on the circumstances, mind you.
4    Q   Okay.  All right.  So let me put the dates back beside
5  this, check this entry where it said "Mike, the detective,
6  called."  It looks like that date would have been 2/26/14.  Does
7  that look right to you?
8    A   Can you put them side by side, please?  Make the dates
9  smaller.
10   Q   I'm trying to line up those borders.  Does it look
11 like the detective called on February 26 of 2014?
12   A   Yes.
13   Q   Would Altisource have known who the vendor was on
14 February 26 of 2014?
15   A   Absolutely.
16   Q   Would Altisource have known whether employees or
17 subcontractors of the vendor had gone to Mr. Thakkar's property
18 on February 26 of 2014?  Would they have had that information?
19   A   No.  We -- what Altisource would have known is that we
20 assigned, you know, an order to the vendor with an issue date
21 and fulfillment or an expected fulfillment date, a due by -- due
22 date.
23   Q   Okay.  So in other words, Altisource would have been
24 able to see that -- that this job was assigned to Baxol; right?
25   A   That is correct.

Page 31

1    Q   But as far as whether Baxol did the job themselves or
2  asked someone else to do it, your testimony today is that
3  Altisource would not have known in February 26 of 2014, who
4  actually went to Thakkar's house at the time that generated this
5  police inquiry?
6    A   That is correct.
7    Q   So on the top entry on this page is a little bit
8  larger note that's, like, about a paragraph that begins with on
9  October 9 of 2013; is that right?
10   A   Correct.
11   Q   It says -- it says "we were notified under EC 575356
12 that the locks were changed and the borrower is unhappy about
13 it."  Now, the EC 575356 would be an earlier case number in this
14 sequence; right?
15   A   Correct.
16   Q   All right.  Take a moment and read that the entire
17 entry and let me know when you've gotten through it.
18   A   I'm done.
19   Q   All right.  Tell me what's being communicated in this
20 entry from VMS.
21   A   Do you want me to read what's written here?
22   Q   No.  I -- I'd rather you just explain to me what
23 Altisource is saying about what transpired at Mr. Thakkar's
24 property in a way that people who are not familiar with mortgage
25 servicing could understand it.

Page 32

1    A   Well.  Here it's saying on 10/9 that we were notified
2  under case, which would have been earlier than 10/9, that the
3  locks were changed and that the borrower was unhappy.  We don't
4  know if it was the borrower.  Whoever had called in that day
5  identifying themselves as the borrower was unhappy about --
6  about it.
7        Here they're stating that the case -- the case was issued
8  to address to stop preservation; however, it was not done.
9  They're also saying based on the information that was provided
10 to us, that the property was vacant.  And once it's vacant,
11 it's -- it qualifies for an interior inspection.  And they
12 reference the work item number that that information was
13 reported back to Altisource under.
14   Q   Okay.  So the property inspection that determined the
15 property vacant was the trigger to the property being re-
16 secured; right?
17   A   That is correct.
18   Q   Now, go back over for just a second and pull this date
19 doc back up so I can look at that side by side again.  It looks
20 like the top entry on that page was made on April 11, 2014; is
21 that right?
22   A   Correct.
23   Q   And that would have correlated to the entry we were
24 just discussing; right?
25   A   Yes.

Page 33

1    Q   Okay.  Now, that brings us back to page 875, which
2    would be the most recent entries with respect to what was in
3    Vendor Management System; right?
4    A   Yes.
5    Q   And I think we mentioned earlier that this date range
6    is April 12 of '14 to January 6 of '15, when the VMS system was
7    closed out on this file; right?
8    A   On that case; yes.
9    Q   Yeah, on that case.  All right.  So the entry at the
10   bottom is April 12, 2014; right?
11   A   Yes.
12   Q   All right.  So let me do this.  So we'll just go back
13   to the notes for that time frame from April 12 of '14 to January
14   6 of '15.  Now, first entry at the bottom of the page, can you
15   read that entry for me, please?
16   A   While we understand that there has been a PPI error,
17   please ensure that officer is not notified about the same.  They
18   need to submit a copy of subpoena document through fax to us.
19   And once you have the document, let them know that we will
20   review with legal and share information.
21       Please also confirm, apart from vendor information, are
22   they looking for any other details?  If so, please revert to
23   compliance.
24   Q   Okay.  This is an Altisource employee that made this
25   entry?

Page 34

1    A   Correct.
2    Q   Do you know who the employee is that made this entry?
3    A   Based on the user name, Laxmi Vishwanathan.
4    Q   I — I think I recall that name from our previous get
5    together.  Tell me who that person is at -- at Altisource.
6    A   Today -- are you -- well --
7    Q   What was their position at this time?
8    A   At that time -- I believe at that time she may have
9    been a team leader.
10   Q   Okay.  Did she work either with you or for you in your
11   area of management?
12   A   She worked in the compliance group.
13   Q   Okay.  So she was a peer to you; right?
14   A   I'm sorry?
15   Q   She was like a peer to you?
16   A   We worked in separate bus -- we worked in the same
17   business unit.  We worked in different groups of the --
18   Q   Okay.
19   A   -- business unit.
20   Q   All right.  The entry right above the one we just
21   discussed indicates that someone placed a call to Mr. Mike that
22   we recognize as the detective; right?
23   A   Correct.
24   Q   And so they placed a call and asked for him to call
25   back to discuss the document, which apparently is referring to

Page 35

1    the subpoena; correct?
2    A   That is correct.
3    Q   Do you know if Altisource ever was served with a
4    subpoena for information relating to this investigation?
5    A   I don't know.
6    Q   Okay.  Do you know if Altisource ever voluntarily
7    provided information to the police that were investigating this
8    situation?
9    A   If it was done, it would have been in the -- in the
10   comments.
11   Q   So the records that we're looking at now, if anyone
12   had -- had actually given information to the police department,
13   it would be noted in these comments?
14   A   To my knowledge, yes.
15   Q   Okay.  Have you found any entry that led you to
16   believe that Altisource ever provided information to the police
17   that were investigating this incident?
18   A   Not during my investigation of this.
19   Q   Okay.  Do you know if Altisource has provided any
20   information to the police even since the litigation has been
21   filed in the case?
22   A   I -- I'm sorry.  Can you repeat that?
23   Q   I understand this, at the period of time that we're
24   looking at now, it's obviously prior to a lawsuit being filed;
25   correct?

Page 36

1    A   Correct.
2    Q   And what I'm saying is even since the litigation has
3    been filed, do you know if Altisource has provided any
4    information to give the police officers the information they
5    were requesting back around the time of these incidents?
6    A   If memory serves me right, I believe the police,
7    when -- when a follow-up was made about the subpoena, that
8    officer had said that they were closing on their end since Mr.
9    Thakkar had advised them they were pursuing a lawsuit.
10   Q   Okay.  So it's your understanding that the police
11   indicated they closed the criminal investigation because Mr.
12   Thakker decided to file a civil lawsuit?
13   A   I -- that's my recollection.
14   Q   Okay.  Okay.  We noted earlier that this entry at the
15   bottom the page would have come in around April 12 of 2014.  By
16   April 12 of 2014, would Altisource have known who the vendor was
17   as well as who the vendor assigned to go to the property?
18   A   We would absolutely know who the vendor is that that
19   property was assigned to.  But I don't -- no, we would not have
20   known the subcontractor; we don't -- or employee.  We don't deal
21   with the subcontractor or employee unless -- only through to the
22   vendor.
23   Q   Okay.  Do you know if there was any communication in
24   this time frame to the vendor asking for their version of the
25   events that occurred with respect to Mr. Thakkar's property?

Page 37

1     A  I'm drawing a blank; I'm sorry.  If there was
2  communication, I'm sure it would have been provided to you.
3     Q  To the best of your recollection, you've not see any
4  in the documents in the case, or you just don't recall?
5     A  I don't recall
6     Q  That -- that's fine.  The last entry that appears to
7  discuss interaction with law enforcement on these pages is is
8  about the middle of page 875; right?
9     A  Yes.
10     Q  And that entry appears to indicate that someone from
11  Altisource told the officer that they couldn't provide any
12  information until they received a subpoena; right?
13     A  Based on this, yes.
14     Q  Now, is there a designated department or group of
15  employees who typically are assigned to interact with law
16  enforcement if they make these types of inquiries?
17     A  Usually the compliance group work alongside the
18  operations group.
19  I'm sorry.  Let me qualify that.
20     Q  Okay.
21     A  If, as in this case, a request is made, we have the
22  head of the -- back in 2013, '14, that attorney that was
23  Laxmi's, she reported up to her, would have had to give an
24  approval.
25     Q  Okay.  So is it your testimony that -- that Altisource

Page 38

1  would not provide law enforcement with this type of information
2  without the approval of its in-house counsel?
3     A  Without a subpoena from -- from the -- we don't just
4  randomly give information.  Anybody can call in and say they're
5  whoever.  So we require certain documentation before we release
6  certain information.
7     Q  Does Altisource condone vendors or their
8  subcontractors taking personal property from consumers?
9     A  Absolutely not.
10     Q  Okay.  You would agree with me that most people would
11  consider that to be something akin to theft; right?
12     A  We would not condone any personal property being
13  removed, especially on a pre-foreclosed property.  That was not
14  our policy then and it is not our policy today.
15     Q  Now, this particular issue or problem of personal
16  property being taken from pre-foreclosure homes, this was an
17  ongoing problem for Altisource during this time frame; right.
18     MR. MARTIN:  Object to form.
19     Subject to that, you can answer.
20     THE DEPONENT:  We receive allegations all the time.
21  In most cases, there's no merit to it.  People get upset
22  when their properties are being foreclosed on.  They take
23  it out on -- on Altisource.  We investigate.  If there's
24  any merit, we address it.  If there's none, then we respond
25  accordingly.

Page 39

1  BY MR. WOOTEN:
2     Q  Okay.  Now, I pulled up the date document again.  And
3  this is from sort of the top half of the page, but those entries
4  that are about in the middle, they're still in April 2014.  Is
5  that correct?  Take a look at those that are down the middle.
6     A  That's correct.
7     Q  All right.  Now, are you aware of whether Altisource
8  had provided any specific training prior to September of 2013,
9  to its vendors about the policy of not removing personal
10  property from consumers' homes in a foreclosure setting?
11     A  We have ongoing training for all our vendors.  On each
12  work item, work order, that is also a part of the special
13  instruction in -- depending on the work item type.  But at our
14  off-site training, yearly training, that's addressed.  We have
15  vendor calls; that's addressed.
16  So as long as I can recall, and I've been around since
17  the -- since Alti -- Altisource started in 2009, and I've never
18  heard where we've given any approval for any items to be
19  removed, personal items to be removed from a pre-foreclosed
20  home.
21     Q  So anyone who'd been a vendor for any length of time
22  with Altisource would know that Oc -- Altisource does not
23  authorize a property preservation vendor to remove personal
24  property from a pre-foreclosure home?
25     A  That is correct.

Page 40

1     Q  Would Altisource consider it a criminal act for a
2  vendor to remove personal property from a consumer's home?
3     MR. MARTIN:  Object to form.
4     MR. KARLSGODT:  Join.
5     MR. RASP:  Same objection.
6     THE DEPONENT:  Again, our policy dictates that no
7  personal property should be removed from a pre-foreclosed
8  home.
9  BY MR. WOOTEN:
10     Q  If Altisource investigates a complaint and determines
11  that a consumer's complaint, the personal property removed, has
12  merit, what type of action will Altisource take against a vendor
13  responsible for that?
14     A  How do I respond to that?  Throughout the time that
15  I've been around and have come across allegations of personal
16  property removed, nine times out of ten, we'll get to a point
17  where a vendor will say, listen; we know for sure -- Mr. Wooten,
18  is a pre-foreclosed home, we've -- people have called, and
19  talking to me personally and said that they had a 40- or a
20  $60,000 gold watch or grandfather's clock removed.
21  And in speaking with them later, they'll tell me, look; I'm
22  sorry.  I didn't have that there.  So allegations are made.
23  Vendors will -- some vendors will say, look; it did not happen
24  at all.
25  We will investigate.  We'll ask, you know, did you file a

Page 41

1    police report? And nine times out of ten, they haven't; right?
2    So we address it as we go along. We do not condone any criminal
3    acts. And if we find that that's the case, we address with the
4    vendor. Now, the vendor have to take that up with their
5    employees and/or subcontractor. But, again, our contractual
6    agreement is with that vendor.
7        Q    You aware of Altisource ever providing information to
8    any law enforcement agency regarding a vendor removing property
9    from a consumer's home?
10       A    Repeat that.
11       Q    Are you aware of Altisource ever providing a vendor's
12   identification information to any law enforcement officer
13   related to an allegation that the vendor removed personal
14   property from a consumer's home?
15       A    I am aware that we have put -- given the -- provided
16   the vendor's information to reach out to a police officer.
17       Q    So you're saying that Altisource has provided vendor's
18   information to law enforcement in the past on similar
19   allegations as to here?
20       A    No. I'm saying that to my knowledge, I know that if
21   we have received, you know, any inquiry from a vendor, and it
22   may not be about this -- from a police officer, we will -- you
23   know, I have provi -- asked the vendor to contact police
24   officer. I've done that. I haven't given out the vendor's
25   information, but I have given a vendor's -- the police officer's

Page 42

1    information to a vendor.
2        Q    Do you know if that happened in this case?
3        A    Not in this case, no.
4        Q    Isn't it true that --
5        A    And may -- may I correct that?
6        Q    Sure.
7        A    It wasn't allegations of theft. It was allegation --
8    it wasn't an allegation -- I'm sorry. It was vandalism. And
9    the police needed the property secured.
10       Q    In this --
11       A    So that's different.
12       Q    In this case?
13       A    Not in this case.
14       Q    Okay.
15       A    What I said earlier. I'm trying to correct that.
16   Yes.
17       Q    Okay. So in that case where you did provide an
18   officer's information to an Altisource vendor --
19       A    Yes.
20       Q    -- that was where the vendor needed to go back out and
21   secure a property that had been vandalized?
22       A    That's right.
23       Q    Okay. So it was not a situation where you were
24   telling a vendor to go meet with a police officer who might be
25   accusing them of breaking into a home and taking property?

Page 43

1        A    No.
2        Q    Has that ever occurred?
3        A    Without -- not offhand, I don't know. I can't speak
4    to that.
5        Q    And you've been in this department, as you said, since
6    the spinoff when Altisource became a separate company; right?
7        A    No, sir. I said I've been around.
8        Q    Okay.
9        A    I've been in other groups.
10       Q    Okay. All right. So in all your time in working in
11   this area dealing with these types of issues and complaints,
12   you -- that's never happened to your knowledge?
13       A    I can't say that for certainty that it's never
14   happened.
15       Q    Okay. You're -- you just don't know?
16       A    I don't know offhand.
17       Q    Certainly nothing you've ever been involved in that
18   that's ever occurred; right?
19       A    Not to my -- not to my recollection; no.
20       Q    And you're part of the team that manages these
21   complaints and escalations when someone makes this type of
22   allegation; right?
23       A    Occasionally, I help. But that's not my job.
24       Q    Okay. Aren't you typically notified whenever these
25   types of complaints come in?

Page 44

1        A    Not always.
2        Q    Now, isn't it also true that when Altisource hires a
3    vendor such as Baxol to go out and winterize or secure a
4    property, that that vendor is taught and trained to leave a
5    flyer that asks anyone who has questions about what's occurred
6    to contact Altisource?
7        A    Yes. A notice is posted at the property
8        Q    And you'd agree with me that there is no notice that
9    would provide the consumer or law enforcement any information
10   about the actual vendor or persons who went to the consumer's
11   property?
12       A    I don't recall if a notice was posted. I don't recall
13   if a notice was posted. I'm trying to -- I don't recall.
14       Q    Let's step away from Mr. Thakkar's situation for
15   moment and just talk about generally how this occurs. If -- if
16   Altisource requests that a property be winterized or secured,
17   there will be notices posted; right?
18       A    That is correct.
19       Q    And those notices will always refer anyone who sees
20   them to contact Altisource with questions?
21       A    That's right.
22       Q    There will never be a posting that says contact Baxol;
23   right?
24       A    Some vendors do leave their contact information there
25   as well.

Page 45

1    Q   Okay.  So some do?
2    A   Yes.
3    Q   But that's not --
4    A   Well, most -- most vendors will leave their
5  information there as well.
6    Q   All right.  Do you know if there's any indication that
7  a vendor left any information at this property?
8    A   Not that I can recall.
9    Q   So if -- if law enforcement were to find some posting
10  related to Altisource, would they have any other party to talk
11  to about identifying the person or persons who might have gone
12  to the property?
13    A   Whoever call -- whether it be a police officer or a
14  borrower or occupant that call in, Altisource prefers that we
15  deal -- that we stay involved, we work through the issue with
16  our vendor --
17    Q   Okay.
18    A   -- and they -- the party making the claim.
19    Q   And I think we talked about this in the first go-
20  round, but Ocwen is -- is that the largest customer of
21  Altisource?
22    A   Ocwen was one of our clients at the time.  Are --
23  which period are you talking about?
24    Q   Let's talk about 2013, 2014.  Was Ocwen the largest
25  Altisource customer at that time?

Page 46

1    A   Yes.
2    Q   Okay.  Is Ocwen still one of the largest Altisource
3  customers today?
4    A   Today we have several clients.
5    Q   Okay.  Back in 2013, 2014, had Altisource yet obtained
6  any clients other that Ocwen?
7    A   With no -- no disrespect, but is that relevant to --
8  to this case?
9    Q   Yes, it is.
10    A   Okay.  I don't recall.
11    Q   Okay.  All right.  If there had been -- I know at some
12  point Altisource started providing some services to Wells Fargo.
13  I remember a public filing and some publicity about that
14  agreement.  So typically, if there's a major contract to provide
15  these services, typically Altisource would make filings and
16  generate press about that type of thing; right?
17    A   Offhand, I -- I -- I do re -- know about the Wells
18  Fargo, but I don't think they publicize in every instance.
19    Q   Okay.  Remind me again what your title was with
20  Altisource in the 2013, 2014 time frame.
21    A   Oh, you're pulling back on memory here.  I've had
22  several titles.  You should have that in your records.  Back
23  then, a year ago, I --
24    Q   We'll just rely on your history.  That's fine.  If you
25  don't recall of the top of your head, I don't want to make --

Page 47

1    A   Off the top of my head --
2    Q   -- it a memory test.
3    A   -- in 2013, I don't recall.
4    Q   Okay.
5    A   I was a manager of, whether it be operations or -- I
6  was a manager.  I don't recall --
7    Q   All right.
8    A   -- which one.
9    Q   Now, I've marked a document as -- well, let me go back
10  one more time before I do that just to make sure I've covered
11  everything I need to cover there.
12      Okay.  I -- I almost did that and got ahead of myself.  So
13  let me move past these -- these documents that we're dealing
14  with this case information to page 881 of Exhibit 39.
15      Now, can you tell me what these entries are?
16    A   Those are comments from the case log, the case
17  history.
18    Q   Okay.  So do these come from the same place that we
19  were looking at previously with the earlier pages?
20    A   Those are case logs.  Yeah.
21    Q   All right.  So would we see each of these entries in
22  approximately the same time frame back in the previous documents
23  we were just looking at, like 877?
24    A   Can you go back to --
25    Q   Yeah.  Let me -- let me just fix this right quick.

Page 48

1  All right.  So I've put 877 by 881.  Now, 881 has a date range
2  of, it looks like, 10/10 to 10/14; right?
3    A   Yes.
4    Q   Okay.  And we talked earlier about the entries over at
5  877 started in October of 2013; right?
6    A   That's correct.
7    Q   So those entries on 877 would have been between
8  October 9 and October 25; right?
9    A   Right.
10    Q   So -- and I guess what I'm trying to clarify just for
11  my own understanding is:  Would you expect to see everything
12  that we see in 881 over in 877?
13    A   So you're looking at the case history and you're
14  looking at the log.
15    Q   Okay.
16    A   So they -- it's coming from the same system of
17  records.
18    Q   Just --
19    A   Just --
20    Q   -- different parts of the --
21    A   Of the sys --
22    Q   -- same system?
23    A   Yes.
24    Q   So would these -- the documents that are in 881, would
25  they be supplemental to or in addition to what we see in 877?

Page 49

1    A   So basically, the log, that's communication to the
2    operations team of what they needed done.
3    Q   Okay.
4    A   Okay.
5    Q   So would that be coming from the folks that were
6    communicating with the borrower or the complainant and the law
7    enforcement folks?
8    A   It's -- it's -- it depends on who they're coming --
9    it's -- it's a group of people. It's not just one person on the
10   operations team; right, or the compliance. But it will tell you
11   the user who is making those comments.
12   Q   All right. So 881 was the comments. Tell me what 882
13   is, please.
14   A   This is also from the Vendor Management System of
15   Records --
16   Q   Uh-huh.
17   A   -- and these are the properties statuses that -- that
18   are available in the system.
19   Q   All right. Now, this page indicates -- the upper
20   portion on the right says updated by super user, and there's
21   several updates on May 2, 2014, at 7:32 a.m. Tell me what or
22   who super user is.
23   A   That's -- that's automated.
24   Q   Okay. So those are just automated entries that
25   were -- why were these automated entries all being made suddenly

Page 50

1    on May 2, 2014, if you know?
2    A   If you look at -- at the activity -- the activities;
3    I'm sorry, that's on --
4    Q   The earlier pages?
5    A   No. No. No. Go back to this page.
6    Q   Okay.
7    A   So those are BPOs, BPO requested insurance claim.
8    This information is actually coming from -- from Real Serv -- or
9    Ocwen's system of records, Real Servicing, because we do not --
10   our property preservation and inspection group does not order
11   BPOs.
12   Q   So I guess because this says thoughts, it means that
13   with respect to this entry, Ocwen was not requesting any of
14   those things be done, or do you know?
15   A   I don't know. You'd have to ask that of Ocwen.
16   Q   Same sort of coding on 883? Let me go back to that
17   page. Is that still property status codes?
18   A   Yes.
19   Q   All right. Now, you mentioned earlier that this loan
20   went in and out and in and out of active status; right?
21   A   Correct.
22   Q   And on page 884, is this the record of the loan going
23   in and out of active status?
24   A   Correct.
25   Q   So yeah. That's always wonderful when I chop it off

Page 51

1    midstream.
2    A   I can see it the way you have it if you don't mind.
3    Q   I was -- I was trying to get where I could see it with
4    my own eyes --
5    A   Yeah. Oh, you saw yours; okay.
6    Q   -- going up. So it looks like it was inactive on
7    October 10 of 2013, but became active on October 11; right?
8    A   Right.
9    Q   And that would be -- when we say inactive, that would
10   mean it was not in the Vendor Management Services system for
11   property preservation?
12   A   That's correct.
13   Q   So it starts out on this trend. It's initially not on
14   October 10, and then it becomes active for services on October
15   11 at 1:26 p.m.; right?
16   A   That's correct.
17   Q   And then it goes back to inactive on October 16;
18   right?
19   A   Yes.
20   Q   Now, it says these changes were all made by a person
21   identified as R-a-v-i-n-d-r-a; right?
22   A   Yes.
23   Q   Do you know who that is?
24   A   No.
25   Q   Okay. And then, after the October entries, are

Page 52

1    entries in November and December and Jan -- well, November and
2    December's entries are all updated by super user; right?
3    A   Yes.
4    Q   So would that be Ocwen changing the status?
5    A   That would be -- Ocwen is not -- it's the system
6    that's going -- based on information that's provided, it would
7    either make it active or inactive. So it's all system-
8    generated.
9    Q   So who would provide the information for that logic to
10   be applied? Would that be Altisource or Ocwen?
11   A   It depends.
12   Q   Okay. Any way to tell from these entries who's
13   providing the logic that's causing these changes?
14   A   If -- okay. I'm drawing on memory here. I believe
15   these entries were based on the pay -- what was happening with
16   the payments.
17   Q   Okay.
18   A   Yeah.
19   Q   So have you been able to determine if payments were
20   coming in and going out or coming in and being reversed or
21   something like that? Or have you made any inquiry about that?
22   A   I have looked into it. I believe Mr. Thakkar, the
23   borrower, had made a payment in October, but that covered for
24   June, July, and August, and September. But it -- he was still
25   late. He -- he did not pay for -- for October.

Page 53

1    Q   Okay. So you think that's why he became active again
2    in October?
3    A   Yes.
4    Q   Okay. And then he went back to inactive October 16;
5    right?
6    A   Yes.
7    Q   And then in November, in –- the case, he went to
8    active status two times. Looks like a duplicate entry,
9    11/13/2013 at 10: 36 a.m.; right?
10   A   Right.
11   Q   Then there was inactive again on November 19, 2013;
12   right?
13   A   Yes.
14   Q   And then he went back active again December 12 of
15   2013; right?
16   A   Yes.
17   Q   And then it says that he went active again December 16
18   of 2013; right?
19   A   Yes.
20   Q   Do you know why he would be put in active status twice
21   within four days?
22   A   Off –- off –- I don't know.
23   Q   I –- I –- I thought personally the way you were
24   explaining the system is that once a loan was active, it stayed
25   active until somebody made it inactive; right?

Page 54

1    A   Not someone --
2    Q   Oh --
3    A   -- or inactivity. It could be that –- from the
4    client's end or Ocwen's end, as in this case, the payments, and
5    from our end and our system communicating with Ocwen's system,
6    it could be that, you know, occupancy status changes. So you
7    have to take all that into consideration.
8    Q   Okay. Just from looking at this break, all we see is
9    whether it says active or inactive; right?
10   A   Yes.
11   Q   And it looks like on 12/16/2013, when it indicates
12   that it -- the property was in active status on that day, there
13   doesn't appear to be anything that occurred between December 16
14   and December 12 to have taken the property off of active status;
15   right?
16   A   No.
17   Q   Is there –- are there, like, a double active status,
18   or is it just either active or inactive?
19   A   Active or inactive.
20   Q   Okay. And then the last entry there says it was by
21   Michael, whomever that is, on January 6 of '14, and it went back
22   to inactive; right?
23   A   Correct.
24   Q   And do you know if by January 6 of '14, both the
25   incidents involving Mr. Thakkar's property had occurred?

Page 55

1    A   Yes.
2    Q   Okay. Do you know if his property's been back on
3    active status at any point since January 6 of 2014?
4    A   No.
5    Q   Now, right below that there's another section –- well,
6    maybe that explains it. When you look a little closer, the top
7    section has a heading to the left that says client; right?
8    A   Yes.
9    Q   The lower section has a heading to the left that says
10   property; right?
11   A   Yes.
12   Q   Would those be addressing different issues with
13   respect to whether the property's active or inactive?
14   A   So one -- and –- and I requested for this to be
15   explained to me actually, the entries on the property is based
16   on activities that's performed by Altisource.
17   Q   So that would be like the inspections for occupancy;
18   right?
19   A   Yes.
20   Q   Or exterior inspections; right?
21   A   Exterior inspections, yeah.
22   Q   And I think we talked about –-
23   A   Occupancy; yeah, we did.
24   Q   -- that. We talked about that extensively the first
25   go-round. So one would be dealing with the -- what Altisource

Page 56

1    was doing and the other would be dealing with what Ocwen was
2    doing?
3    A   One's based on property and the other is based on
4    client.
5    Q   Okay.
6    A   Yeah.
7    Q   So up at the top where you have the heading with
8    client, that would appear to mean that those entries were being
9    handled by Ocwen; right?
10   A   Those entries, again, it's the system communicating.
11   These are all records from our system of record.
12   Q   Okay. So down under the property heading portion of
13   the page of 884, you have an entry in September 5 of '13, that
14   says there's an inspection, and then you have an inactive status
15   of October 10, active October 11, active October 11, inactive
16   October 16, active November 13, active November 13; right?
17   A   Right.
18   Q   And we go down to the next page, it looks like, I'm
19   assuming, that spills over under the property heading.
20   Would you agree with that?
21   A   (No response.)
22   Q   It seems like it carries over from 884 still under the
23   property heading.
24   A   Can you –- okay. Yes.
25   Q   So then it carries over and it's inactive on November

Page 57

1   19, 2013, active December 12, 2013, active December 16, 2013,
2   and inactive January 6 of '14; right?
3       A   Right.
4       Q   And there's another heading there that says "others."
5   Do you know what those entries are related to?
6       A   Those are all property information.
7       Q   Okay.  Do you know who would have been responsible for
8   making those entries?
9       A   That's -- that would be our Vendor Management Sys --
10  support team.
11      Q   Okay.  Let me show you this portion I just highlighted
12  and pulled out.  What is that entry relating?
13      A   First time vacant date, change from now to September
14  '13.
15      Q   2013?
16      A   2013.
17      Q   When was that change made?
18      A   I see they have this for 6/2/2016.
19      Q   By super user?
20      A   Yes.
21      Q   So two and half years after the first-time vacancy,
22  this change was made in the system?
23      A   That's what this record says -- states.
24      Q   This 6/2 of 2016, is after litigation is filed; right?
25      A   That's correct.

Page 58

1       Q   One of the allegations in the case is that the home
2   was never vacant; right?
3       A   That's what it's alleged to us.
4       Q   Where would this first-time vacancy show up -- just a
5   second.  Where would this first-time vacancy show up other than
6   in this entry that we were just looking at?
7       A   (No response.)
8       Q   In other words, where would we go in the actual VMS
9   records to see this entry in its normal place?  Would that be in
10  the -- the earlier pages we were looking at or some other entry?
11      A   No.  The same -- in the same area where -- the
12  property history.
13      Q   So if we went back up into, like, the first pages of
14  this exhibit, I guess it would be 877, we knew that was around
15  December of '13; right?  I said Dec -- it would have been around
16  October of '13; right?
17      A   (No response.)
18      Q   Looks like that first entry was October 9 of '13;
19  right?
20      A   Yes.
21      Q   And the first-time vacancy finding is a sort of a
22  significant mark in the timeline of property preservation;
23  right?
24      A   Correct.
25      Q   That's when certain services are triggered by virtue

Page 59

1   of the service agreement between Altisource and Ocwen; right?
2       A   That's correct.
3       Q   And, usually, when there's a first-time vacancy,
4   there's an order issued to secure the property within a certain
5   time frame; right?
6       A   Yes.  We issue an order with a due date.
7       Q   Okay.  Typically, how long is the due date from the
8   time of issuance of the order?
9       A   I can't recall what it was in 2013.  But you would
10  have that document, so it would actually give you that due date
11  on -- on this.
12      Q   That particular order; right?
13      A   Yeah.  That's right.
14      Q   The contractual provisions between Altisource and its
15  vendors, they typically require the vendor to acknowledge a
16  request for services within 24 hours; right?
17      A   That is correct.
18      Q   And unless the order or the request for services
19  expresses a different time, they typically expect the order to
20  be fulfilled within 24 hours of acceptance; right?
21      A   Not necessarily true.
22      Q   Unless there's another time stated in the order;
23  right?
24      A   Each order we issue has a 24-hour time line to accept
25  so that it doesn't expire in the system.  We expect that the

Page 60

1   vendor will acknowledge an order.
2       Q   What happens if an order is not acknowledged within 24
3   hours by a vendor?
4       A   Usually they expire and --
5       Q   Are there any --
6       A   -- then we have to re-issue again.
7       Q   Is there any actions taken against a vendor who
8   doesn't accept orders within 24 hours?
9       A   No.  We'll reach out to them to find out if there are
10  system issues.  It's usually if they don't accept it's because
11  of some system -- system issue that they may be having.
12      Q   Do you know if the contractual language between
13  Altisource and the vendors say that Altisource has the right to
14  cease sending orders to a vendor who doesn't accept them within
15  24 hours?
16          MR. RASP:  Object to form.
17          You can answer.
18          THE DEPONENT:  We -- I -- I believe the contract
19  between Altisource and our vendors dictates that we expect
20  for them to accept the order within 24 hours.  It doesn't
21  expect for them to complete the order within 24 hours.
22  BY MR. WOOTEN:
23      Q   All right.
24      A   Yes.
25      Q   Now, if my earlier question led you to believe that I

Page 61

1    was asking if they both accepted and completed --
2        A    Okay.
3        Q    -- within 24 hours --
4        A    Okay.
5        Q    -- I need to ask you a better question.
6        A    Okay.
7        Q    You know, I warned you that I might ask a bad
8    question.
9        A    Okay.
10       Q    So what I was saying is that typically Altisource
11   expects the order to be accepted within 24 hours.
12       A    Yes.
13       Q    And then either the order will contain a time to
14   complete the work --
15       A    That's right.
16       Q    -- or if it's silent, you would expect it to be done
17   within 24 hours -- another 24 hours?
18       A    I can't recall.  I don't know about being silent.
19   Usually our orders have a due date.
20       Q    Okay.
21       A    And if that vendor for whatever reason cannot complete
22   it by that due date, then they're -- they communicate back with
23   us, you know, a note in the system why they can't.
24       Q    All right.  And if they can't complete it timely,
25   what's the normal operating procedure there?  Is the time just

Page 62

1    extended or is it reassigned?
2        A    Well, it would obviously go into a late status.
3    Because that property is assigned to that vendor, so they're
4    responsible for all the work items that generates -- that we
5    generated on those -- that property.
6            Whether or not they can complete the work depending on
7    circumstances, that, they have to communicate back to us.  We
8    expect for them to communicate back to us.
9        Q    Okay.  Now, let's move from this document to -- I'm
10   going to move to the next one, which is going to be Bate's-
11   labeled Altisource 1001 and 1002.  And I will have marked that
12   as Exhibit 40 to your deposition.
13           (Exhibit No. 40 was marked for identification.)
14           And ask you if you recognize this document?
15       A    Well, my name is right there, so, yes.
16       Q    I thought you might have some familiarity with this
17   one.  What's the date of this document?
18       A    This was sent on Monday, January 13, 2014.
19       Q    Okay.  What is -- what's the subject of this
20   memorandum?
21       A    Trash-out, name change.
22       Q    What -- what was -- prior to January 13, 2014, what
23   was a trash-out?
24       A    Cleaning out the REO property.
25       Q    Okay.  So a trash-out would only deal with an REO

Page 63

1    property?
2        A    That's correct.
3        Q    Okay.  And that nomenclature was very specific to the
4    category of REO property?
5        A    That is correct.
6        Q    And that -- that nomenclature was not employed in the
7    context of pre-foreclosure properties?
8        A    No.
9        Q    Now, when you say a trash-out with respect -- you
10   know, when I'm doing this and we start talking, I know you know
11   the industry, and I've deposed enough people I kind of know some
12   things.  And I tend to forget that we're going to have an
13   audience that don't always know these abbreviations.  So let's
14   talk about what is an REO property.
15       A    Real-estate owned.
16       Q    And that means that the foreclosure process is
17   completed and the bank or the mortgage servicer as it may be, in
18   your case Ocwen, has become the owner of the property through
19   foreclosure; right?
20       A    That's correct.
21       Q    Okay.  And so they still have an obligation to
22   maintain the property; right?
23       A    Yes.
24       Q    So these -- these, what used to be called trash-out
25   orders would be entered once the property went into the bank's

Page 64

1    name?
2        A    Into the investor's name or -- yes.
3        Q    Or your client's name?
4        A    Or my client's, yeah.
5        Q    Right.  And so that would be when you would go get
6    everything out of the house, whatever was there, and it would
7    either go to the trash or to storage; right?
8        A    Well, there's a process.
9        Q    Right.  Tell us about that process.
10       A    It's all based on the state guideline.  So if a state
11   requires for us to post a notice in the RE -- while that
12   property is in the REO space, then that -- that notice must be
13   posted to allow time for, whether it be the owner or the
14   occupant, to remove those personal items.
15       Q    Now, and you're talking in that regards specifically
16   about personal items.
17       A    And specifically about REO properties, yes.
18       Q    Right.  Now, when I -- when I talk about the trash-out
19   order with respect REO property, it's not simply about personal
20   property; right?  It's about getting the property into shape to
21   be presented to be put on the market; right?
22       A    That is correct.
23       Q    So if there's a, you know, a broke-down car in the
24   backyard or, you know, tires, something like that, they're not
25   just going to go clean out the interior of the house; they're

Page 65

1  going to clean up the whole place and get it into marketing
2  shape; right?
3       A   That is correct.
4       Q   And that's the purpose of a trash-out?
5       A   That is correct.
6       Q   Okay.  And that -- like you said, it only comes up
7  when the property has transferred into the hands of your client.
8       A   That's correct.
9       Q   All right.  And I think if you look at this memo, you
10  would -- you would agree with me that the first paragraph is
11  discussing this; right?
12       A   That is correct.
13       Q   And so after this memo, at least Altisource's
14  nomenclature became clean-out instead of trash-out; right?
15       A   Right.
16       Q   And was it your decision to change the name, or did
17  that come from upstairs?
18       A   That came from our operations and com -- along with
19  our compliance team.
20       Q   Okay.  All right.  Now, the second paragraph says that
21  Altisource will use -- will continue to use the term "debris
22  removal" as the only acceptable language to define rotting or
23  deteriorating materials; right?
24       A   Correct.
25       Q   And then it talks about exterior debris.  And it says

Page 66

1  it can include, but is not limited to, upholstered furniture
2  where fabric is rotting due to rain and humidity exposure;
3  right?
4       A   Correct.
5       Q   Interior debris is generally considered food and
6  organic garbage left in refrigerators, freezers, and waste cans;
7  correct?
8       A   Yes.
9       Q   And then it says how some other items may be
10  considered debris if they have water damage or deterioration or
11  fungal growth; right?
12       A   Yes.
13       Q   The last sentence of that paragraph -- if my notices
14  would not come up right when I'm hitting something.  That's
15  good.
16          The last sentence of that paragraph I highlighted talks
17  about personal property; right?
18       A   Yes.
19       Q   And -- and it says "every attempt to protect personal
20  property from being removed to the landfill must be taken by the
21  vendor.  And questionable items may be stored in a pile in the
22  backyard if in doubt."  Right?
23       A   Yes.
24       Q   And was this change something that -- that Ocwen made
25  alone, or was this an industry change?

Page 67

1       A   This was not a change.  If you notice in the first,
2  Altisource will continue --
3       Q   Okay.
4       A   -- to use -- and then the language that follows.
5       Q   Okay.
6       A   So it was not a change.  This was always --
7       Q   You're just simply re-emphasizing the policy?
8       A   That's right.
9       Q   Okay.  So, then, underneath that there's a heading of
10  general reminders, REO and PFC; right?
11       A   Yes.
12       Q   PFC is terminology related to pre-foreclosure; right?
13       A   Correct.
14       Q   So the previous paragraph that began with a discussion
15  of debris removal, was addressing only pre-foreclosure property?
16       A   Altisource PFC; yes.
17       Q   Right.  All right.  Now, there's a two-point reminder
18  there.  The first one says "proper photo documentation must be
19  submitted as outlined in the respective vendor guides."  Right?
20       A   Yes.
21       Q   And then the second says "pay special attention to the
22  VMS instructions."  Right?
23       A   Correct.
24       Q   Now --
25          MR. WOOTEN:  By the way, if I'm killing anybody or

Page 68

1  somebody needs to take a break, speak up, because I will
2  absolutely get lost.
3          MR. MARTIN:  That -- that's fine.  I would mention I
4  did have lunch brought in.  So I'm assuming that lunch is
5  here.  So whenever there's a convenient time if we're
6  close --
7          MR. WOOTEN:  Let me -- let me finish this document.
8          MR. MARTIN:  Yeah.
9          MR. WOOTEN:  It's only two pages.  And we can take a
10  break and figure out where we are on that; all right?
11          MR. MARTIN:  Sure.
12  BY MR. WOOTEN:
13       Q   Now -- and I said it's two pages.  Actually, the
14  second page is just sort of the carry-over of your email; right?
15       A   Yes.
16       Q   Just sort of the ending page.  And this became sort of
17  the modified and updated policy from January 13, 2014, going
18  forward; right?
19       A   Yes.  And whenever I send a memo out, this is usually
20  up -- the vendor guides are updated and made available in our
21  vendor management document repository and become available to
22  the vendors as well.  So this is sent email.  We also have it
23  available in the system.
24       Q   All right.
25          MR. WOOTEN:  So with that said, let's take a brief

Page 69

1    moment and go off the record and see where we are on some
2    of these other issues.
3        THE VIDEOGRAPHER:  At approximately 12:19, we are off
4    the record.
5        At approximately 1:03, we are on the record.
6    BY MR. WOOTEN:
7        Q   All right.  Ms. McTaggart, we had just finished a
8    document before we went for a short break.
9        In summer and fall of 2013, where would concerns about
10   vendors removing personal property from pre-foreclosure homes
11   rank as a concern for Altisource?
12       A   Vendors -- I'm sorry.  Can you repeat?
13       Q   Sure.  I think I asked a question.  You know how I am.
14   I think I asked:  As far as the concern about vendors on the
15   ground taking personal property from pre-foreclosure homes,
16   where did that concern rank among Altisource's problems in
17   summer of 2013?
18       A   Where --
19       MR. MARTIN:  Object to form.
20       You can answer.
21       THE DEPONENT:  Okay.  Where it ranked?
22   BY MR. WOOTEN:
23       Q   Yeah.  Was it in the radar?  Was it a concern?  Was it
24   a non-factor?  Was it a major problem?  Do you have any idea?
25       A   Anything to do with the homes that were in our man --

Page 70

1    under our management was a concern, regardless if it was, you
2    know, a complaint about any personal items being removed or a
3    code officer calling us about the condition of the property.
4    We -- we were concerned about anything that related to any of
5    the properties.
6        Q   Okay.  Now, I'm talking specifically about the concern
7    of personal property being removed from pre-foreclosure homes.
8    Had -- was that itemized, ranked, categorized as a source of
9    liability or concern for Altisource in the summer of 2013?
10       MR. MARTIN:  Object to -- object to form.
11       You can answer.
12       THE DEPONENT:  We actually had a compliance team that
13   handled any complaints that came in.  So, yes, that was --
14       that a concern of ours, anything related to the
15       property.
16   BY MR. WOOTEN:
17       Q   Do you know if by the summer of 2013, if Altisource
18   that had ever been sued by a consumer where the consumer alleged
19   that Altisource sent a vendor to their property who removed
20   their personal property from a pre-foreclosure home?
21       A   Did you say summer of 2013?
22       Q   Yeah.
23       A   Not to my knowledge.  I think that would be a question
24   that I'd have to pose to our legal group.
25       Q   Okay.  You weren't aware of any litigation on those

Page 71

1    topics in the summer of 2013 time frame?
2        A   I'm not certain about any lawsuits.
3        Q   Let me go to the next exhibit and see if we can try to
4    move a little bit forward.  Do you recognize this document?  It
5    is, by the way, Altisource 103, 104, and 105, and it's Exhibit
6    41.
7        (Exhibit No. 41 was marked for identification.)
8        Are you familiar with this document at all?
9        A   It's -- it looks familiar, yes.
10       Q   Okay.  And do you know the subject of this document?
11       A   VMS updates, vendor updates.
12       Q   And what were these updates addressing?  Is that the
13   information that's on page 1004?
14       A   I'm sorry.
15       Q   And you know my rule:  If you need a break, other than
16   just finish the question on the table, we'll give you a break.
17       A   I'm --
18       Q   I'm not trying to torture you.
19       A   Okay.
20       Q   So -- but is page 1004 of this -- the second page of
21   this exhibit, is this discussing changes related to exterior
22   property inspections?
23       A   It -- it -- that's correct.
24       Q   Okay.  And -- and what is the purpose of this change?
25       A   Changes happen in the industry and -- or a request or

Page 72

1    requirement from our -- our clients.
2        Q   All right.  What is the change that's being made here
3    in January of 2014?
4        A   As stated, when an inspection vendor selects the
5    occupancy status of a property as vacant, they will see 18
6    additional questions which will be added and will have to be
7    answered by the vendor.
8        Q   And would those -- that all be done electronically by
9    the vendor?
10       A   Yes.  That would be completed in our Vendor Management
11   System.
12       Q   Okay.  Do you know if any of those 18 factors were
13   considered in either September, October 2013, and or the
14   December of 2013 inspections related to the Thakkar property?
15       A   I would actually have to look at the document and see
16   the -- I can't offhand recall the 18 questions that were added.
17   What was the date of this memo again?
18       A   This was January '14.
19       Q   Okay.
20       Q   So this -- this change would have occurred after --
21       A   Yes.
22       Q   -- those two entries onto Mr. Thakkar's premises?
23       A   Yes.  I mean that we were always, you know, enhancing
24   our products and updating the systems.
25       Q   Okay.  And there's three points here that are stated

Page 73

1    as the purpose of having these 18 questions; is that right?

2       A   Yes.

3       Q   They're numbered A, B, and C on this page?

4       A   Yes.

5       Q   What is number A?

6       A   Substantiating the claim that the property is indeed

7    vacant.

8       Q   Right.  And we talked a little bit about this in the

9    first go-round, but if -- if Altisource's vacancy inspection was

10   wrong, that's going to trigger a request for someone to come out

11   and secure the property; right?

12      In other words, if they find the property to be vacant when

13   it is actually not, the next vendor is going to be sent to go

14   and secure that property based on that first inspection; right?

15       A   So if a report is submitted as vacant -- an inspection

16   report is submitted as vacant, it generates orders to the

17   vendor, the preservation vendor.  It is a standard industry

18   practice for the -- that preservation vendor to do or perform

19   their due diligence to ensure that that property is vacant

20   before they, you know, secure it.

21      But if, in fact, they -- they enter the property and there

22   are any indications that there is property, we expect that they

23   exit the premises or the house, secure it, and to notify

24   their -- Altisource immediately.

25       Q   Okay.  What's the second reason listed there for

Page 74

1    making these changes?

2       A   Getting the vendor to perform a visual inspection

3    rather than a drive-by inspection.

4       Q   So when we talk about the difference between a visual

5    inspection and a drive-by inspection, is a visual inspection

6    where you would expect that the inspector would actually get out

7    of his or her car and actually check some of these particular

8    things that you are asking them to check with these 18

9    questions?  Like, actually verify whether the meters are working

10   or not, that type thing?

11       A   Yes.

12       Q   So the idea is --

13       A   Speak with the neighbors.

14       Q   The idea is to make them stop and take a few minutes

15   and actually look at the property in more than just a couple

16   seconds to pull up, take a picture, and drive away; right?

17       A   That's correct.

18       Q   Okay.  The last one, C, what is that one, please?

19       A   This change will bring more accuracy from inspections

20   and reduce the number of lawsuits and claims from borrowers.

21       Q   Okay.  So in January 2014, did Altisource have

22   concerns about the accuracy of vacancy inspections?

23       A   We always have concerns.  The vendors do the same.  I

24   mean, it's standard industry practice that you're concerned.

25   You want to make sure that whoever is going to that property, is

Page 75

1    reporting, you know, correctly back to -- to us.

2       Q   I know you didn't author this memo -- at least it

3    doesn't appear that you did.  Do you -- did you author this

4    memo?

5       A   No.

6       Q   No.  Do you know who did?

7       A   Memos will come from -- it's -- it's a combination of

8    the training group, the operations group, and it will come to

9    me.  And before I send it out, I'll, you know, make sure that if

10   there are any grammatical errors or anything like that, I --

11   I'll tweak it.

12       Q   Okay.  So you would have seen this at least in a draft

13   form before it went out as a final version?

14       A   Possibly.

15       Q   In January 2014, was Altisource concerned about the

16   number of lawsuits and claims that it was facing?

17       A   Item C indicated, you know, to get the redu -- the

18   reduction of the lawsuits pertaining to that, yeah.

19       Q   In January of 2014, in your capacity as an employee of

20   Altisource, did you have any idea about the number of lawsuits

21   or claims from borrowers related to improper vacancy

22   determinations or removal of personal property from pre-

23   foreclosure homes?

24       A   No, I did not.

25       Q   Okay.  Do you know of anyone who's not an attorney for

Page 76

1    Altisource who would have that information?

2       A   About the lawsuits?

3       A   About the number.

4       A   The number?  The number of lawsuits, I -- it would

5    have to be --

6       Q   Legal department?

7       A   That's right.

8       Q   Okay.  I think you may recall that we talked about the

9    fact that Altisource did an annual vendor summit each year.

10       A   Correct.

11       Q   And that was a place where Altisource would try to get

12   together with its vendors and see people face-to-face that they

13   may only talk to over the phone or by email most of the year and

14   provide some training and some entertaining, that type thing?

15       A   Yes.

16       Q   And typically, Altisource expected your vendors to

17   attend these events; correct?

18       A   All vendors are invited, yes.

19       Q   Okay.  Does -- do you know if Altisource keeps any

20   records on who attends and who doesn't attend these events in

21   their vendor network?

22       A   The last couple of years, I have maintained -- I have

23   kept that record.  Well, at least for the last year, but apart

24   from that, no.

25       Q   I'm going to show you Exhibit 42, which is Altisource

Page 77

1    1029 through 1041.
2        (Exhibit No. 42 was marked for identification.)
3        Have you ever seen this document before?
4        A   Yes, I have.
5        Q   Does this document appear to be a vendor compliance
6    presentation prepared by Cindy Dexter who was a senior counsel
7    for Altisource?
8        A   Correct.
9        Q   And was this presented to the vendors who attended the
10   vendor summit in June of 2013, in Austin, Texas?
11       A   Correct.
12       Q   Do you know if Baxol attended the June 2013, vendor
13   summit in Austin, Texas?
14       A   You had asked me this question before.  No.  The
15   answer is still no, I don't recall.
16       Q   Okay.  And what are -- and same for Green Group.  I'm
17   assuming you don't know either on that?
18       A   No.
19       Q   Okay.  And this was before you tracked attendance;
20   right?
21       A   That's right.
22       Q   Flipping from the cover page to page 130, there is a
23   slide prepared here that gives an overview of the presentation;
24   right?
25       A   Correct.

Page 78

1        Q   And someone chose a picture that says "Danger; thin
2    ice" with respect to this; right?
3        A   Correct.
4        Q   Was this kind of a "scare your vendors into paying
5    attention" presentation?
6        A   It's a compliance.  We want the vendors to be aware.
7    And it wasn't -- because I -- I attend all these conferences as
8    well.  It's not just -- it goes both ways, you know.  This is
9    Cindy -- this was Cindy's presentation, but the vendors all
10   participated with, you know, giving the feedback or knowledge,
11   share their knowledge.
12       Q   Okay.  So the first topic she had "order compliance."
13   It's on page 1031.  Let's look at what she had on this slide.
14   The first bullet point was to not perform work before receiving
15   an order except for special circumstances; right?
16       A   Yes.
17       Q   And if a vendor performs work without an order, does
18   Altisource pay for that work?
19       A   Not necessarily.  They have to show cause, as in the
20   case of a -- a slide.  If they -- if they went to the property
21   and found something that would create -- that was life -- a life
22   hazard or a code violation, prevent a code violation.
23       Q   Right.  So that would fall into those categories of
24   the certain things that the vendor guide says you should do if
25   you see it --

Page 79

1        A   Yeah.
2        Q   -- and we'll get straight on it later; right?
3        A   Yes.
4        Q   And that's to keep people safe and make sure nobody
5    who comes on the property is going to be harmed?
6        A   That's right.
7        Q   Or like, for instance, with an electrical problem, you
8    wouldn't want it to sit there and continue for fear that there
9    might be an electrical fire and burn the asset down, and that
10   wouldn't be good; right?
11       A   Correct.
12       Q   So -- but outside of those types of special
13   circumstances, if a vendor showed up and they were supposed to
14   winterize the house and they decided to cut the grass but they
15   had no order to, typically Altisource wouldn't pay them for
16   cutting the grass if they didn't have an order; right?
17       A   If it wasn't a pre-approved item, no, you could not --
18   you can't do it.
19       Q   Yeah.  They just couldn't sit out there and figure out
20   things to do to charge the investor for; right, or the -- your
21   client?
22       A   Oh, they can do it.  It's just that we don't approve
23   that -- that type of activity.
24       Q   Right.
25       A   Yeah.

Page 80

1        Q   So they're going to do what they've been sent to do.
2        A   They've been sent to do certain items.  That's what
3    we -- we send.  And if they find anything there that needs to be
4    done, then they notify us.
5        Q   Right.
6        A   And then we can determine whether or not they should
7    proceed.
8        Q   So in other words, if you -- if you go there for one
9    thing and you find two things that you think should be done, you
10   submit a bid.  And then Altisource will tell them whether the
11   bid is approved or not; right?
12       A   If -- yes, if it's not a pre-approved item.
13       Q   Okay.  All right.  The second thing she mentioned is
14   that work items must be completed in compliance with all
15   governing codes, laws, or ordinances; right?
16       A   That is correct.
17       Q   And in -- in Altisource's opinion, does this line item
18   mean that Altisource's vendors should only enter property if
19   they're allowed to do so under state law?
20       MR. MARTIN:  I would object to form.
21       MR. RASP:  Join.
22       THE DEPONENT:  Now that's --that is -- I want to make
23   sure I understand your question.
24   BY MR. WOOTEN:
25       Q   Right.

Page 81

1    A   Repeat for me.
2        MR. WOOTEN:  Can you repeat that?
3        (Read back as requested.)
4    BY MR. WOOTEN:
5        Q   Okay.  Let me just re-ask the question so we can go
6    from there.  In performing services that Altisource assigned,
7    including entry of a premises to secure it, they should be in
8    compliance with state law when they undertake any of those
9    actions; right?
10   A   Well, we expect that the vendors -- whatever activity
11   that we're performing on these properties, we -- we -- we're
12   ensuring that, not just the vendor, that Altisource is following
13   state laws.  Additionally, we expect that that vendor is, you
14   know, aware of any local ordinances or any state laws.
15       So in combination with what Altisource is doing, we expect
16   our vendors on the outside to make sure that what they're doing
17   or what we're sending them to do is according to meet, like,
18   local ordinance and state laws.
19   Q   Okay.  And -- and I think we may see this in a minute,
20   and I think this presentation mentions it:  Altisource relies on
21   vendors to have their knowledge of state law or local law
22   requirements for their activities; right?
23   A   That's correct.
24   Q   And does Altisource expect the vendors to notify
25   Altisource if the vendor believes Altisource's request would

Page 82

1    violate state law?
2    A   Yes.  Sometimes things change, and they're -- since
3    they're the boots on the ground, they would know more about it
4    before we do.
5    Q   Okay.
6    A   You know, they meet code officers and police officers
7    all the time.
8    Q   Right.  The next page says -- "Double Check Details" is
9    the title, and it indicates you should not perform work without
10   verifying the property address; right?
11   A   That's correct.
12   Q   Do you know if Altisource has ever had a case where a
13   vendor went and secured the wrong property?
14   A   Yes.
15   Q   That's happened before; right?
16   A   Yes.
17   Q   The next page, 1033, is titled "Local Expertise";
18   right?
19   A   Yes.
20   Q   And -- and this is, I think, kind of what I was
21   talking about earlier.  This is where you're wanting your
22   vendors to apprise Altisource if they are aware of a legal
23   requirement that they don't believe Altisource is complying
24   with; right?
25   A   Right.

Page 83

1    Q   The next slide is titled "Personal Property"; right?
2    A   Yes.
3    Q   What is the first bullet point on that slide say?
4    A   "Improper personal property disposition is the number
5    one cause of monetary claims for PPI."
6    Q   What does PPI stand for?
7    A   Property Preservation and Inspection.
8    Q   That's pre-foreclosure?
9    A   That's the business unit that --
10   Q   So that would handle pre-foreclosure and REO?
11   A   That's correct.
12   Q   And so in June of 2013, your colleague who is
13   presenting said that improper disposition of personal property
14   was the number one cause of monetary claims; right?
15   A   Correct.
16   Q   And PPI is the department that you work in; right?
17   A   That's correct.
18   Q   But you -- you were never part of any discussions with
19   leadership or management about this area being a problem and the
20   number one cause of monetary claims that you recall?
21   A   That was Cindy's --
22   Q   That's her bailiwick?
23   A   That's her -- yes.
24   Q   Okay.  So she was in charge of that?
25   A   That's correct.

Page 84

1    Q   But she never shared that with you before this
2    presentation?
3    A   I was busy doing everything else.
4    Q   Okay.  So do you know if you saw this presentation
5    then or not?
6    A   Yes, I've seen it.
7    Q   Okay.  Do you recall if you saw it at the time, or did
8    you see it getting ready for today?
9    A   No.  I saw -- I was at the -- the vendor summit as
10   well as, you know, we -- she -- we gathered as a group before we
11   went to the summit to review these presentations.  So I saw it
12   before.
13   Q   Okay.  And then the other thing I think is somewhat
14   significant on this page, especially for this particular
15   situation, the last bullet point there, what does it say?
16   A   "No personal property to be removed from PFC assets.
17   Debris removal only."
18   Q   And we talked about how Altisource distinguishes
19   debris from personal property dealing with the earlier exhibit;
20   right?
21   A   Correct.
22   Q   The next slide, it's 1035, it's titled "Debris Removal
23   versus Trash-out"; right?
24   A   Correct.
25   Q   Now, trash-out, was that language being used in 2013

Page 85

1  interchangeably with the initial secure debris removal, or was
2  it only being utilized with respect to REO properties at this
3  time frame?
4      A   Only REO.
5      Q   Okay.  So if a vendor is referring to the removal of
6  personal property in a pre-foreclosure context as trash-out,
7  that is -- that's not language that Altisource has approved or
8  instructed them to use?
9      A   No.
10     Q   And I noticed in this slide that the only mention of
11 personal property is in the REO -- REO context, and it -- it has
12 some conditions on removal of the property; right?
13     A   Correct.
14     Q   If these conditions are not met, what is Altisource
15 normally supposed to do with the personal property?
16     A   It's on a case-by-case basis.  Usually -- well, first
17 off, we have to follow state laws.  There are a couple states
18 that, while following state laws, we do remove personal
19 properties to storage.  But, again, the state dictates what is
20 done with these items.
21     Q   Do you know what the requirements are in Illinois?
22     A   Offhand, I -- I don't -- I don't recall what notice is
23 posted in Illinois.
24     Q   Do you know if the work orders provided by Altisource
25 to its vendors in a trash-out situation explain what, at least,

Page 86

1  Altisource understands Illinois' requirements to be?
2      A   The -- there are special instructions in each work --
3  work item.  Additionally, training is provided.  The vendor
4  guide is there.  We have a matrix available in the document
5  repository in the Vendor Management System.  So these are all
6  available to the vendors.
7      Q   Okay.  Let me show you the next page, 1036, it's
8  titled "Appearance and Conduct"; right?
9      A   Yes.
10     Q   Okay.  There's a -- under the first heading, there's
11 four bullet points.  The second one is "no illegal activity";
12 right?
13     A   Correct.
14     Q   The last heading, what does it say?
15     A   Appropriate language and --
16     Q   I'm sorry.  The --
17     A   I'm sorry.
18     Q   -- last of the --
19     A   Oh.
20     Q   -- big headings.
21     A   Okay.  "Altisource has a zero tolerance for unlawful
22 or unprofessional acts, discrimination, or misrepresenting
23 Altisource in the field."
24     Q   And would Altisource consider it unlawful to remove
25 personal property from a pre-foreclosure home?

Page 87

1      A   Yes.
2      Q   What would be the discipline for a vendor who had
3  done -- who had, in fact, removed personal property from a pre-
4  foreclosure home?
5      A   Again, it's all case-by-case.  It's on a case-by-case
6  basis.  And --
7      Q   Are you aware of whether Altisource has ever
8  terminated a vendor relationship for removing personal property
9  from a pre-foreclosure home?
10     A   Off the top of my head, I can't recall that.
11     Q   Okay.  You are typically the messenger when a vendor's
12 terminated in your current position, aren't you?
13     A   No.
14     Q   Okay.  Did you act as the messenger when Baxol's
15 relationship with Altisource was terminated?
16     A   No.  Terminations are handled by our Vendor Management
17 System -- I'm sorry; our Vendor Management Organization.
18     Q   So you typically have no role in determining whether
19 or not a vendor would be terminated?
20     A   Oh, I did not say that.  Oh, yes; definitely, I do.
21     Q   You just don't have the role of communicating the
22 decision?
23     A   And -- and sometimes -- it depends.  It's all on a
24 case-by-case basis.  And if our Vendor Management or -- or --
25 I'll refer to them as VMO.  If our VMO require assistance, I

Page 88

1  will get on a call with them with any vendor at any time.
2      Q   Okay.  The next page is titled "Accountability";
3  right?
4      A   Correct.
5      Q   First heading says "the vendor's responsible for
6  pulling background checks on all employees and subcontractors";
7  right?
8      A   Yes.
9      Q   How does Ocwen -- I'm sorry.  Strike that.  How does
10 Altisource verify that vendors actually perform these background
11 checks on their employees and subcontractors?
12     A   Are you asking about today or --
13     Q   Let's talk about the 2013 time frame.
14     A   In 2013 -- well, it's always by our vendor oversight,
15 which is part of our Vendor Management Organization.  But there
16 is a contract in place between us with -- between Altisource and
17 our vendors.  And that's dictated in the contract.
18        I do believe that in certain instances, a sample is
19 requested -- sample background checks are requested from the
20 vendor through -- the vendor oversight will request samples
21 during their audits.
22     Q   Okay.  So there's a sampling process during the
23 audits?
24     A   That was back in 2013, '14.
25     Q   Do you know how frequently vendors would be audited in

Page 89

1    that time frame?
2        A    I -- I believe that was yearly -- on a yearly basis.
3        Q    And when you say sample, do you know what percentage
4    of either employees or subcontractors of the vendor Altisource
5    would request records on?
6        A    No.  I do know that we perform background checks on
7    our vendors or the principals of the company.  But to the level
8    of employees and subcontractors, I don't know.
9        Q    All right.  The second heading here says "the vendor's
10   accountable for code violations and damage caused by vendors
11   late or incomplete orders"; right?
12       A    Correct.
13       Q    And the last one says "the vendor's accountable for
14   personal property claims caused by vendor error."
15       A    That's correct.
16       Q    Who decides whether the removal of personal property
17   is vendor error or an error in instructions by Altisource?
18       A    You'd need to be more specific in what -- are you
19   talking about pre-foreclosure, or are you talking about REO?
20       Q    Well, let's keep to pre-foreclosure --
21       A    Okay.  Yeah.
22       Q    -- for our purposes since that's our scenario.
23       A    Okay.
24       Q    And I think you would agree --
25       A    Yes.

Page 90

1        Q    -- that based on what you've testified, that pre-
2    foreclosure, there's never supposed to be personal property
3    removal.
4        A    Correct.
5        Q    So if -- if a vendor such as Baxol or their
6    subcontractor said we were ordered to go and take personal
7    property out of the home by Altisource, and Altisource says, no,
8    we didn't tell you to do that, forget me, forget my client,
9    forget the judicial system, how does Altisource and that vendor
10   normally work out that type of dispute among themselves?
11       A    Well --
12       MR. RASP:  Objection to form.
13       THE DEPONENT:  Okay.  Thank you.
14       MR. RASP:  Go ahead.
15       THE DEPONENT:  Well, based on the documents you have
16   reviewed so far, I'm -- I'm sure it's -- it's evident that
17   we don't condone or will not authorize removal of any
18   personal property from a pre-foreclosed home.
19   BY MR. WOOTEN:
20       Q    And -- and that being the case, do you have an opinion
21   as to why it was the number one problem for Altisource in the
22   summer of 2013?
23       MR. MARTIN:  Object to form; asked and answered
24   already.
25       MR. RASP:  Join.

Page 91

1        THE DEPONENT:  Again, allegations are always made.
2    Nine times out of ten, those -- there were no merits to the
3    claim.  And for those that we found merit, we addressed
4    with the claimant and the vendor.
5    BY MR. WOOTEN:
6        Q    Do you believe there's merit to Mr. Thakkar's claims
7    in this case?
8        MR. MARTIN:  Object to form.
9        MR. RASP:  Same objection.
10       MR. KARLSGODT:  Join.
11       THE DEPONENT:  That's a hard -- I -- I -- I'm not in a
12   position -- I think this is where you'll have to prove
13   that's -- that something was done here.  It's -- it's your
14   client and the vendor or the vendor's subcontractor.
15   Altisource was not at that property.
16   BY MR. WOOTEN:
17       Q    The vendors and vendors' subcontractors who went to
18   the property, were there work orders issued by Altisource?
19       A    Not to remove personal property; not at all.
20       Q    Did Altisource issue work orders to them to go to the
21   property?
22       A    Yes, we did.
23       Q    Let's look at the next page.  This is addressing
24   working on occupied properties; right?
25       A    Correct.

Page 92

1        Q    Okay.  And I -- I don't think there was any -- an
2    instance where we thought that someone from Altisource was
3    present at this property when someone named Thakkar was at the
4    property; right?
5        A    At no time was any employee of Altisource at this
6    property.
7        Q    As far as you know, no vendors of Altisource or
8    subcontractors of those vendors were present at the Thakkar
9    property when anyone was -- Mr. Thakkar or anyone else was
10   present?
11       A    It was reported to Altisource that the property was
12   vacant.
13       Q    And that -- that was based on an inspection that was
14   performed by Laudan; right?
15       A    That's correct.
16       Q    The next frame is Altisource 1039; right?
17       A    Yes.
18       Q    This document says "Mandatory Reporting of Suspected
19   Fraud"; right?
20       A    Yes.
21       Q    The last major heading there says that Altisource will
22   take appropriate action -- appropriate action against anyone
23   found having engaged in fraudulent or dishonest conduct,
24   including disciplinary action or civil or criminal prosecution
25   when warranted; right?

Page 93

1    A   Yes.
2    Q   And you would agree with me that removing personal
3    property from a pre-foreclosure home would be a criminal act?
4       MR. MARTIN:  Object to form.
5       MR. KARLSGODT:  Join.
6       MS. DEUTSCHLE:  Join.
7       MR. RASP:  Same objection.
8       THE DEPONENT:  Again, I -- I can only answer in the
9       form that at no time does -- have I ever known that
10      Altisource approved the removal of any property, personal
11      property from a pre-foreclosed home.
12   BY MR. WOOTEN:
13   Q   So if -- if you sent -- if Altisource issued a work
14   order to a vendor and requested services to be performed at a
15   pre-foreclosure home and did not request removal of personal
16   property and Altisource later learned that the vendor had, in
17   fact, removed personal property, would Altisource consider that
18   to be a dishonest act?
19   A   If it is confirmed.
20   Q   Okay.  Has Altisource's investigation made any
21   determination of whether they believe personal property was
22   removed by a vendor or subcontractor at Mr. Thakkar's home?
23   A   I'm sorry.  Repeat that.
24   Q   Has Altisource's investigation of the incident with
25   Mr. Thakkar determined whether Altisource believes that any

Page 94

1    vendor or subcontractor of a vendor for Altisource removed any
2    personal property from Mr. Thakkar's home?
3    A   Again, Altisource was not at the property.  And based
4    on my knowledge, I -- I -- I don't know if they have -- if
5    Altisource made such a decision -- or aware of that knowledge.
6    I think that's between your plaintiff and the party that was
7    present at the property.
8    Q   And the document we're looking at was presented to
9    Altisource vendors by an Altisource employee in June of 2013;
10   correct?
11   A   The document was presented at the vendor summit.
12   Q   Let me show you two clips I put together.  One is from
13   the first exhibit we looked at, page 876.  The other is from the
14   form that we were just looking at.  When the police department
15   investigated Mr. Thakkar's break-in under an active criminal
16   investigation, asked Altisource to provide the name of its
17   vendor who secured the property, did Altisource provide that
18   vendor's information to the police?
19      MR.MARTIN:  Object -- object to form; asked and
20      answered.
21      Subject to that . . .
22      THE DEPONENT:  We requested for the police officer to
23      provide a subpoenas -- a subpoena; in order for
24      us to release that information.  Subpoenas -- this would
25      have been handled through our legal department.

Page 95

1    BY MR. WOOTEN:
2    Q   Okay.  Does Altisource believe it's appropriate to
3    deny investigative information to active law enforcement
4    investigations related to the conduct of its vendors?
5    A   Absolutely not.
6    Q   Did Altisource ask the vendor if the vendor was
7    opposed to their information being provided to the police
8    department?
9    A   I -- I have no knowledge of Altisource asking the
10   vendor.  However, there's a contract in place.  And provisions
11   are made that in such an event, we would release the information
12   to the police provided, you know, they requested -- the
13   information is subpoenaed.  There is a process that is followed
14   and handled by our legal team.
15   Q   Do you know if anyone told the police where they
16   should send the subpoena to in this case?
17   A   I have seen email communication that I believe was
18   provided to you.  Yes; so the information was provided to the
19   police officer.
20   Q   This document came from page 875.  This was the last
21   communication noted by an Altisource employee with the
22   investigating officer under that ticket number; is that correct?
23   A   Yes.
24   Q   Do you know how many months had passed or how much
25   time had passed between the first request for Altisource's

Page 96

1    assistance in the investigation and this entry?
2    A   I believe it's all available in the case log here.
3    Q   So whatever those dates are?
4    A   Yes; that's correct.
5    Q   You don't dispute those; right?
6    A   No.
7    Q   Do you have any idea how much turnover exists among
8    vendors and subcontractors who perform this type of work?
9    A   No, I don't.  Off the top of my head, I don't.
10   Q   Okay.  Would you rely on the vendors and their
11   subcontractors to have better information about how high the
12   turnover is in this field of work than Altisource?
13   A   Again, Altisource's relationship is with the vendor,
14   not the subcontractors or employees of the vendor.  So we
15   don't -- I don't know the turnover of subcontractors.
16   Q   Okay.  Do you know if Altisource has taken any action
17   against anyone who provides pre-foreclosure or property
18   preservation services on the basis that they engaged in
19   fraudulent, dishonest, or criminal conduct?
20      MR. MARTIN:  Object to form; outside of the scope of
21      the deposition.
22      Subject to that, you can answer.
23      THE DEPONENT:  Did -- did you say similar to this
24      case?
25      ///////////////////////////////////

Page 97

BY MR. WOOTEN:
1   Q   What I said was if you knew whether Altisource had
2   ever taken any action against any vendor or subcontractor who
3   was providing pre-foreclosure property preservation services
4   where Altisource found the conduct to be fraudulent, dishonest,
5   or criminal?
6       MR. MARTIN:  Same objections.
7       THE DEPONENT:  Let me repeat myself:  Our relationship
8   is not with subcontractors.  So basically, we don't have
9   any direct line of communication with subcontractors.  Our
10  relationship is with the vendor, and I do know we have
11  released or terminated vendors based on performance issues
12  but . . .
13
14  BY MR. WOOTEN:
15  Q   Do you know if those performance issues dealt with the
16  vendor engaging in fraudulent, dishonest, or criminal activity?
17  A   I don't have that information handy.  I don't know.
18  Q   Do you know if Altisource maintains any records
19  regarding the reasons that they terminate their relationships
20  with any vendor?
21  A   That would be a Vendor Management Organization --
22  they would retain that information.
23  Q   So they would have it or not, you don't know?  Or you
24  know that they do have it?
25  A   Obviously, if we really -- really -- if we're

Page 98

1   terminating a vendor, they would have that.  They would have
2   that or, you know, make that notation to the vendor.
3   Q   Okay.  So there would have been some record as to why
4   they made their decision?
5   A   Yes.
6   Q   Do you know the person or group of people in the
7   Vendor Management Organization who would be involved in making
8   those decisions and maintaining those records?
9   A   Termination of a vendor is not just a vendor
10  management decision.  It involves operations.  It's a group of
11  people, a vendor review board, that make that decision.  And
12  it's carried out by the vendor management team.
13  Q   Are you part of the vendor review board?
14  A   Yes, I am.
15  Q   And how long have you been a part of that?
16  A   We created that -- that board a couple of years ago.
17  Q   Have you been on it from the outset?
18  A   Yes.
19  Q   Let me show you the next page of this slide -- I guess
20  the last page as well.  This is the summary regarding vendor
21  compliance; right?
22  A   Yes.
23  Q   The second heading says "local expertise; inform
24  Altisource of local requirements"; right?
25  A   Correct.

Page 99

1   Q   And that would include unique requirements of a
2   particular state that the vendor was aware of; right?
3   A   Local ordinance, state.
4   Q   Personal property, it says "protect yourself; take
5   good pictures."
6   A   Yes.
7   Q   "Accountability, responsible for your employees and
8   subs."
9   A   Yes.
10  Q   "Fraud, zero tolerance; report any suspected
11  fraudulent activity"; right?
12  A   Yes.
13  Q   Let me show you the next exhibit, Exhibit 43.
14  (Exhibit No. 43 was marked for identification.)
15  Have you seen this document before?
16  A   Yes.
17  Q   It's an email, appears to be from an Altisource
18  employee to other Altisource employees.
19  A   Yes.
20  Q   And it appears to involve Mr. Thakkar's property in
21  Naperville; right?
22  A   Correct.
23  Q   The email appears to track the language that we found
24  in the documents earlier today about property being current on
25  Real Servicing but still reflecting active on VMS; right?

Page 100

1   A   Correct.
2   Q   I mean, we don't have to check it word-for-word, but
3   that seems to be the thrust of this email; right?
4   A   Yes.
5   Q   So some notation, basically either identical or
6   similar to this effect, made it into the notes; right?
7   A   That's correct.
8   Q   Are these emails copied into the notes, or the
9   employees typically just type something similar into the notes
10  when they send these types of messages?
11  A   A case is created as you saw earlier, and then
12  comments are made there.
13  Q   Okay.  And I think if you look at the email, just
14  below that, which this employee appeared to be responding to, it
15  actually mentions the case number sort of down at the end;
16  right?  Which I can blow that up for you --
17  A   Yes.
18  Q   -- if you want me to.
19  A   Yes.
20  Q   All right.  And you were copied on this message, I
21  believe, as well, in the cc line?
22  A   Correct.
23  Q   Is that because it was an escalation?
24  A   Correct.
25  Q   All right.  Let's look at the next document, please.

Page 101

1   I'm going to slide it back to the top.  This as Exhibit 44.
2       (Exhibit No. 44 was marked for identification.)
3       And it covers page Altisource 7848 through 7853; correct?
4   A   Correct.
5   Q   Tell us what this document represents?
6   A   These are cases that — would you mind moving forward?
7   Q   Forward in time?
8   A   Yeah.  Yeah.  Let me see what's — let me take a quick
9   look at all the cases.  Okay.  These are cases that were
10  extracted from our system of records, the Vendor Management
11  System, and the ICAS Work System.
12      Our legal team worked with our vendor management support
13  team, and they -- from my understanding, is that this – this
14  took a lot of time, invested time.  They had to code a script in
15  order for them to extract the cases or search –– perform a
16  search, because I think this was in response to the cases in
17  Illinois.
18      This was specific to Illinois.  So they had to do searches
19  for –– in response to your request or the Court's order.  The
20  same was done with the ICAS Work, which is now our Claims
21  Inquiry System.
22  Q   Is that the system that came online in 2016?
23  A   It came about -- I think about -- it was in 2015.
24  Q   Okay.  All right.
25  A   Yes.

Page 102

1   Q   So let me show you:  I've highlighted the first entry
2   on this page from February 27 of 2013; right?
3   A   Yes.
4   Q   This indicates that one of the attorneys at Altisource
5   had gotten a call from a detective with the Chicago Police
6   Department; right?
7   A   Yes.
8   Q   And it was about a burglary at a consumer's home where
9   there was a claim that the bank that winterized the property
10  left a key inside the home as well as paperwork with the
11  attorney's name on it and things had been stolen, including a
12  shotgun; right?
13  A   Yes.
14  Q   Now, when these types of complaints came in, did
15  Altisource track these complaints to a determination of whether
16  they believed there were valid or not?
17  A   Yes.
18  Q   And where were those records kept relating to those
19  determinations?
20  A   In the — whether it be the Vendor Management System
21  or the ICAS Work.
22  Q   So it -- it would be trackable by the case number?
23  A   That is correct.
24  Q   Here's another from that first page.  I think it's the
25  third or fourth one down.  A caller complained that his property

Page 103

1   was vandalized, a door was kicked, money was missing, blinds on
2   the windows taken, water meter removed.  He said he left a
3   voicemail in PPI to a response of a vacancy letter.
4       No way from this document to tell how Ocwen determined
5   whether or not this complaint was valid; right?
6   A   Correction; Altisource.
7   Q   I –– you know what?  I knew I was going to do it.  I'm
8   sorry.  No way from the document we're looking at to tell the
9   ultimate decision Altisource made about whether this complaint
10  was valid or not; right?
11  A   Not looking at this.  But I — if I'm not mistaken,
12  you were provided the screenshots from the system.
13  Q   Okay.  The screenshots of the determination screens?
14  A   Yeah; from the status screen –– yeah, the status
15  screens.
16  Q   Okay.  Do you know if some or all of those pages are
17  redacted?  Have you seen those documents in production?
18  A   I have seen some.
19  Q   Do you know if they're redacted or otherwise illegible
20  or hidden?
21  A   Can you share them with me?
22  Q   I think we'll see at least one or two of them before
23  the day gets gone, but I just didn't know if you had looked
24  through what was produced to see what was redacted and what
25  wasn't redacted.

Page 104

1   A   I've looked through some of them.
2   Q   The screenshots?
3   A   The screenshots; yes.  And don't forget that I'm
4   familiar, you know, with the system, so I can look at it there
5   as well, so.
6   Q   Right.
7   A   Yeah.
8   Q   So the information that's in those screenshots would
9   be available to pretty much anybody who worked for Altisource
10  and PPI?
11  A   Not everybody; it would be the people that's with the
12  business unit and our attorneys.
13  Q   How many people are with the business unit?
14  A   Several hundred.
15  Q   Are they all management people, or are they sort of
16  workers on the line?
17  A   A combination.
18  Q   Okay.  The information regarding those determinations
19  of these complaints, is that information shielded or hidden in
20  any way from the general employee population at Ocwen?
21  A   Not Ocwen; Altisource.
22  Q   You know what?  I need to go take a nap.  Are those
23  complaints viewable by Altisource employees, those
24  determinations regarding these complaints?
25  A   Let's be specific.

Page 105

1    Q   Okay.
2    A   Altisource is too broad.  The property preservation
3  and inspection team would be able to see.
4    Q   And you said that was several hundred people?
5    A   Yes.  Yes.
6    Q   Okay.  Does Altisource keep track of what vendors are
7  involved in these complaints or what subcontractors are involved
8  in these complaints through their vendors?
9    A   We keep a record of these cases, so we can always go
10  back and see.  And if we find that there's a vendor with issues,
11  that would be cause -- cause for termination; performance
12  issues, that would be cause for determination.  Therefore, we
13  would have record of that as well.
14    Q   How many times would complaints have to be lodged
15  about a vendor removing consumer property or personal property
16  from a pre-foreclosure home before Altisource would take action
17  to terminate the vendor?
18    A   Again, nine times out of ten, they are just baseless
19  allegations.  You know, we --
20    Q   Let me limit it to valid allegations.
21    A   Valid allegations --
22    Q   How -- how many times before Altisource would
23  terminate the vendor?
24    A   Well, again, it's case-by-case.  Depending on the
25  outcome of our investigation and depending on how the vendor

Page 106

1  responds to the claim, we address the claim together as a group.
2  The vendor will take responsibility.  And if there is a
3  subcontractor issue, obviously he's going to -- he or she would
4  terminate that subcontractor.
5    Q   Let me show you page 7849.  We pulled out the fourth
6  complaint there.
7    A   Can you -- can I just --
8    Q   Yeah.
9    A   The fourth complaint?
10    Q   Yeah.  So I'll drop it --
11    A   Okay.
12    Q   -- in just a second.  But I wanted you to see the that
13  the allegation here is that the property was secured, personal
14  belongings were missing: flat screen TV, five pairs of brand new
15  Michael Jordan shoes, clothes, there's stuff on the bed, been to
16  closet and paperwork's all over the place, caller mentioned
17  people who just came and took what they want.
18    Caller also wants to get the vendor's contractor's info;
19  right?
20    A   Correct.
21    Q   Okay.  And this is -- looks like it was a 3/1/2014
22  complaint from a Mr. Davis in Bolingbrook, Illinois; right?
23    A   Yes.
24    Q   Okay.  Do you know the outcome of this investigation
25  from Altisource's perspective as to whether this was a valid

Page 107

1  complaint or not?
2    A   There are a few of these claims that I know they
3  were -- well, they were closed because they -- these were --
4  some of these were baseless allegations.  Some of these cases on
5  here were just access issues.  Those were closed as well.  I
6  recall a couple of them where, after they made the claim, we
7  made numerous attempts to contact them through phone and emails
8  and they never responded to us.
9    Q   With respect to Mr. Davis's claim here, do you know if
10  a determination was made about the validity of his claim?
11    A   I don't recall offhand with this -- with his claim.
12    Q   Okay.  All right.  Let me move on to the next exhibit
13  then.  I'll show you what I've marked as Exhibit 45, which is
14  Document 7854.
15    (Exhibit No. 45 was marked for identification.)
16    A   Yes.
17    Q   Do you recognize this document?
18    A   Yes.
19    Q   Is this the screenshot that you were describing?
20    A   Yes.
21    Q   Okay.  Is there a redaction at the bottom of this
22  screenshot?
23    A   Yes.
24    Q   Okay.  And what is redacted there?  If -- if this
25  matter --

Page 108

1    A   Those are the comments.
2    Q   -- was not a litigated matter and this was just a file
3  you're reviewing, if you're sitting at your computer, you would
4  not see this redaction; right?
5    A   No.
6    Q   And no employee in your department would see this
7  redaction?
8    A   No.  If they have access to -- and I want to re --
9  correct something I said about the several hundred employees
10  within -- not all employees within the group have access to all
11  the information.  They have access to -- because, for instance,
12  you have the pre-foreclosure team.  And you have -- they would
13  have access to theirs.
14    And you have the REO team.  They have access to theirs.
15  You have a team that handles a specific client.  They have
16  access to their things.  So not everybody have access to certain
17  things.  So if this is a pre-foreclosure property, the pre-
18  foreclosure operations team and the compliance team would have
19  access to that.
20    Q   And what I'm getting at is:  If you were at work and
21  at a computer station, you would not see any -- any of this
22  information blocked; right?
23    A   No, I wouldn't.
24    Q   And no one with appropriate access would see any of it
25  blocked?

Page 109

1    A   No.
2    Q   Okay.  And -- and I'm not even going to ask you to
3  comment on a specific case, but, just generally, what type of
4  information is in this area in this screen?
5    A   Those are comments.
6    Q   Is that typically where you would see the results of
7  Altisource's reviewing of an investigation of a complaint?
8    A   This particular screenshot is from the Vendor
9  Management System.
10   Q   Uh-huh.
11   A   So, yes, you would see a comment there.  And you'd
12 also see the status there as well.
13   Q   Okay.  So status being --
14   A   Closed, opened.
15   Q   -- open or closed with respect to the case?
16   A   That's right.
17   Q   Not with respect to whether it was active or inactive
18 on the system; right?
19   A   Correct.
20   Q   Now, this is -- this document actually is the
21 screenshot from Mr. Thakkar's file.  If you look up at the top,
22 and it's kind of hard to see, but it's the 311 Danbury Drive,
23 Naperville address in the first box.
24   A   Would you mind scrolling down for me?
25   Q   Yeah.  And if you look at "issue identified by" --

Page 110

1  it's hard to make out the quality of this copy.  It's not good.
2  But it -- it --
3    A   So I can't see what you seeing because it's too large
4  on my screen.
5    Q   Oh, it's too large?
6    A   Yeah.
7    Q   Okay.  Well, don't let me do that then.  Let me just
8  clear that off.  Can you see it better now?
9    A   No.  I can't see the case.  I can't see anything about
10 the case.
11   Q   All right.  And -- so you're looking at the top of the
12 page; right?
13   A   Yeah.  I don't -- I see as far up as -- okay.  Now I
14 see it.
15   Q   Well, it helps if I mash the right button.
16   A   Yeah.
17   Q   That's not your fault.  That's operator error.  So are
18 you able to tell that involves my client's property?
19   A   Yes; 311 Danbury.
20   Q   Now, it seems like in the middle of that section where
21 it says case description, all that print is very faint and very
22 hard to read.  What is typically in the field that says case
23 description?
24   A   Usually the conversation.
25   Q   Okay.  So that would be the complaint --

Page 111

1    A   Yes.
2    Q   -- originally made by the consumer?
3    A   Yes.
4    Q   Okay.  And then the part that's redacted here would
5  typically be the part where you detailed your findings based on
6  your investigation?
7    A   Communication.
8    Q   Right.  So it would -- normally it would note whatever
9  steps you had taken to the point in time that this was created?
10   A   That's correct.
11   Q   Okay.
12   A   Excuse me.
13   Q   If you -- remember, don't let me torture you.  If you
14 need a break or something let me know.
15      Exhibit 46 is Altisource 7962, 7963.
16      (Exhibit No. 46 was marked for identification.
17      And I'm about to show that document to you.  Now, I just
18 grabbed one of these out of the stack that was presented, but do
19 you recognize this document as a -- the form letter that's
20 mailed when a property inspection finds that they believe the
21 property is vacant?
22   A   Correct.
23   Q   And this is what we -- I think we talked about the
24 first go-round, the 15-day letter; right?
25   A   Yes.

Page 112

1    Q   Okay.  And so once Ocwen mails this letter, Ocwen --
2  I'm sorry.  Let me back right up again.  Ocwen's name is on the
3  letterhead here?
4    A   That's correct.
5    Q   But this is a letter sent by Altisource?
6    A   This is sent from -- by Ocwen.
7    Q   Okay.
8    A   Yeah; from Ocwen's system.
9    Q   Right.  It comes from Ocwen's system, but Altisource
10 has to trigger the letter or request for the letter based on the
11 inspection; right?
12   A   On the inspection, yes.
13   Q   Okay.  So once the request is triggered, then Ocwen
14 will then send this letter, and the borrower should communicate
15 with Ocwen; right?
16   A   That's correct.
17   Q   And at this point, before there's been a vacancy
18 determination that's final, the borrower would most likely have
19 never heard of Altisource; right?  They would have been dealing
20 with Ocwen.
21   A   That's correct.
22   Q   Okay.  Now, do you know how responses to these letters
23 are tracked by Ocwen and the results delivered back to
24 Altisource?
25   A   The second page is mailed back and those are -- that

Page 113

1    they -- the PO Box that's on there, they come in to the mail
2    room, and those are scanned and sent over to the pre-foreclosure
3    group.
4        Q    Okay.  So the pre-foreclosure group would be a -- that
5    would be an Altisource group?
6        A    That's an Altisource group.  Likewise, Ocwen, when
7    they receive these letters, too, they will update their system.
8        Q    Okay.  Correct.  And I'm -- I think you mentioned that
9    the first time --
10       A    Yes.
11       Q    -- we talked about this process.  Let me just publish
12   a document that's marked as Exhibit 47.
13       (Exhibit No. 47 was marked for identification.)
14       It is Altisource Document 8086 through 808 -- 8099.
15       And I think you mentioned this document earlier.  Do
16   you -- do you recognize this -- this document?
17       A    Yes.
18       Q    And explain for us what this is.
19       A    So this is -- this document is a screenshot from the
20   I -- the ICAS Work system.
21       Q    The new system?
22       A    The new system.
23       Q    And this is the one you mentioned you thought came
24   online in 2015; right?
25       A    Yes.

Page 114

1        Q    Okay.  And did you have the same difficulties finding
2    records about these types of complaints with the new system as
3    the old?
4        A    This -- the ICAS Work is -- have different statuses.
5    But in regards to finding cases with the same issue as in your
6    plaintiff's -- you -- your case, yes.  My understanding is
7    it -- they had to do a script and it took time to compile these.
8        Q    Okay.  And is it fair to say -- and I think I pulled
9    all these together that -- that had been turned over to us from
10   this system, but I -- I'm just going to take a second to flip
11   through them.
12       It looks like the first two pages deal with a property in
13   Dolton, Illinois.  Then the next four pages beginning at 8089
14   deal with a property in Sauk Village, Illinois; right?
15       A    Correct.
16       Q    And then the next document deals with a property in
17   Rockford, Illinois, and that is a three-page document; right?
18       A    Yes.
19       Q    And then there is a two-page dealing with a property
20   on West Rye Street (ph.) in Chicago; right?
21       A    Yes.
22       Q    And that is the complaints there that were located
23   through this system; right?
24       A    That is correct.
25       Q    Now, let's look back at the complaint that begins on

Page 115

1    8089 for a property in Sauk Village.  What is the date of that
2    case being closed?
3        A    9/16/2016.
4        Q    I think at the bottom of that page there's a box
5    that's 9/14 of '16, where a Cedric Phillips wrote that he had
6    tried to reach the complainant multiple times and there was no
7    response, left a voice mail.  And it says "as we have done only
8    securing on the property based on a report provided by the
9    vendor, not performed any other preservation, seeking approval
10   to close the case as PPI and vendor have followed the process."
11       Did I read that correctly?
12       A    Yes.
13       Q    So it appears that this complaint was closed because
14   there was no contact from the person that made the complaint;
15   right?
16       A    That is correct.
17       Q    Second page of this document on 9/8/16 says "Mr.
18   Phillips wrote and received response from the vendor.  And they
19   had attached supporting photos of the installation of a knob
20   lock"; right?
21       A    (No response.)
22       Q    And is that correct?
23       A    Yes.  That's --
24       Q    The second paragraph says "unfortunately, upon arrival
25   to the property, there were no signs of the home being occupied

Page 116

1    on the exterior of the home; therefore, our vendor had proceeded
2    with securing.  Per our vendor, nothing had been removed from
3    the property, as upon securing, the alarm system had went off
4    and the police had shown up and stated the home is indeed
5    occupied.  We advised our vendor to no longer proceed with
6    work."  Right?
7        A    Yes.
8        Q    If you look down at the next page, three of four,
9    there's an entry on 9/6 of '16, again by Mr. Phillips, said
10   there was a termination.  "The property was reportedly vacant
11   with no personals in August of 2016."  Right?
12       A    Yes.
13       Q    "There was a debris removal order canceled on 8/25 of
14   2016 because the owner came back saying he was maintaining the
15   property and had been out for a vacation."
16       A    Yes.
17       Q    "There was a securing order issued on 8/22 and
18   completed on 8/23 of '16."  Right?
19       A    Yes.
20       Q    Says "there was a 'move personal property' order; it
21   was canceled on 8/25/16."  Is that right?
22       A    That's right.
23       Q    What is the difference between a move personal
24   property order and an initial debris removal order?
25       A    So the personal properties, if it's scattered around

Page 117

1    the yard, they can move it into a pile in the backyard.  Well,
2    you saw the explanation of debris.  We don't term personals as
3    debris.  So that's your distinction.
4         Q   So to move personal property, your understanding of
5    that order would be to just get it into a location in the back
6    of the property and secure it?
7         A   In the back of the property.  Anything that is -- that
8    may cause code violations or, you know, damage to the property
9    or a neighboring property, then we try to get it into a secure
10   location.
11        Q   All right.  That's -- that's -- moving personal
12   property there does not indicate taking personal property from
13   inside the home and taking it away from the property?
14        A   No.
15        Q   I'm going to show you the next exhibit.  It's
16   Altisource 8162 through 8164.  And it's number Exhibit 48.
17        (Exhibit No. 48 was marked for identification.)
18        You're able to see this document?
19        A   Yes.
20        Q   Okay.  Now, this document's got a case number
21   mentioned in the email; right?
22        A   That's correct.
23        Q   And you can go back to, based on the dates, the
24   earlier exhibit that defined that same case number; right?
25        A   Right.

Page 118

1         Q   Now, I think we can probably tell which one it is
2    because it talks about a flat screen TV and five pairs of brand
3    new Michael Jordan shoes; right?
4         A   Correct.
5         Q   And this is an Altisource employee writing to another
6    Altisource employee indicating that the consumer had said that
7    he came home and found personal belongings had been taken
8    including a flat screen TV, five pairs of brand new Michael
9    Jordan shoes, clothes, and stuff on the bed, and they'd been to
10   the closet and the paperwork.  And this is a request for
11   information from the vendor; right?
12        A   Yes.
13        Q   The next page of this exhibit, Altisource 8163, is
14   from someone at Baxol Properties sent Tuesday, March 4, 2014,
15   regarding a property in Bolingbrook; right?
16        A   Yes.
17        Q   Now, the email body says "we reviewed this matter with
18   our contractor and we see -- and see we were there for the
19   initial inspection on December 10.  A flat screen TV and also
20   apparel that could possibly Michael Jordan brand but cannot tell
21   from the pictures as well as personal items on the bed can be
22   seen in the photos.  We visited twice after, once to remove
23   hazards, and lists those, and once for an exterior snow removal.
24   Upon both visits the property was found secure.  We have not
25   been back since December 17.  No personal property was removed."

Page 119

1    Right?
2         A   Yes.
3         Q   Now, here, according to this report, there are
4    pictures that indicated that the property the consumer claimed
5    was gone could be seen in the pictures that were taken by
6    Baxol's contractor; right?
7         A   Right.
8         Q   Now, the email that we just looked at from Amy --
9    looks like from Amy Johnson at Baxol, is it responding to the
10   email below it from the Altisource employee?
11        A   Yes.
12        Q   After Baxol indicated that they could see the property
13   in their pictures that the consumer claimed was missing but
14   denied removing the property, what was Altisource's decision
15   with respect to the consumer's complaint?
16        A   Generally, we would have gone back and communicated
17   the same to the claimant.  And in some cases -- not in this
18   case, because I'm not sure what occurred here, but in gen --
19   generally speaking, sometimes they will -- the claimant will say
20   well, I'm not happy with your decision, but I can't prove it,
21   or -- and that will -- they go away.  You know, it's resolved.
22        Q   When you say resolved, do you mean resolved by the
23   consumer not pursuing the claim, or do you mean resolved by
24   something else?
25        A   Resolved by the consumer not -- we'll ask for more

Page 120

1    information.  We'll ask for witnesses.  We'll ask for a police
2    report.  We don't just close a case based on the vendor saying
3    that, you know, we didn't take it.
4         We usually require certain information or request certain
5    information from the claimant.  And if they can't produce it, I
6    mean, you know, it's their word against the subcontractor's
7    word.  And usually if -- if a subcontractor is going to --
8    provides the photographs, I mean -- and you tell them that it's
9    in the photos; you can see it, I mean, sometimes those are hard
10   to prove.
11        Q   What do you mean they are hard to prove?  When you can
12   see the consumer's property that is now claimed to have been
13   stolen in the photos?
14        A   Yes.  It's a claim.  It's an allegation and we want to
15   help that claimant.  So if someone steals my property,
16   obviously, the first thing I am going to do is file a police
17   report.  I'm going to pursue it.  And we do have those who
18   pursue it.  You know, they file their police report and -- and
19   get the police involved.
20        Q   When you see property in photos -- let me kind of back
21   up a little.  I think I need to kind of lay more of a predicate
22   to this so that people hearing this will understand it better.
23        I don't know that we've talked about this in particular:
24   When someone is ordered to make an initial secure of the
25   property after a first-time vacancy determination, they're

Page 121

1  supposed to go in and take pictures of the property and upload
2  them through an app on a Smartphone directly to PPW so it can be
3  loaded to Altisource; right?
4      A   Not necessarily.  I mean it depends on the vendor and
5  the system that they're using.
6      Q   But all these vendors now have Smartphone apps that
7  show you how long they're onsite, and they're supposed to take
8  pictures from their phone and upload them to the website; right?
9      A   Yes.  But it doesn't -- it's not specific to property
10  preservation website.  Yeah.
11     Q   Well, no.  I -- I didn't say that it was.
12     A   Okay.
13     Q   But I'm saying that Altisource has implemented this
14  regime where vendors and any vendors they hire or subcontractors
15  are supposed to be using these apps that tell everyone they have
16  to log into the property, they have to take pictures, and then
17  they have to log out of the property when they leave; right?
18     A   We do have a requirement that they have to use Aspen
19  Grove in order to check in when they go to these properties.
20  Though, I was made to understand that some of these companies
21  like PPW or Property Preservation Wizard do have that service --
22     Q   Built in?
23     A   Yeah, built in to theirs as well.
24     Q   Right.  And -- and -- but irrespective of whether it's
25  Aspen Grove or another acceptable vendor, this has been a

Page 122

1  standard in this industry for a while now that vendors who go to
2  a property are supposed to check in electronically.  They're
3  "GO" located.  In other words, they're tagged geographically in
4  a spot; right?
5      A   Correct.
6      Q   And if it's not the right spot, you don't authorize
7  the work or the payment; right?
8      A   Correct.
9      Q   And then they're supposed to do whatever they're sent
10  there to do.  And then, when they're ready to go, they have to
11  check out of the app with respect to that property; right?
12     A   That's my understanding, yes.
13     Q   And while they're there, they're always supposed to
14  take before, during, and after photos of what they do; right?
15     A   Correct.
16     Q   Do you know if Altisource is -- shares with consumers'
17  complaints that Altisource actually has pictures from the
18  vendor's trip to the property and can review those pictures?
19     A   Are you speaking to overall, or are you speaking
20  specific to your case?
21     Q   Well, for instance, this case we were just looking at,
22  you had someone who described property that was taken that the
23  vendor says appears to be shown in the photos.  Does anyone from
24  Altisource notify the consumer that it appears you can see this
25  property in the photos when the vendor was present on the

Page 123

1  property?
2      A   Generally speaking, if you're talking, you can say,
3  yes, we saw it there, and the vendor confirmed that they never
4  removed it, that they left it there.
5      Q   And does Altisource provide photographic proof to the
6  consumers who make these complaints that they have pictures
7  showing the property's still there?
8      A   No, we don't.  That's proprietary.  We don't share
9  that without a --
10     Q   Do you make it known that Altisource has pictures
11  before, during, and after the work that was performed?
12     A   Not to that extent.  I mean, not to my knowledge.
13     MR. MARTIN:  Nick, whenever you're done with this
14     document, why don't we take five minutes?
15     MR. WOOTEN:  Yeah.  Give me just a second.  Are
16     we –- were we on 48?  Is that where we were finishing up?
17     Because I think I had slid past it.  Yeah, we were on 48.
18     This is a good time to stop.
19     THE VIDEOGRAPHER:  At approximately 2:27, we are off
20     the record.
21     At approximately 2:43, we are on the record.
22  BY MR. WOOTEN:
23     Q   All right.  I'll show you the next exhibit.  It's
24  marked as Exhibit 49.
25     (Exhibit No. 49 was marked for identification.)

Page 124

1      It's Altisource 8212 through 8214.  Do you recognize this
2  document?  And the first page appears to be an email responding
3  to someone who's employed by Altisource from an employee at
4  Baxol; is that correct?
5      A   Yes.  The email is from -- the first email on top,
6  October 7, is from Baxol, Kristen at PCR.
7      Q   All right.  And if we go down a little bit further,
8  starting at the bottom of the second page is the email from the
9  Altisource employee to Baxol; right?
10     A   That is correct.
11     Q   And this is regarding a complaint for removing
12  property, personal property, from the home; right?
13     A   Yes.
14     Q   So this request was sent out on September 18 of 2014.
15  There was an acknowledgment, said there was an investigation on
16  September 19, 2014, the middle of the page 8213.  And then there
17  was the response on October 7 at 1:59 p.m.; right?
18     A   Yes.
19     Q   And in the response, Baxol says that their bid was
20  based off the initial yard debris.  And they cite to a work
21  order; right?
22     A   Yes.
23     Q   And it says "everything was determined to be debris
24  due to the condition the items were found in.  Pictures were
25  uploaded into VMS with our proposal."  Right?

Page 125

```
1        A   Yes.
2        Q   So that means they went to the property, saw things
3   that needed to be done, and made a proposal to Altisource;
4   right?
5        A   Correct.
6        Q   Her next paragraph says "approval was issued" and it
7   references a work order; right?
8        A   Yes.
9        Q   And the approval was for a bid placed for 15 cubic
10  yards of exterior debris and 30 cubic yards of interior debris;
11  right?
12       A   Yes.
13       Q   Did we talk about a cubic yard the first go-round?
14       A   I don't recall.
15       Q   Okay.  I -- I've heard some people in this case
16  describe that as being -- a cubic yard as being about the size
17  of a washer or a dryer.  Would you agree with that?
18       A   Yes.
19       Q   Okay.  So this says there was an approval issued for
20  the removal of the equivalent of 30 washers or dryers from the
21  interior of this home.
22       A   Yes.  That's what that says.
23       Q   Okay.  And it says "no questions were asked from
24  Altisource, and neither of the work orders were placed into
25  pending corrections.  We completed the approved work order based
```

Page 126

```
1   off the scope of work we submitted."  Did I read all that
2   correctly?
3        A   Yes.
4        Q   And it talks about another work order being issued as
5   a hazard removal proposal, and they requested it be canceled due
6   to all the debris already being removed.
7        A   Yes.
8        Q   And she ends by saying "again, the work order was not
9   in question or found in pending corrections and was canceled."
10  Did I read that correct?
11       A   Yes.
12       Q   Do you know if there was any response to this email by
13  anyone from Altisource?
14       A   Is there a case number on this?
15       Q   I don't believe I see one in the heading.  I'll see if
16  I can pull it up.
17       A   No, not in the heading.  Can you go back to the
18  initial email?
19       Q   I don't believe that I see one.  Do you see one?
20       A   No.
21       Q   I do see something listed as a personal property
22  claim.  What's the difference between a personal property claim
23  and a case?
24       A   Usually a case can be raised for an access issue,
25  personal property claim.
```

Page 127

```
1        Q   This has sort of a different numbering scheme than
2   some of the case numbers that we were seeing earlier; right?
3        A   That's a property ID.
4        Q   Okay.  So that would be, like, the loan number or
5   something?
6        A   Yes.
7        Q   Okay.  Would there not typically be a case number
8   opened when an email like this was sent by someone from
9   Altisource?
10       A   Typically if there's a claim, yes, a case is opened.
11       Q   All right.  The next document's marked as Exhibit 50.
12          (Exhibit No. 50 was marked for identification.)
13          It's Altisource 8250 to 8251.  Have you seen this document
14  before?
15       A   It's not up.  It's not available yet.
16       Q   You're right.
17       A   Okay.
18       Q   Operator error again.  Do you recognize this as a
19  police report from Marseilles Illinois Police Department?
20       A   Yes.  Yes.
21       Q   And there's a second page to it that appears to have
22  information about the report; right?
23       A   Yes.
24       Q   Now, the allegation in this police report is that the
25  consumer went to the home on 1/20/2014 for an inspection and had
```

Page 128

```
1   a computer in the basement.  Altisource also went to the
2   property on 1/20.  And when she returned on 1/21, the computer
3   was gone; right?
4        A   Yes.
5        Q   Okay.  Did Altisource investigate this complaint?
6        A   Yes.  I believe this is on -- on the complaints that
7   were provided to you, the cases, yes.
8        Q   This indicates that she spoke with Ocwen and they
9   advised her to speak to Altisource; right?
10       A   Yes.
11       Q   And this one says that Altisource decided to close her
12  case until she produced a police report; right?
13       A   Are you looking at the -- yes.  I believe we followed
14  up with the police in this case --
15       Q   Okay.
16       A   -- several months later and she never filed a -- a
17  report.
18       Q   Is this not a police report?
19       A   Or -- I'm sorry.  She never followed through with the
20  police on this report.  And they had closed the investigation on
21  their end.
22       Q   She also stated that Altisource would not give her any
23  information regarding who was contracted to work at her house on
24  January 21, 2014; right?
25       A   That's what the document states, yes.
```

Page 129

1     Q   Now, this consumer went to the police department and
2 filed a report. This report obviously made it into Altisource's
3 hands; right?
4     A   Correct.
5     Q   So once the report was received, did Altisource at
6 that point provide any information to either this police
7 department or this consumer about which contractor went to this
8 property?
9     A   I believe, based on the review of the cases that were
10 provided to you, that there were communication between
11 Altisource and the police. I don't know what information was
12 shared.
13     Q   Didn't you say earlier you thought that the police
14 closed this case because the lady didn't pursue it?
15     A   That's correct.
16     Q   This police report is in June of 2014, when the
17 incident occurred in January; right?
18     A   Yes.
19     Q   Let me show you what I've marked as Exhibit 51.
20     (Exhibit No. 51 was marked for identification.)
21     It's Altisource 8288 through 8289. I'm sorry; 8282, 8288,
22 and 8289. I think there were some redacted documents that were
23 not produced in there. Do you see that?
24     A   Exhibit 51, yes.
25     Q   Right. This is another complaint about a property in

Page 130

1 Sauk Village that we mentioned earlier in the grouping that was
2 produced; right?
3     A   Yes.
4     Q   This is a -- the response on the second page from True
5 Assets indicating that when the vendors went to the property,
6 they triggered an alarm and the police showed up; right?
7     A   Yes.
8     Q   I'll show you what I've marked as Exhibit 52, which is
9 Altisource 8296.
10     (Exhibit No. 52 was marked for identification.)
11     Here's a complaint, and this is to Laudan Properties,
12 saying that "owner of a property reported seeing two contractors
13 taking furniture and personal items and she will contact the
14 police for the vendor to be arrested. Please advise if anything
15 was ever removed from the property. Your immediate response is
16 really appreciated." Did I read that correctly?
17     A   Yes.
18     Q   Okay. Do you know if anyone from Laudan responded to
19 this email?
20     A   I am not sure.
21     Q   Here's Exhibit 53.
22     (Exhibit No. 53 was marked for identification.)
23     It's 8297 through -- the numbers skip. It goes from 8297
24 to 8300, and then 8304. Do you see that last page number?
25     A   Yes.

Page 131

1     Q   This appears to be a series of emails about a property
2 in Rockford; right?
3     A   Yes.
4     Q   And you were copied on at least some of these emails;
5 correct?
6     A   Yes.
7     Q   Do you know what the complaint was with respect to
8 this property?
9     A   Not offhand, no.
10     Q   It doesn't appear to be clear from this email, does
11 it?
12     A   They're checking to see when was the verification
13 label posted at the property.
14     Q   Was Altisource involved in litigation with Agnew?
15     A   I'm sorry?
16     Q   Was Altisource involved in litigation with Agnew Field
17 Services in the last two or three years?
18     A   Meaning?
19     Q   Some type of claim against each other.
20     A   No; not to my knowledge.
21     Q   Does Agnew continue to be a vendor for Altisource to
22 the best of your knowledge?
23     A   Yes.
24     Q   Exhibit 54 is Altisource 8309 through 8314.
25     (Exhibit No. 54 was marked for identification.)

Page 132

1     Do you recognize this document?
2     A   Yes. These correspond back to the -- your --
3     Q   Case numbers?
4     A   Yes. And actually you asked about Carl Davis. There
5 it is right there at the very bottom.
6     Q   Okay. So this wasn't closed because you found that
7 property wasn't taken; this was closed because you couldn't
8 communicate with Mr. Davis?
9     A   And we -- yes. So we couldn't get any information,
10 follow through, so.
11     Q   And I think there are several -- I think if you look
12 at that particular case number, there are several entries around
13 June of 2014, related to Mr. Davis's situation; right?
14     A   Correct.
15     Q   It looks like the case number about Mr. Davis's
16 property goes all the way to Altisource 8311.
17     A   I'm sorry. I missed that.
18     Q   If you look at next to last entry on page 8311, it
19 looks like that whole page down to that point -- so going all
20 the way back basically to March of 2014 --
21     A   Yes.
22     Q   -- is these entries on this case from Mr. Davis;
23 right?
24     A   Yes.
25     Q   And if you look in the middle of page 8311, does this

Page 133

1    appear to be an indication that, internally, Altisource believed
2    Mr. Davis's property had been removed?
3        A   No.
4        Q   And it says "as the owner of personal items were
5    removed from the property, like missing flat screen TV, five
6    pairs of brand new Michael Jordon shoes, and clothes, stuff in
7    bed, been to closet and paperwork.  Kindly call the vendor and
8    check with the subcontractor about this issue as there was work
9    item so-and-so for hazard removal.  Kindly provide us with
10   vendor commitment regarding personal property claim so that we
11   can forward this case to escalation."
12       You don't read that as Altisource finding merit to Mr.
13   Davis's complaint?
14       A   No.
15       Q   Is that just standard language?
16       A   That's how some people write.
17       Q   Okay.  Do you know who wrote this?
18       A   Just looking here, no.
19       Q   Okay.  You'd have to go back to some other software —
20       A   Yes.
21       Q   -- to find that?
22       A   Actually, I believe you'd see the username.
23       Q   Like in vendor management?
24       A   On the cases —
25       Q   Okay.

Page 134

1        A   -- that you had previously.
2        Q   You'd have to go back to the earlier case numbers that
3    we were looking at earlier --
4        A   Yeah; before.
5        Q   -- in the earlier exhibit?
6        A   Yeah.
7        Q   All right.  It looks like we've picked up at the end
8    of 8311.  There's a new case number, but it looks like the
9    latest date is June 3 of 2014.  Let me ask you something:  When
10   Ocwen secures a property, do they use a standard code for the
11   property's locks or lockboxes?
12       A   Altisource?
13       Q   You know what?  I just sat here and looked at this
14   thing that said Ocwen and I said it again.  When Altisource
15   orders a property to be secured, is there standard codes that
16   are issued for the lockboxes?
17       A   I believe we changed it over time.
18       Q   And how frequently is it changed?
19       A   Now it's unique to the property, so.
20       Q   Was there a period of time where it was a common code
21   for pretty much every lockbox?
22       A   Yes.
23       Q   And how many years was that?
24       A   Offhand, I can't recall.
25       Q   When was the change to the unique code implemented?

Page 135

1        A   Approximately two years ago.
2        Q   So 2016?
3        A   Quite possible.
4        Q   No earlier than 2015?
5        A   We're in 2017.  Latter part of 2015, 2016.
6        Q   Prior to that, the code would have been a common code
7    for each lockbox?
8        A   Yes.
9        Q   So a person who's working in property preservation
10   would know that any Ocwen lockbox had a common code?
11       A   If they're working for Altisource.
12       Q   Are you aware of any circumstances where either a
13   vendor or subcontractor or any of their employees have ever been
14   arrested for going into a home that had an Ocwen lockbox on it
15   without permission?
16       A   Without me sending them a work -- not to my knowledge.
17       Q   Fair to say that anyone who knew what Ocwen's common
18   code was would know how to access an Ocwen property where Ocwen
19   was performing property preservation?
20           MR. MARTIN:  Object to form.
21           THE DEPONENT:  Repeat.
22   BY MR. WOOTEN:
23       Q   Yes.  If you were working for Altisource --
24       A   Uh-huh.
25       Q   -- and you knew the common code for an Ocwen lockbox,

Page 136

1    then you could access any property where Ocwen had secured the
2    property and placed a lockbox; right?
3        Q   Where Altisource secured that property?
4        Q   Right.
5            MR. MARTIN:  Same objection.
6            THE DEPONENT:  I imagine so.
7    BY MR. WOOTEN:
8        Q   Are you familiar with Document 55?
9        (Exhibit No. 55 was marked for identification.)
10       A   Yes.
11       Q   Tell me what that is, please.
12       A   This is a vendor application.
13       Q   Okay.  And this -- is this for Laudan?
14       A   That's correct.
15       Q   So the -- the application would have been provided,
16   and Laudan would have responded and provided these answers back
17   to Altisource?
18       A   Yes; to our Vendor Management Organization.
19       Q   All right.  Now, have you had a chance to review any
20   of the privileged logs that were provided to us in this
21   litigation?
22       A   No.
23       Q   This is one of the four different versions covering
24   various sets of documents that have been produced.  On this
25   particular document, there's some emails between a Mr. Linton

Page 137

1  and Mr. Kalchbrenner.  Do you know Russ Kalchbrenner?
2     A  I -- I don't know him.
3     Q  Are you aware that he is the president of Green Group?
4     A  I see that here; yes.
5     Q  Have you ever interacted with Mr. Kalchbrenner?
6     A  Never.
7     Q  Okay.  Don't know what he looks like; never spoken to
8  him?
9     A  No.
10    Q  Do you know if Mr. Kalcchbrenner was represented by
11 Altisource attorneys in January of 2015?
12       MR. RASP:  Objection to form.
13       MR. MARTIN:  Same.
14       THE DEPONENT:  I have no knowledge.
15 BY MR. WOOTEN:
16    Q  Okay.  Do you know if Altisource has made a claim
17 against Mr. Kalchbrenner or Green Group in this litigation?
18    A  I believe they're part of this.
19    Q  Okay.  Do you know who filed a claim or a lawsuit
20 against Green Group and Mr. -- or Mr. Kalchbrenner's company?
21    A  No.  I don't have that information.
22    Q  Okay.  I'm going to show you a document marked as
23 Exhibit 57.
24    (Exhibit No. 57 was marked for identification.)
25    It's a -- second of the litigation privileged logs that

Page 138

1  were provided.  Have you had a chance to review this document?
2     A  I don't recall this one.
3     Q  Okay.  There's some documents mentioned here where
4  your name popped up.  The one that I highlighted deals with
5  Bates Number 993-994.  Do you see that?
6     A  Yes.
7     Q  It appears that you sent an email to a person named
8  Joe D. at Baxol Properties.
9     A  It appears so.
10    Q  And a couple of attorneys for Altisource were copied
11 on the email; is that right?
12    A  That's correct.
13    Q  This was sent in January of 2015; right?
14    A  Correct.
15    Q  Who is Joe D.?
16    A  Joe Dungeness; he was the operations manager for
17 Baxol.
18    Q  Okay.  Did you have a -- some sort of personal
19 relationship, professional relationship with him prior to
20 January of 2015?
21    A  Joe Dungeness was the main contact --
22    Q  Okay.
23    A  -- at one point.
24    Q  So you -- you had interactions with him prior to any
25 of this litigation coming up?

Page 139

1     A  Yes.
2     Q  Okay.  So if you called him on his cell phone, he
3  would know you, and y'all would have had at least some friendly,
4  professional interactions?
5     A  No.  I don't have his cell phone number; never have.
6     Q  Okay.  Aren't your vendors like Baxol required to
7  provide cell phone numbers to Altisource for all their key
8  people?
9     A  They provide numbers, and they provide an emergency
10 contact in the system.
11    Q  All right.  But you don't believe that you had access
12 to Mr. -- say his last name.  I never --
13    A  Dungeness.
14    Q  Dungeness; you don't believe you knew his cell phone
15 number?
16    A  I don't know if that was -- if his number was the
17 emergency contact or if it was Mr. Borst.
18    Q  Okay.  Was it your decision to reach out to Joe D.
19 from Baxol, or did someone ask you to reach out to him?
20    A  I was asked.
21    Q  Okay.  Did you ever speak with this gentleman about
22 this situation with respect to Mr. Thakkar's property?
23    A  No.  I didn't speak to him about it.
24    Q  Did you ask him to speak to Altisource's attorneys
25 about it?

Page 140

1     A  I coordinated a call, yes.
2     Q  Okay.  All right.  Was that the purpose of this email
3  for you to make an introduction to this gentleman to
4  Altisource's attorneys?
5     A  The purpose was to coordinate the call, schedule the
6  call.
7     Q  All right.  Do you happen to know where this gentleman
8  lives now?
9     A  No.
10    Q  Did you ever know where he lived?
11    A  No.
12    Q  Do you know what state he lives in?
13    A  Not a clue.
14    Q  When you reached him, did you call him on -- do you
15 still have access to the phone number you reached him on?
16    A  Whatever number was available in our Vendor Management
17 System.
18    Q  Do you know if that number information was produced in
19 discovery in this case?
20    A  I'm not sure.
21    Q  This document is the third privileged log that was
22 produced.  It's Exhibit 58.
23    (Exhibit No. 58 was marked for identification.)
24    And I'll take you down to these pages where I made sure I
25 give you the right information.  This references Document 8003

Page 141

1   through 8009, March 30, 2015, between Altisource and Nakia
2   Agnew. Is Nakia Agnew the principal of Agnew Field Services?
3       A   I believe Nakia is co-owner.
4       Q   Okay. And this says the document is a confidential
5   settlement agreement and release between Altisource, Agnew, and
6   Nakia Agnew; right?
7       A   That's correct.
8       Q   Do you know what common interest Nakia Agnew and Agnew
9   Field Services had with Altisource regarding this litigation?
10          MR. MARTIN:  Object to form.
11          You can answer.
12          THE DEPONENT:  I don't know.
13  BY MR. WOOTEN:
14      Q   Do you have any idea why there may have been
15  litigation or some reason to resolve a legal dispute between
16  Agnew and Altisource in March of 2015?
17      A   I'm not sure what -- that that was a settlement
18  agreement. I'm not sure of the details.
19      Q   Do you know if -- if in or around the time of March
20  2015, Altisource had any issues with Nakia Agnew or Agnew Field
21  Services about their provision of services to Altisource.
22          MR. MARTIN:  Object to form.
23          THE DEPONENT:  Not to my knowledge.
24  BY MR. WOOTEN:
25      Q   All right. Are you aware of any complaints or issues

Page 142

1   that Nakia Agnew or Agnew Field Services may have raised with
2   Altisource in or around March 30 of 2015?
3           MR. MARTIN:  Same objection.
4           THE DEPONENT:  Not that I'm aware of.
5   BY MR. WOOTEN:
6       Q   Have you ever spoken with Nakia Agnew?
7       A   Several times.
8       Q   How frequently have you spoken with Nakia Agnew?
9       A   Depending on what is happening -- they're one of our
10  main vendors for client -- so I'm on calls with the operations
11  team.
12      Q   All right. Let me just check one more thing.
13  We need a couple minutes to talk and then we'll be done.
14      A   Okay.
15          MR. WOOTEN:  So if we can take a short break.
16          THE VIDEOGRAPHER:  At approximately 3:15, we are off
17  the record.
18          At approximately 3:28, we are on the record.
19          MR. WOOTEN:  So before we came back on record, we
20  were -- you and I were discussing the 48,000, 47,000
21  documents produced in this case that have an Altisource
22  Bates label on them. We only used about 100 today.
23          I don't really remember how many we used the first go-
24  round. What I'm -- do we agree that there's no question or
25  contest about authenticity with respect to the documents

Page 143

1   produced with an Altisource Bates label?
2           MR. MARTIN:  Right. And -- and my response was that
3   certainly anything that's produced from Altisource's
4   records, we're not going to contest authenticity on. The
5   only caveat was that of all the documents produced, I would
6   want to confirm that none came from a third party. That
7   would be the only caveat.
8           But if it's from Altisource records, absolutely, we
9   will not contest authenticity preserving all other
10  objections.
11          MR. WOOTEN:  I -- that's fine with us. Anybody else
12  got a problem with that or --
13          MR. RASP:  No.
14          MR. KARLSGODT:  We're all right.
15          MR. WOOTEN:  Good. We ain't got to make anybody miss
16  a flight.
17          All right. So we're going to tender the witness.
18              FURTHER CROSS-EXAMINATION
19  BY MR. RASP:
20      Q   Ms. McTaggart, my name is Kevin Rasp. I'm an attorney
21  who represents Baxol. I appreciate your patience and your hard
22  work today.
23          Just as a matter of bookkeeping, Baxol will reserve its
24  rights to reconvene this deposition, just because we are looking
25  at an hour and half to -- of scheduled time to complete our

Page 144

1   deposition. I don't think I will need an hour and a half. I'm
2   going to try to move through this quickly. But in the event
3   other issues arise, Baxol is reserving its rights to ask you
4   further questions under Federal rules and under our notice which
5   I've attached and marked -- I'm sorry; I haven't attached. I've
6   marked as Exhibit 59 and put in front of you.
7           (Exhibit No. 59 was marked for identification.)
8           Have you seen this notice, the 30(b)(6) deposition before?
9       A   I have.
10      Q   And do you understand that you've been designated as
11  the witness to address the items subject to your counsel's
12  objections that appear on the backside of Exhibit 59?
13      A   I do.
14      Q   Did you review any specific documents for today's
15  testimony about the topics that Baxol has identified for you?
16      A   I did.
17      Q   Which documents have you specifically reviewed? And
18  it may be easier to say categories of documents?
19      A   The contract, Baxol's contract.
20      Q   Any other documents that you reviewed for the Baxol
21  deposition?
22      A   Several work items.
23      Q   And -- and what work items are you referring to?
24      A   I re -- securing orders, all that were made available
25  by counsel.

Page 145

1    Q   Were they the work orders that are implicated by
2  plaintiff's allegations in this case for services in October and
3  January of 2013 and 2014?
4    A   That is correct.
5    Q   Did you review any other documents in preparation for
6  today's deposition with Baxol?
7    A   I reviewed many documents.
8    Q   Any specific documents come to mind beyond what you've
9  described already?
10   A   Photographs, case history.
11   Q   It -- it may be an easier way to go about it:  Have
12 you reviewed any documents that have not yet been produced in
13 this case to your knowledge?
14   A   To my knowledge, everything's been produced that's not
15 privileged.
16   Q   Did you speak with any individuals, apart from your
17 lawyer or company counsel, to prepare your testimony in response
18 to the Baxol notice of deposition?
19   A   Yes.
20   Q   Who did you speak with?
21   A   Laxmi Vishwanathan, Bijumon Michael, Santi Singh
22 (ph.).
23   Q   Any other individuals?
24   A   Oh, and Robert Bailey.
25   Q   I think I know from your prior testimony, but who is

Page 146

1  Laxmi?
2    A   Laxmi is now the manager for our compliance group.
3    Q   And why did you speak to her about your testimony here
4  today?
5    A   She was involved.  It's part of the compliance
6  investigation, so she would have knowledge.
7    Q   And who is Benjamin?
8    A   Bijumon.
9    Q   Bijumon.
10   A   B-i-j-u-m-o-n Michael; he's a manager of operations
11 that -- he was also a part of the pre-foreclosure group.
12   Q   And why did you speak with Bijumon in anticipation of
13 today's testimony?
14   A   He had knowledge of the case and work orders.
15   Q   Was -- oh, and then you also said Robert Young?
16   A   Robert Bailey.
17   Q   Bailey.
18   A   Yes.
19   Q   Who's Robert Bailey?
20   A   He's senior manager for our Ven -- or one of the
21 senior managers for the Vendor Management System.
22   Q   And that's the system referred to as VMS today?
23   A   That is correct.
24   Q   Okay.  Since your deposition now, in November of last
25 year, have you had any communication with any former employees

Page 147

1  of Baxol?
2    A   No.
3    Q   All right.
4    A   At least not to my knowledge.
5    Q   Sure.  Okay.  Are you familiar with the field
6  agreement services between Baxol and Altisource that was
7  previously marked as Exhibit 13 to your deposition last year?
8    A   I'm familiar, but it would be nice to have a copy of
9  it.
10   Q   Sure.  And counsel can pull that up on your screen.
11       MR. MARTIN:  I'm sorry.  What exhibit are you pulling
12 up?
13       MR. RASP:  Oh, I'm sorry.  I meant Nick and --
14       MR. WOOTEN:  I'll pull it up for her.
15       MR. MARTIN:  Okay.
16       MR. RASP:  I didn't mean to volunteer you, like,
17 make Eric do it.
18       MR. WOOTEN:  My name's Chris Chandler now.  I'm
19 running the tech.
20       MR. RASP:  All right.  Thank you, Nick.
21 BY MR. RASP:
22   Q   The -- do you see on your screen the Exhibit 13, the
23 field vendor agreement?
24   A   I see Exhibit 8.
25   Q   Okay.  And that's a -- a prior sticker I believe.  I

Page 148

1  have two stickers on mine.  But in any case, the field vendor
2  agreement between Altisource and Baxol, is that the agreement
3  that governs the relationship between those parties including
4  any addendums to that agreement?
5    A   Yes; for 2012, this was the 2012 agreement.
6    Q   What was the agreement that governed the parties in
7  2013?
8    A   This was the same --
9    Q   Okay.  Did the --
10   A   -- contract.
11   Q   Oh, and did this agreement also govern the parties in
12 January of 2014?
13   A   That is correct.
14   Q   Has it been modified by any other document for those
15 time periods to your knowledge?
16   A   I believe there is an addendum to this agreement.
17   Q   Terrific.  I'd like to ask you a little bit about that
18 addendum.  The -- let's -- well, let's -- if you flip --
19       MR. RASP:  Nick, you can flip to that second page.
20       MR. WOOTEN:  Yeah.
21 BY MR. RASP:
22   Q   Do you see at the top of page 2 it refers to services,
23 service levels, and termination?
24   A   Yes.
25   Q   That services section incorporated in the affidavit,

Page 149

1   does that describe the relationship between the two entities,
2   Baxol and Altisource?
3       A   That describes the services, yes.
4       Q   And if you look at on that page 2.2.1, there's a
5   paragraph called "Vendor Quality." Do you see where I'm
6   referring?
7       A   Yes.
8       Q   At the end of that paragraph, there's language that
9   says -- that refers to the defective performance or failure of
10  the vendor to satisfy service level. Do you see that last
11  sentence?
12      A   2.2.1?
13      Q   Yes.  It begins "in the event of any defective
14  performance or failure."
15      Did you find where I'm looking?
16      A   Yes.
17      Q   Okay.
18      A   I'm -- I think.
19      Q   Okay.  Great.  Great.  Great.  With regard to this
20  address -- excuse me, Mr. Thakkar's residence, did Altisource
21  make any request to Baxol for Baxol to perform or re-perform the
22  services, the property preservation services, that Baxol
23  provided under the agreement?
24      A   So this thing -- this document states in the event of
25  any defective performance or -- or failure of vendor to perform

Page 150

1   or to satisfy any applicable service.  To my knowledge,
2   Altisource did not request for them to perform or to -- or re-
3   perform any services.
4       Q   Okay.  The -- if you look now at the addendum to the
5   agreement, which is -- let me see here.  Well, it's about
6   halfway through that file.
7       MR. RASP:  Nick, I'm sorry.  I heard you were the tech
8   guy.
9       MR. WOOTEN:  It's all right.  I can find -- I can find
10  it.  Tell me what page.
11      MR. RASP:  Oh, could you turn to the second page,
12  2.1.3?
13      MR. WOOTEN:  We're on that already.  You want to go --
14  or stay on 2.1?
15      MR. RASP:  Oh, I'm sorry; 2.1.3 of the addendum.
16      MR. WOOTEN:  Okay.  You said the bottom right?  Do you
17  know if there's a page number for that?
18      MR. RASP:  Oh, I don't have a page -- oh, it's page 2
19  of 10 of the addendum.  So it should be maybe about page --
20      MR. WOOTEN:  Services, service level termination?
21      MR. RASP:  Yes; exactly.
22  BY MR. RASP:
23      Q   So, Ms. McTaggart, do you see a 2.1.3, the "Work Item
24  Acceptance" paragraph?
25      A   Yes.

Page 151

1       Q   You have testified to this a little bit, but
2   specifically how quickly did Baxol -- or strike that.  How
3   quickly was Baxol obligated to accept the work items once
4   Altisource submitted them?
5       A   All vendors were required to accept that order within
6   24 hours.
7       Q   Okay.  And I think you explained, too, that the work
8   orders often had a complete by time --
9       A   A due date.
10      Q   A due date; thank you.
11      A   That's correct; yeah.
12      Q   Thank you.  But Baxol was required, like other
13  vendors, to accept work orders within 24 hours that they were
14  posted; is that correct?
15      A   Correct.  If they didn't, they would expire.  That
16  doesn't mean that they had to complete the work within 24 hours.
17      Q   Yes.
18      A   Yes.
19      Q   And if Baxol declined or failed to accept the work
20  order within 24 hours -- do you see at 2.1.3 that the failure of
21  the vendor to accept a work item will constitute a material
22  breach of the agreement?  Do you see that language in all caps?
23      A   Yes.
24      Q   Could you read that sentence in all caps, failure of
25  vendor?

Page 152

1       A   "Failure of vendor to accept such a work item will
2   constitute a material breach of this agreement and may result in
3   vendor's suspension as an approved Altisource vendor."
4       Q   Is that the policy that Altisource had towards its
5   vendor in -- maybe more clearly, the expectation it had for work
6   orders that it submitted?
7       A   Well, we expected for them to accept the order.  If
8   they could not complete it, then, obviously, they'd tell us why
9   they couldn't.
10      Q   I -- the -- does that allow Baxol any discretion to
11  decide whether it does or does not want to do the work order
12  that Altisource has posted for it?
13      A   Of course.
14      Q   In what way does it allow some discretion?
15      A   They're the boots on the ground, so if they go to that
16  property and it's occupied, they'd notify us that that property
17  is occupied.
18      Q   But it is true that the failure of the vendor to
19  accept the work order could constitute a material breach based
20  on this language?
21      A   Based on the contract, that's what it states.  But
22  that -- you know, all our vendors knew that if they didn't
23  accept an order, it would expire in the system.
24      Q   Uh-huh.  Now, I think -- I think we can set aside the
25  agreement.  I think you can answer these questions based on your

Page 153

1   experience. But the -- there's reference in the documents to
2   the "Statement of Work." Does that phrase mean something to
3   you?
4        A   Yes.
5        Q   How would you describe the Statement of Work that you
6   would provide to vendors like Baxol?
7        A   Each work item had specific instructions.
8        Q   And did the Statement of Work define the scope of
9   tasks that you expected Baxol to perform for Altisource?
10       A   Well, we -- it's in combination with our vendor guide,
11  all our training. So it wasn't just one item.
12       Q   And -- and you referred to reviewing some of the work
13  orders and contract orders specific to Baxol. I don't know if I
14  need to show you them. I think that they were marked as Exhibit
15  6 initially. But those work orders to Baxol, do those state the
16  Statement of Work that Altisource expected of Baxol with the
17  guides and the other things you mentioned?
18       A   I would need to look at -- there's a portion --
19       Q   Sure.
20       A   -- that says special instructions, and those are the
21  instructions specific to that type of work item.
22       Q   Okay. Just for -- for the purpose of demonstrating --
23  I'm not going to yank this thing.
24       Let me just show the witness this as an example:
25  Altisource 125, which is -- so this is Altisource 125, which was

Page 154

1   previously marked as Exhibit 6 to your deposition. When you
2   were referring to special instructions, there's a box on the
3   bottom titled "Special Instructions." Is that your reference?
4        A   That is correct.
5        Q   And the language contained in the Special Instructions
6   on a document like Altisource 125, does that state the Statement
7   of Work for this particular vendor?
8        A   That's specific to the -- each work item. It's a --
9        Q   Okay.
10       A   It says work item level. Our vendors know the
11  expectation.
12       Q   Okay. And how do you mean "work item level"?
13       A   You're looking at one right there. And you can also
14  refer back to the compliance presentation where Cindy Dexter
15  emphasized to the vendors that they should read all special
16  instructions on each work item.
17       Q   Certainly.
18       A   That's right.
19       Q   Certainly. The -- Altisource did not authorize Baxol
20  to do tasks beyond what is set forth in the Special Instructions
21  and these other guides that you've referred to; is that fair?
22       A   That's fair.
23       Q   And, you know, Altisource did not authorize Baxol to
24  do anything -- all right. Strike that. I suppose that's what
25  I've just asked.

Page 155

1   Altisource did not authorize Baxol to perform the vacancy
2   determination in the instance of Mr. Thakkar's property
3   preservation, did it?
4        A   Can you repeat that?
5        Q   Sure. Sure. Did Al -- did Ba -- did Altisource
6   authorize Baxol to make the vacancy determination in the
7   property preservation of Mr. Thakkar's pre -- residence?
8        A   Each vendor is to -- I'm sorry. Altisource expects
9   that each vendor would confirm occupancy status before
10  proceeding with any work.
11       Q   The -- what did Laudan do with regard to -- or strike
12  that. What was Laudan asked to do by Altisource with regard to
13  this property?
14       A   Confirm occupancy --
15       Q   So --
16       A   -- inspect the property, confirm occupancy.
17       Q   So just to be clear, was Baxol asked to do that
18  initial vacancy determination?
19       A   No.
20       Q   Okay. The -- I just want to ask a little bit about
21  how information gets to Baxol. Does Baxol receive information
22  about this statement of work solely through the VMS system?
23       A   Yes. That's the conduit.
24       Q   Does it receive instructions by any other method
25  outside of VMS?

Page 156

1        A   Specific to work-- work item?
2        Q   Uh-huh; yes.
3        A   No. All -- the Special Instruction is at the work-
4   item level.
5        Q   Now, we've talked little bit about Ocwen's system. I
6   think it's Real Sys -- Real System?
7        A   Real Services.
8        Q   Real Services; I just have RS. So does -- does Baxol
9   have access to RS, the Ocwen system?
10       A   No.
11       Q   Does Baxol have any access to see the property or --
12  or strike that. Does Baxol have any access to see the client-
13  specific information that's contained in the RS system and
14  provided to Altisource?
15       A   I'm sorry. That's a little bit confusing.
16       Q   Sure. Sure. What I'm -- what I'm driving at is:
17  Does Altisource have -- is there Altisource -- strike that. Is
18  there information that Altisource receives from Ocwen that is
19  not equally available to Baxol, information such as the loan
20  information?
21       A   You can look at the screenshot of what's available to
22  the vendor, the property details.
23       Q   Okay. To your knowledge, does Ocwen have any
24  communication directly with Baxol?
25       A   Not to my knowledge.

Page 157

1  Q   And when Baxol provides information to Oc -— or to
2  Altisource, does Altisource receive that information solely
3  through the VMS portal?
4  Q   Can you be little bit more specific?
5  A   Sure.  Sure.  Let me just ask more broadly actually.
6  You know, how does Altisource receive the information from Baxol
7  from its property preservation services?
8  A   Through the VMS.
9  Q   Does -— does Baxol ever call Altisource
10  representatives with information related to its property
11  preservation services?
12  A   A communication happens.  I'm sure we call them; they
13  call us.
14  Q   Is VMS the definitive -- perhaps you might call it the
15  final record of what property preservation systems were provided
16  at the property?
17  A   Correct.
18  Q   Okay.  So any type of external communication between
19  the two would ultimately be distilled and inputted into VMS?
20  A   That's correct.
21  Q   Is -- can -- does Baxol have access to modify
22  information that it finds in VMS such as the loan status?  Can
23  Baxol modify loan status in VMS?
24  A   Not to my knowledge.
25  Q   Can Baxol raise flags within the VMS system for work

Page 158

1  orders?
2  A   No.
3  Q   Can -- and by flag, does that mean both stop flags and
4  hold flags?  Are those two different things?
5  A   I'm familiar with stop flags.
6  Q   Okay.
7  A   I'm not sure what -— when you refer to hold flag,
8  where you get that term from.
9  Q   Okay.  Are there other -— well, that's a fair
10  question.  Okay.  The -- if Baxol encounters a flag in the VMS
11  system, does V-- does Baxol have the authorization and access
12  to lower that flag?
13  A   Baxol would not.
14  Q   Who at Altisource is authorized to the raise and lower
15  flags on work orders?
16  A   That is done through our -- our VMS.
17  Q   And I -- I don't -- this is not -- I don't mean this
18  to be a pop quiz either.  You were asked during your initial
19  deposition about Exhibit 18, I believe, which is page -—
20  MR. RASP:  And, Nick, I can just bring it to her.
21  BY MR. RASP:
22  Q   I'm showing you what was previously marked as Exhibit
23  18, Altisource 778, and following -- I think it's just 778 to
24  779.  Does this page, this exhibit -— or strike that.  It's -—
25  it's just one page, Altisource's 778.  Does this page and

Page 159

1  exhibit state the Altisource policy with regard to stop
2  preservation and stop inspection flags?
3  A   Yes, at that time.
4  Q   And by "at that time", you mean at the time in -- at
5  the end of 2013 and the beginning of 2014?
6  A   Yes.
7  Q   Okay.
8  MR. RASP:  Let me just check my notes.  I might be
9  able to pass the witness.
10  BY MR. RASP:
11  Q   Okay.  I don't want to revisit your prior deposition
12  testimony too much, but at some point in October of 2013, did
13  Altisource learn that the plaintiff had paid the deficiency or
14  at least some part of the deficiency on the -- the mortgage?
15  A   That's what I explained earlier.
16  Q   Okay.  And after learning that, did Altisource retract
17  the work order that had been issued to Baxol to your knowledge?
18  A   If -- I think those orders were completed in the
19  system.
20  Q   In -- did Altisource advise Baxol of the payment of
21  the mortgage in December due to what you described at that point
22  was a technical glitch?
23  A   I'd like to correct that.
24  Q   Okay.  But let me ask that question just a little bit
25  better, because then, I do know that you have a -- I saw in your

Page 160

1  discovery that there's a question on that issue.
2  First of all, when plaintiff paid the mortgage, did
3  Altisource advise Baxol of that mortgage payment and retract any
4  pending work orders?
5  A   Not to my knowledge.
6  Q   The -- well, maybe I'll leave that for your counsel.
7  Okay.  Oh, was Baxol involved in the determination to
8  convert the Thakkar property from inactive to active in, I
9  believe it was September of 2013?
10  A   Not to my knowledge.
11  Q   Was Baxol involved in any of those determinations that
12  we reviewed today for whether the Thakkar account was active or
13  inactive in the VMS system?
14  A   Not to my knowledge.
15  Q   Okay.  Thank you again.  I think you have done a
16  Herculean effort today.
17  MR. RASP:  I'll pass the witness.
18  FURTHER CROSS-EXAMINATION
19  BY MR. KARLSGODT:
20  Q   All right.  I have just a few questions.  My name's
21  Nathan Karlsgodt.  I'm representing Green Group.  Have you ever
22  heard of Green Group?
23  A   Throughout this.
24  Q   Okay.
25  A   Yes.

Page 161

1    Q   As far as you know — as far as you know, no one from
2   Altisource Solutions has any — had any personal contact with
3   someone from Green Group; correct?
4    A   Not to my knowledge.
5    Q   No emails, texts, phone calls; correct?
6    A   Not to my knowledge.
7    Q   And I don't know if you know this, but same question
8   for Ocwen.  As far as you know, Ocwen hasn't had any personal
9   contact with someone from Green Group; correct?
10   A   Not to my knowledge.
11   Q   No.  And same thing with Ocwen, no emails, texts,
12  phone calls; correct?
13   A   Not to my knowledge.
14   Q   Green Group wasn't one of Altisource Solution's
15  vendors; is that correct?
16   A   No.
17   Q   Is it your understanding that Green Group was a
18  subcontractor of Baxol?
19   A   That's my understanding.
20   Q   Yeah.  And, typically, Altisource Solutions would have
21  no interactions with vendor's subcontractors; is that correct?
22   A   That's correct.
23   Q   In 2013, 2014, did Altisource Solutions have any sort
24  of system to confirm the instructions that were given to vendors
25  were being communicated fully to their subcontractors?

Page 162

1    A   Repeat, please.
2    Q   Yeah; sure.  In 2013 and 2014 —
3    A   Uh-huh.
4    Q   — did Altisource Solutions have any sort of system to
5   confirm that the instructions given to vendors were being fully
6   communicated to their subcontractors?
7    A   No.  Our agreement was with the vendor, and expected
8   that they'd cascade that information down to their
9   subcontractors.
10   Q   Okay.  Does Altisource Solutions ever review the
11  contractual agreements between vendors and subcontractors?  I'm
12  sorry; vendors and their subcontractors?
13   A   Not to my knowledge.
14   Q   Does Altisource Solutions require any sort of
15  contractual language to be included in — in agreements between
16  vendors and their — and vendors' subcontractors?
17   A   Not to my knowledge.
18   Q   My under — my understanding is that the vendor —
19  that a vendor's subcontractor might have access to the PPW
20  online system but not the VMS system; is that correct?
21   A   PPW is not an Altisource platform, so —
22   Q   Okay.
23   A   — no.
24   Q   But a vendor's subcontractor would not have access to
25  the VMS system because they're not a vendor; is that correct?

Page 163

1    A   That is not totally correct.
2    Q   Okay.
3    A   I don't know if the vendor gives access to their
4   subcontractors.  That's a question for Baxol.
5    Q   Okay.  And so if the vendor didn't give access to a
6   vendor's subcontractor, then — then, hypothetically, the
7   vendor's subcontractor would have no other way to access the VMS
8   system?
9    A   That's correct.
10   Q   And a vendor's subcontractor, they also wouldn't have
11  access to Ocwen's RS, or Real Servicing system; correct?
12   A   Correct.
13   Q   So if Altisource was contacted by a borrower who said,
14  hey, this — this property is actually occupied, is that
15  something that you would communicate to Ocwen through the VMS
16  system?
17   A   Repeat that.
18   Q   Yeah.  Let me ask — let me ask again:  So if
19  Altisource was contacted by a borrower and the borrower said,
20  hey, I want to let you know that this property is actually
21  occupied, would Altisource communicate that information to Ocwen
22  through the VMS system?
23   A   Yes.
24   Q   Okay.  Is that the exclusive or preferred system for
25  communicating that sort of information to Ocwen?

Page 164

1    A   That's the only system.
2    Q   Okay.  And once Ocwen has that information, Ocwen can
3   stop Altisource from providing further property services from an
4   occupied property by raising something called a stop flag;
5   correct?
6    A   Well, if a borrower — if — if I'm — if I understand
7   your question correctly —
8    Q   Yes.
9    A   — you asked if a borrower contacts Altisource.
10   Q   Yeah.
11   A   We would immediately stop work —
12   Q   Okay.
13   A   — on the property.
14   Q   So Altisource doesn't have to go to Ocwen first to
15  raise a stop flag?  Altisource has the power to raise a stop
16  flag themselves?
17   A   We can stop the preservation.
18   Q   Okay.  And so the stop flag system, that doesn't just
19  appear in the RS, it also appears in the VMS system; is
20  that correct?
21   A   Well, those — there's an integration between both —
22  between both systems.
23   Q   Okay.  So, presumptively, if it appeared in one
24  system, it would also appear in the other, because they're
25  integrated?

Page 165

1    A   That's go -- that's what you saw earlier going from
2  active to inactive.
3    Q   Okay. But if a vendor's subcontractor didn't have
4  access to the VMS system, they would have no way to see the stop
5  flag that had been raised for a property being occupied;
6  correct?
7    A   They wouldn't see a flag, but you would expect that if
8  a subcontractor is going to a property, they're going to perform
9  some form of due diligence to ensure that that property is, in
10 fact, vacant before they proceed.
11   Now, keep in mind, these are the guys with the industry
12 knowledge. They're the boots on the ground.
13   Q   Okay. But if Altisource had been contacted
14 telephonically to be informed that a -- that a build -- a
15 particular residential property was occupied, and that
16 information was input into the VMS system, a vendor's
17 subcontractor who didn't have access to the VMS system would not
18 be able to see that particular piece of information that was
19 delivered telephonically from the borrower to Altisource;
20 correct?
21   A   The subcontractors wouldn't see any information.
22   Q   Okay. Does Altisource distinguish between the terms
23 vacancy and occupancy?
24   A   Vacant and occupied.
25   Q   Okay. And, so, if I understand you correctly, based

Page 166

1  upon your response, Altisource believes the terms vacant and
2  occupied can be used interchangeably?
3    A   Yes.
4        MR. MARTIN: Object to form.
5        You can answer.
6        THE DEPONENT: Well, pre-foreclosure -- and -- and I
7        believe -- and correct me if I'm wrong here -- you're
8        speaking specifically to this case --
9  BY MR. KARLSGODT:
10   Q   Yes.
11   A   -- or in general?
12   Q   Oh, I'm -- actually, in general.
13   A   Okay.
14   Q   Let's start with that.
15   A   So pre-foreclosure properties --
16   Q   Yeah.
17   A   -- and I believe it's pre-foreclosure properties we
18 are going to discuss here; not REO.
19   Q   Uh-huh.
20   A   Pre-foreclosure properties go active and inactive.
21 People move in, people move out. And that is why we expect our
22 vendors and their employees and subcontractors will use their
23 discretion, because they, they -- you know, that they're
24 going to perform their due diligence to ensure that they -- that
25 that property is correctly identified as to whether it's vacant

Page 167

1  or occupied.
2    Q   Okay. Do you know whether or not a vendor's
3  subcontractors distinguish between the terms vacancy and
4  occupancy?
5        MR. MARTIN: Object to form.
6        THE DEPONENT: I'm used to hearing the term vacant or
7        occupied. And whether they call it vacancy or occupancy, I
8        don't know what subcontractors call it. I call it vacant
9        or occupied.
10 BY MR. KARLSGODT:
11   Q   Okay. Based on your understanding of the terms
12 vacancy and occupancy, can a property be vacant yet occupied at
13 the same time?
14       MR. MARTIN: Object to -- object to form.
15       You can answer.
16       THE DEPONENT: Can it be vacant yet occupied?
17 BY MR. KARLSGODT:
18   Q   Yes.
19   A   It's either it's vacant or it's occupied.
20   Q   Okay. And so I'm guessing your answer would be the
21 same for the inverse: Could a property be not vacant but
22 unoccupied?
23       MR. MARTIN: Object to form.
24       You can answer.
25       THE DEPONENT: I'm confused by your question. I'm

Page 168

1  sorry.
2  BY MR. KARLSGODT:
3    Q   That's all right. Let me ask you this: If I told you
4  that under Illinois law the term vacant is defined as generally
5  empty or deprived of contents, would that be consistent with
6  your understanding?
7    A   Not necessarily in this -- in the property
8  preservation industry.
9    Q   Okay. So you don't use the term vacant consistent
10 with the definition that I've just given you?
11       MR. MARTIN: Object to form.
12       You can answer.
13       THE DEPONENT: We've come across many properties where
14       the borrower have turned over the property. It's filled
15       with items, and they've walked away from it. There are
16       items still left there.
17       So the distinc -- the distinction between whether that
18       property is occupied while -- or vacant, that's why it's --
19       it's necessary for the boots on the ground to perform their
20       due diligence.
21 BY MR. KARLSGODT:
22   Q   Okay. If I told you that in Illinois the term
23 unoccupied is defined as -- that no one is living in the
24 dwelling or had actual use or possession of the property, is
25 that consistent with your understanding of the term unoccupied?

Page 169

1    MR. MARTIN: Object to form.
2    You can answer.
3    THE DEPONENT: That's the law; yes.
4  BY MR. KARLSGODT:
5    Q   Okay. So my question, I guess, to you is this: Does
6  Altisource distinguish between vacancy as it relates to
7  possessions or belongings being in a residence versus occupancy,
8  which is with respect to persons and whether or not they are
9  using the premises? Is that something that Altisource
10 distinguishes between? Or do you use the term vacant and
11 unoccupied just solely with respect to persons or persons'
12 belongings?
13   MR. MARTIN: Object to form.
14   You can answer.
15   THE DEPONENT: Thank you. We use that term -- again,
16 we're going -- in this industry, you have to perform your
17 due diligence. You have to -- to -- a property can have
18 personal items, it can have beds, couches, and it's still
19 va --- vacant. The people have moved out.
20   It could be occupied and just an air mattress on it.
21 I've seen it all. You have a --- whether it's a vendor,
22 their employees, or their subcontractors, it's necessary
23 for them to perform some due diligence.
24 BY MR. KARLSGODT:
25   Q   Okay. So I think if I understand you correctly,

Page 170

1  Altisource is focused on whether or not there's a person
2  actually using the --- the residence; is that correct, when
3  determining vacant or occupied?
4    A   That is a broad term. There's several conditions that
5  Altisource take into consideration before --- and this is
6  expressed to our vendors as well; they know, it's done through
7  training --- to confirm whether or not that property is occupied
8  or vacant.
9    Q   Okay. But I guess -- I guess my question is it's --
10 I'm just trying to find out what the focus of Altisource is when
11 they're making a determination or when they are asking somebody
12 else to make a determination as to whether or not a property is
13 vacant or unoccupied.
14   Is it -- is it with respect to personal belongings? Is it
15 with respect to whether or not persons are using the actual
16 premises? Or is it some sort of combination of both those?
17   A   It's a com -- it's a combination of everything.
18   Q   Okay. Do you know whether or not a vendor's
19 subcontractor would always be using those definitions that
20 Altisource is using for determining whether a property is vacant
21 or occupied?
22   MR. MARTIN: Object to form.
23   You can answer.
24   THE DEPONENT: Again, we share all our training vendor
25 guides, special instructions, with our vendors. Our

Page 171

1  expectation is that the subcontractor or the employee that
2  they're utilizing in that specific state, that they are
3  made aware of the state law, the local ordinances, and
4  Altisource's expectations.
5  BY MR. KARLSGODT:
6    Q   Okay. But in 2013 and 2014, Altisource had no way to
7  confirm that a vendor was relaying those items you just
8  referenced to their vendor's subcontractors; correct?
9    A   Our vendors signed a contract that they would do that,
10 so our expectation is that they were doing that.
11   Q   Yeah. No. I understand it's your expectation --
12   A   Yeah. That --
13   Q   -- based upon the contract. But you had no system in
14 place to confirm that it was being relayed from the vendor to
15 the vendor's subcontractor.
16   A   No. We relied on the vendor to do that.
17   Q   Do you know whether or not Illinois treats -- or has a
18 definition for an abandoned premises?
19   A   I believe that was addressed in Affirmative Response
20 18, the laws of --- pertaining to the laws of Illinois. I
21 believe that was addressed.
22   Q   Okay. And when you say Response 18 -- I apologize;
23 there's been a lot of --- a lot of discovery here. Is there any
24 way you can specify as to which one you're referring to?
25 Otherwise, I --- I ---

Page 172

1    A   You're asking me to ---
2    MR. RASP: You want me to ask a different question?
3    MR. MARTIN: The answer; our answer as in to the
4  complaint. The complaint ---
5    MR. KARLSGODT: Oh, okay.
6  BY MR. KARLSGODT:
7    Q   Okay. Are you familiar with the PPW system?
8    A   I've heard of it.
9    Q   Yeah. Do you know whether a vendor's subcontractor
10 would be able to discern solely from the PPW system whether a
11 particular property is pre-foreclosure or REO?
12   A   Offhand, I don't know. I'm sorry. I can respond to
13 that a different way specific to this case. Baxol was a pre-
14 foreclosure vendor ---
15   Q   Okay.
16   A   -- solely. Yes.
17   Q   But you don't know whether or not that information is
18 reflected in the PPW system?
19   A   I'm not sure.
20   Q   Okay.
21   MR. KARLSGODT: That's it.
22   MR. WOOTEN: Let's go off for a minute and see what's
23 left.
24   THE VIDEOGRAPHER: At approximately 4:13, we are off
25 the record.

Page 173

1    At approximately 4:13, we are on the record.
2         FURTHER CROSS-EXAMINATION
3    BY MS. DEUTSCHLE:
4    Q    Ms. McTaggart, my name is Kathrin Deutschle. I
5    represent Laudan Properties. I just have a few questions for
6    you.
7         I believe that you testified at your prior deposition that
8    Laudan Properties was a vendor of Altisource in 2013, 2014; is
9    that correct?
10   A    Correct.
11   Q    Okay. Any orders that would have been given by
12   Altisource to Laudan would have gone through the VMS; is that
13   correct?
14   A    That's correct.
15   Q    Okay. And any findings that Laudan would report back
16   to Altisource would also be through the VMS; is that correct?
17   A    Yes.
18   Q    Okay. In this case, Laudan was ordered to determine
19   the vacancy status at the Thakkar premises on two occasions,
20   October 2013 and January 2014.
21   A    Was it -- I believe there was an order in September.
22   I don't have the -- the -- can I look at the -- the -- the
23   documents?
24   Q    What -- what documents would you need to reflect --
25   refresh your recollection?

Page 174

1    A    The inspection orders.
2         MR. WOOTEN: You know an item number?
3         MS. DEUTSCHLE: I have no idea.
4         THE DEPONENT: Thank you.
5         MR. WOOTEN: If you can just tell us a Bates number,
6    then we'll --
7         THE DEPONENT: 6, Exhibit 6; the first inspection
8    order was issued on 9/5/2013.
9    BY MS. DEUTSCHLE:
10   Q    And was there a second order?
11   A    The second order was issued on 11/14, and the third on
12   12/17. So there were three orders.
13   Q    Three orders? Okay. Do you have knowledge whether
14   Laudan reported back whether the prop -- whether the premises
15   was vacant or occupied on any time that Laudan visited the
16   premises?
17   A    I believe they reported that it was vacant.
18   Q    Do you have any knowledge as to what Laudan did or
19   actions it took to determine, when it was making its status, as
20   to whether the property was vacant or occupied?
21   A    I'm not sure.
22   Q    Have you spokeN to anyone at Laudan regarding Mr.
23   Thakkar's claims?
24   A    No.
25   Q    Did Laudan have any role or part in whether Mr.

Page 175

1    Thakkar's account was active or inactive on the VMS system?
2    A    Yes.
3    Q    Okay. And how is that?
4    A    Occupancy changes; once you report that it's vacant,
5    it triggers the securing orders.
6    Q    Okay. So was it just by Laudan reporting that the
7    property was vacant that it would trigger?
8    A    Yes. That order; yes.
9    Q    Okay. And it would only be by Laudan placing in the
10   system vacant or occupied?
11   A    That's correct. That trigger -- triggers those
12   orders.
13   Q    Okay. There's no other way that Laudan would be able
14   to trigger any order?
15   A    That Altisource triggers the order?
16   Q    Correct.
17   A    It's based on -- on the -- the vacancy -- the
18   occupancy report back to us.
19   Q    Okay. Do you know whether any instructions were given
20   to Laudan as to what it was to do in order to determine whether
21   a premises was vacant or occupied?
22   A    We've provided numerous guides, training gui --
23   training guides to all our vendors. But, again, they're the
24   experts. That's -- you know, that's what theY presented to us
25   to become a vendor. They have knowledge of the industry.

Page 176

1         MS. DEUTSCHLE: I don't have any more questions.
2         MR. MARTIN: I have just a few quick clean-up
3    questions.
4         FURTHER EXAMINATION
5    BY MR. MARTIN:
6    Q    Pat, earlier today you were asked about whether
7    Altisource ever gives vendor information to the police. Do you
8    remember that series of questions?
9    A    Yes.
10   Q    Okay. And as I understand, generally Altisource
11   requires a subpoena?
12   A    That's correct.
13   Q    Okay. And once you get that subpoena, is that handed
14   over to the legal department?
15   A    That's correct.
16   Q    And in responding to that, would providing vendor
17   information to the police, would that be a part of the response?
18   A    Yes.
19   Q    Okay. Second question -- series of questions:
20   You -- you were asked about whether the -- whether there were
21   any postings in this -- in this case regarding Mr. Thakkar's
22   property. Do you recall seeing any -- any pictures of -- of
23   postings in this case?
24   A    I recall seeing postings with the Altisource logo. I
25   couldn't tell the content.

Page 177

1    Q   Okay.  In your first deposition -- I've got your
2    exhibits from that deposition in front of you -- there was a
3    one-page document that was placed in front of you, Exhibit 17.
4    Let me hand that to you.  And you were asked some questions, I
5    believe, about this note here at the bottom.
6        A   Yes.
7        Q   Okay.  First of all, that note at the bottom, what --
8    what does that -- what does that say just so we're all clear?
9        A   It says "Note: Inspections completed after 10 April
10   2013, should be reported as occupied in case no one is there to
11   verify the occupancy status.  Anything prior to that will be
12   vacant by -- I'm not sure -- by --
13       Q   Okay.  And have you had a chance after the deposition
14   to see where this document came from?
15       A   I did.
16       Q   And what -- what does it pertain to?
17       A   Gated communities.
18       Q   So this is in relation to gated communities?
19       A   Yes.
20       Q   And Mr. Thakkar did not live in a gated community; is
21   that right?
22       A   Not to my knowledge.
23       Q   Okay.  A final question:  You provided some testimony
24   about the situation that existed with Mr. Thakkar paying off the
25   loan, I believe it was December 26, and then the -- the manual

Page 178

1    reconciliation that occurred from between Altisource's records
2    Ocwen's records.  Do you recall that testimony from your
3    previous deposition?
4        A   Very well.
5        Q   Okay.  And have you had a chance to further look at
6    that issue?
7        A   Yes.
8        Q   Okay.  Can you -- can you describe for us exactly what
9    happened in that -- in that sequence?
10       A   I had described it then as a technical glitch.  I've
11   had more time to look into it.  It was not a technical glitch.
12   It was a process timing issue.  The -- the manual reconciliation
13   was done a few hours that morning before that loan was paid off.
14   So that's why that was missed.
15       Q   Okay.  And, then, did a later reconciliation occur on
16   January 6?
17       A   That's correct.
18       Q   Okay.  And then there was -- was there a holiday in
19   the middle there as well?
20       A   Yes.  Yes.
21       Q   That was the New Year's Day holiday?
22       A   Yes.  Yes.
23       Q   Okay.  I have nothing further.
24       A   Thank you.
25           MR. MARTIN:  Anyone else?  So at this time we'll close

Page 179

1    the deposition of the Altisource corporate representative.
2    We would like to review and sign.
3            THE VIDEOGRAPHER:  Thank you very much.  Please stand
4    by.  At approximately 4:22, we are off the record.
5                (Proceedings concluded.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 180

DISCLOSURE

STATE OF GEORGIA     Deposition of Patricia McTaggart
COUNTY OF ROCKDALE   November 9, 2017

        Pursuant to Article 8.B of the rules and regulations of the
Board of Court Reporting of the Judicial Council of Georgia, I
make the following disclosure:

I am a Georgia Certified Court Reporter.  I am here as an
independent contractor for Janice Baker & Associates.

Janice Baker & Associates was contacted by the offices Nick
Wooten, LLC, Attorney at Law to provide court reporting services
for this deposition.  The firm will not be taking this
deposition under any contract that is prohibited by O.C.G.A. 15-
14-37(a) and (b).

November 9, 2017.


                        _____
                        J. Robin Sawyer, CCR, CVR
                        #4882-9574-0787-9168

Page 181

## CERTIFICATE

GEORGIA:

Rockdale County:

I hereby certify that the foregoing transcript was stenographically recorded by me, as stated in the caption; the colloquies, statements, questions, and answers thereto were reduced to typewriting under my direction and supervision; and the transcript is a true and correct record of the testimony/evidence given to the best of my ability.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in the action.

November 9, 2017.

_____
J. Robin Sawyer
Certified Court Reporter
#4882-9574-0787-9168

---

Page 182

## ERRATA SHEET

I do hereby certify that I have read all questions propounded to me and all answers given by me on November 9, 2017, taken before J. Robin Sawyer and that:

1) There are no changes noted.

2) The following changes are noted:

Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or the Official Code of Georgia Annotated 9-11-30(e), both of which read in part: Any changes in the form or substance which you desire to make shall be entered upon the deposition...with a statement of the reasons given...for making them. Accordingly, to assist you in effecting corrections, please use the form below:

Page No.      Line No.      should read:

And the reason for the change is:

Page No.      Line No.      should read:

And the reason for the change is:

Page No.      Line No.      should read:

And the reason for the change is:

---

Page 183

Page No.      Line No.      should read:

And the reason for the change is:

Page No.      Line No.      should read:

And the reason for the change is:

Page No.      Line No.      should read:

And the reason for the change is:

Page No.      Line No.      should read:

And the reason for the change is:

Page No.      Line No.      should read:

And the reason for the change is:

Page No.      Line No.      should read:

And the reason for the change is:

Page No.      Line No.      should read:

---

Page 184

And the reason for the change is:

Page No.      Line No.      should read:

And the reason for the change is:

Page No.      Line No.      should read:

And the reason for the change is:

If supplemental or additional pages are necessary, please furnish same in typewriting annexed to the interview.

_____
(name and signature of deponent.)

Sworn to and subscribed before me,

this the      day of      , (year).

Notary Public