**STATE OF NEW YORK**
**DEPARTMENT OF FINANCIAL SERVICES**
**BANKING DEPARTMENT**

## AGREEMENT ON MORTGAGE SERVICING PRACTICES

WHEREAS Ocwen Financial Corporation, the parent company of Ocwen Loan Servicing, LLC (collectively "Ocwen"), a mortgage servicer regulated by the New York State Banking Department (the "Department") and headquartered at 2002 Summit Boulevard, 6th Floor, Atlanta, Georgia 30319, requested that the Department grant approval for it to acquire Litton Loan Servicing LP ("Litton"), a mortgage loan servicer engaged in the business of servicing mortgage loans in New York State and headquartered at 4828 Loop Central Drive, Houston, TX 77081 and a subsidiary of Goldman Sachs Bank USA ("GSB") headquartered at 200 West Street, New York, New York 10282 (the "Acquisition"); and

WHEREAS, the Department seeks to ensure that the post-acquisition entity, which would become the twelfth largest mortgage loan servicer in the United States, has sufficient capacity to properly board and manage a significant portfolio of stressed loans, including the ability to effectively manage the increased volume and comply with HAMP requirements, internal loss mitigation policies and procedures and laws and regulations governing mortgage loan servicing and foreclosure activities; and

WHEREAS, the Department further has consumer protection concerns relating to practices highlighted in the media that have been prevalent in the mortgage servicing industry generally, including but not limited to, the practice of "Robo-signing," referring to affidavits in foreclosure proceedings that falsely attest that the signer has personal knowledge of the facts presented therein and/or were not notarized in accordance with state law; weak internal controls and oversight that may have compromised the accuracy of foreclosure documents; unfair and improper practices in connection with loss mitigation, including improper denials of loan modifications; and imposition of improper fees by servicers, among others; and

WHEREAS, the Superintendent of Financial Services and of Banks has conditioned the issuance of a "No Objection" letter on the Acquisition upon Ocwen's commitment to adhere, and in the case of any portfolio serviced by a different Ocwen subsidiary or affiliate, to cause to adhere to this Agreement on Mortgage Servicing Practices (the "Servicing Practices"), together with Litton's commitment to adhere to the Servicing Practices, and GSB's commitment to adhere to the Servicing Practices in the event it reenters the mortgage servicing business following its sale of Litton; and

WHEREAS, Ocwen and Litton wish to be leaders in the mortgage servicing industry by adhering to, and causing to be adhered to, the Servicing Practices which they believe are in the best interest of homeowners and investors, and GSB also wishes to be a leader by committing to adhere to the Servicing Practices in the event it should return to the mortgage servicing business; and

WHEREAS, to provide further assurance to the Department that the interests of borrowers whose mortgage loans are currently serviced by Litton will be adequately protected if the Acquisition proceeds, Goldman Sachs Group, Inc. ("GS") has separately committed for itself and its subsidiaries to forgive 25% of the unpaid principal balance on certain delinquent first lien residential mortgage loans owned by GS or a subsidiary of GS, totaling approximately $13 million in forgiveness.

NOW THEREFORE, Ocwen and Litton agree to adhere to the following Servicing Practices and GSB agrees that, if it reenters the mortgage loan servicing business, it will adhere to the Servicing Practices (each of Ocwen, Litton and GSB, if it reenters the mortgage loan servicing business, is hereinafter referred to as "Servicer"):

## MORTGAGE SERVICING PRACTICES

*Document Execution and Accuracy of Documentation*

1. Servicer shall ensure that affidavits and sworn statements submitted in foreclosure proceedings are executed by individuals with actual personal knowledge of the matters set forth therein based upon the individuals' personal review of borrowers' loan files and other information relating to borrowers' loans.

2. Servicer shall ensure that any information set forth in an affidavit or sworn statement detailing a borrower's default and the right to foreclose is accurate, complete and reliable.

3. Servicer shall ensure that notarized documents are signed by the affiant in the actual presence of a notary.

4. Servicer shall not provide incentives to employees or third parties based upon the number of documents executed or the speed at which documents are executed.

5. Servicer shall withdraw any pending foreclosure action in which filed affidavits are not accurate, complete, and reliable, and/or were not notarized in accordance with applicable law. In any subsequent foreclosure action concerning the same mortgage, Servicer shall ensure that all affidavits are accurate, complete, reliable, and notarized in accordance with applicable law.

6. Servicer shall implement policies and procedures to ensure that borrowers' account information is accurate and complete, and shall promptly remediate any inaccuracies in borrowers' account information. Servicer shall annually cause to be conducted an independent review of its systems, policies and procedures to ensure that they are sufficient to ensure that borrower's account information is accurate and complete.

*Ownership of Note; Foreclosures*

7. Servicer shall implement processes to ensure that, in any foreclosure action Servicer commences, or in any foreclosure action commenced by another entity on a mortgage

2

Servicer services, the foreclosing entity has a documented enforceable interest in the promissory note and mortgage under applicable law, or otherwise possesses the legal right to foreclose.

8. In each summons and complaint to commence a foreclosure action on a mortgage Servicer services, Servicer shall include or cause a third party to include an affirmative allegation that at the time the proceeding is commenced, the foreclosing entity is the owner and holder of the subject mortgage and note, possesses a security interest or other interest entitling it to foreclose on the subject mortgage and note, or has been delegated the authority to institute a foreclosure action by such owner and holder, or party possessing the legal right to foreclose. In addition, Servicer shall plead or cause a third party to plead in such complaints that the originals of the subject mortgage and note are in the foreclosing entity's possession and control or that of the custodian, or in the alternative that all the requirements of Paragraph 10 below have been met, and that such foreclosing entity is otherwise entitled to enforce the subject mortgage and note pursuant to law.

9. Upon a borrower's request, Servicer shall provide to the borrower the name of the entity that holds the borrower's note and contact information for such entity.

10. If the original note or any interim assignment or allonge is lost or otherwise unavailable, Servicer shall comply with applicable law in any attempt to establish ownership of the note and the right to enforcement. Servicer shall ensure good faith efforts to obtain or locate a note lost while in the possession of Servicer or Servicer's agent.

11. Servicer shall not intentionally destroy or dispose of original notes that are still in force.

12. In the event that any borrower is found to have been wrongfully foreclosed, Servicer shall ensure that the borrower's equity in the property is returned if the property has not been sold to a third party, or if sold to a third party, adequately compensate the borrower for the wrongful foreclosure.

*Quality Assurance/Audits*

13. Servicer shall conduct regular audits of a statistically valid sample of documents prepared by staff and agents in furtherance of foreclosure and bankruptcy proceedings to ensure that the documents and their preparation comply with the loan instruments, prevailing law and these Servicing Practices. The audit reviews shall also verify the accuracy of each factual allegation in each affidavit or sworn statement, account summary, ownership certification, loss mitigation affidavit, adverse action notice and other pleadings, filings or documents, by reviewing the underlying documentation/information. Servicer shall take appropriate remedial steps if any deficiencies are identified, including remediation in individual cases, revision of procedures, retraining, and disciplinary action.

3

*Oversight of Third Party Vendors*

14.  Servicer shall adopt policies and procedures to oversee and manage foreclosure firms, law firms, foreclosure trustees, and other agents, independent contractors, entities and third parties (including subsidiaries and affiliates) that provide foreclosure or bankruptcy processing services ("Third-Party Providers"), including:

(a) Ensuring compliance with the Administrative Order of the Chief Administrative Judge of the Courts of New York dated March 2, 2011, AO/431/11, setting forth the form and requirements for an affirmation by plaintiff's counsel in residential mortgage foreclosure actions;

(b) Performing due diligence of Third-Party Providers' qualifications, expertise, capacity, complaints, information systems, quality assurance plans, financial viability, and compliance with licensing requirements and rules and regulations (including prohibitions on fee splitting);

(c) Amending agreements or engagement letters with Third-Party Providers to require them to comply with their contractual obligations to Servicer, Servicer's policies  and procedures, the loan instruments, these Servicing Practices, and New York laws and rules;

(d) Conducting regular reviews of a sample of the foreclosure and bankruptcy documents prepared by each foreclosure firm, law firm, foreclosure trustee and other Third-Party Providers it uses to ensure compliance, and taking appropriate remedial steps if any problems are identified through this review or otherwise, including terminating its relationship with the firm or trustee;

(e) Tracking any instance where an adversary requests the imposition of sanctions against a law firm, foreclosure firm, trustee or other Third-Party Provider, or where a court imposes such sanctions, and taking appropriate action, including termination of its relationship with any Third-Party Provider that has been sanctioned by a court;

(f) Adopting standards for documentation of Third-Party Providers' fees and charges;

(g) Adopting policies and procedures for reviewing customer complaints about Third-Party Providers;

(h) Ensuring that all Third-Party Providers are provided reliable contact information for Servicer employees who possess information relevant to the services provided by the Third-Party Providers; and

(i) Conducting a risk assessment of Third-Party Providers to ensure that such Providers adequately protect confidential borrower information as required by Section 501(b) of the Gramm-Leach-Bliley Act.

*Staffing*

15. Adequate Staff. Servicer shall develop and implement a program to maintain sufficient staff in place who are adequately trained to: (1) provide information to borrowers or borrowers' representatives; (2) process requests for loss mitigation alternatives, including loan modification applications; (3) evaluate requests for non-foreclosure options; (4) manage foreclosure documentation process, including execution of relevant foreclosure documents; (5) handle escalated cases; (6) facilitate resolution of borrower complaints; and (7) manage collections. Factors that shall be considered in determining the adequacy of staffing, include without limitation:

(a) Size of loan portfolio;

(b) Percentage of delinquent loans;

(c) Percentage of loan modification or other loss mitigation requests;

(d) Number of pending foreclosure actions;

(e) Knowledge and experience level of existing staff;

(f) Loan to employee ratio; and

(g) Compliance and internal audit results, including reviews of document management system.

16. Servicer shall provide a report within 90 days of the adoption of these Servicing Practices or otherwise upon reasonable request of the Department identifying the number of full time equivalent employees assigned to loss mitigation alternatives, and escalation and the caseload of each individual.

*Training*

17. Servicer shall ensure that employees and managers engaged in mortgage loan servicing, collection, loss mitigation, foreclosure prevention and foreclosure processing and/or proceedings participate in a compliance training program. The training program shall address, at a minimum:

(a) State and federal laws and regulations governing mortgage loan servicing, including laws relating to the handling of specific classes of delinquent borrowers (Servicemembers Civil Relief Act and Bankruptcy Code), loss mitigation, collection practices, and foreclosure proceedings;

(b) Preparation and execution of legal documents, including affidavits of indebtedness or merit, declarations, assignments, note endorsements and lost note affidavits;

5

(c) Guidelines of foreclosure alternatives under the Making Home Affordable ("MHA") program such as Home Affordable Modification Program ("HAMP"), Home Affordable Refinance Program ("HARP"), Home Affordable Foreclosure Alternatives ("HAFA"), Home Affordable Unemployment Program ("UP") and other borrower assistance programs offered through state, federal or local government;

(d) Servicer's policies and procedures for servicing mortgage loans and handling delinquent accounts;

(e) Procedures and systems used to facilitate verification of information contained on foreclosure documents prepared, regardless of whether such document is internally or externally prepared, verification of information provided to borrower or third-party representative concerning loan modification or other loss mitigation documents and written correspondence; and

(f) Action that will be taken by Servicer against employees for noncompliance with servicing policies and procedures, in particular, execution of documents and verification of borrower information.

18. All employees or managers engaged in mortgage servicing, loss mitigation, foreclosure alternatives, foreclosure processing or proceedings hired after the initial compliance training required under these Servicing Practices is provided shall receive compliance training within 30 days of their employment start date. The contents and implementation of the compliance training must be fully documented, including completion of a certification form by each respective employee stating that the individual attended the required training and understands Servicer's policies and procedures relating to mortgage loan servicing, document execution and loss mitigation alternatives. Documentation relating to the contents, scheduling and attendance at each training session must be maintained for a period of three years and available for review by the Department upon reasonable request.

### Notices, Single Point of Contact and Modifications for Transferred Servicing Files

19. Acquisition of Delinquent Loans. Within 30 days of the acquisition of delinquent loans, *i.e.*, loans that are delinquent 60 days or more, and loans where default may be imminent, a notice must be provided to borrowers appointing a single point of contact or providing for the appointment of a single point of contact based upon the borrower's convenience. The notice must also include information regarding the policies and procedures employed by the acquiring Servicer in handling any pending loss mitigation request, trial modification, permanent modification or non-foreclosure option transferred from the previous servicer. The provisions of paragraphs 26 and 27 shall apply to the designated single point of contact.

20. As of the effective date of any acquisition or transfer of loan servicing portfolios to Servicer, Servicer shall establish and have up and running a toll-free number to handle all in-bound calls from borrowers previously serviced by another servicer. The team handling such in-bound calls must have access to electronic and paper-based borrower

records and knowledge about Servicer's servicing policies and procedures, including loss mitigation programs, collection practices and payment dispute resolution. Additionally, the team must remain operational until any acquired or transferred servicing portfolio is fully integrated into Servicer's servicing platform but not less than 90 days.

21. Pending Modification. Borrowers with pending modification requests must be provided with a notice within 5 days of the initial communication identifying the single point of contact. The notice shall provide: (1) a list of all documents and information required from the borrower to evaluate the borrower for a loan modification; (2) an explanation of any change in the type of loss mitigation alternative for which the borrower is being considered; (3) the reason for the change in the type of loss mitigation offered (e.g., borrower does not qualify, program not offered); (4) the time frame in which the borrower must supply the requested information; (5) a toll-free number that provides a list of government approved not-for-profit housing counselors in the homeowner's geographic area as listed on the Department's website, the Department of Housing and Urban Development's website or the Division of Housing and Community Renewal's website; (6) a statement clearly outlining the effect of the borrower's failure to submit all required documentation, including potential denial of loan modification or other loss mitigation alternatives, continuation of pending foreclosure action or referral to foreclosure; and (7) a statement outlining the action that will be taken if documentation is not received within the time period specified in the notice.

22. Trial Modification. Borrowers with trial modification shall be allowed to continue making existing trial modification payments for the remainder of the trial modification period. If the trial modification period terminates in less than 60 days, an extension shall be granted unless such extension is not compliant with Government Sponsored Enterprise ("GSE") program guidelines and the loan is a GSE loan. Written communication must be provided to the borrower, which at a minimum addresses: (1) the new expiration date for the borrower's trial modification; and (2) a list of documents, if any, required to complete the permanent modification. Documentation concerning the extension of the trial modification period must be maintained in the borrower's servicing file.

23. Permanent Modification. Borrowers who have successfully completed the trial modification prior to transfer and are awaiting a permanent modification must be allowed to continue making trial modification payments until the acquiring Servicer can provide permanent modification documents, unless such payment is not compliant with GSE program guidelines and the loan is a GSE loan. The permanent modification payment shall not change materially from the permanent modification payment previously offered or discussed with the borrower or borrower's representative. Borrowers must be provided with clear written communication listing: (1) monthly payment, including any escrow for taxes and insurance; (2) interest rate and period of applicability if such rates adjust; (3) principal balance; (4) instructions for properly executing the modification agreement; (5) the time frame in which the borrower must return the permanent modification agreement; and (6) a statement outlining the action that will be taken if documentation is not received within the time period specified. Borrowers who have submitted executed permanent modification documents and are satisfactorily making payments under the permanent modification shall be allowed to continue such modification arrangements.

7

24. Previously denied modification request. Borrowers who were previously denied loan modification by the transferring Servicer shall not be precluded from consideration for a modification or other loss mitigation alternative offered by the acquiring Servicer by reason of the previous denial.

25. Documentation of the actions taken to comply with Paragraphs 19-24 must be maintained in the borrower's servicing file. Additionally, management information reports (monthly, quarterly and annually) shall be maintained listing: (1) the volume of delinquent loans; (2) pending modifications or other loss mitigation alternatives; (3) active trial modifications; (4) pending foreclosures or foreclosure sales; and (5) permanent modifications, acquired and post compliance with Paragraphs 21-24. The reports must be available for review by the Department upon reasonable request.

*Borrower Communication*

26. Servicer shall assign a single point of contact or provide for the appointment of a single point of contact based upon the borrower's convenience, to each borrower who has submitted a request or an application for a loss mitigation alternative, and to borrowers in the process of foreclosure, within the following timetable:

(a) Within 30 days of the date of Servicer's agreement to adhere to these Servicing Practices as to Servicer's existing delinquent borrowers;

(b) Within 7 days of the date of Servicer's agreement to adhere to these Servicing Practices as to all of Servicer's existing borrowers in foreclosure;

(c) Thereafter, within 15 days of Servicer's identification consistent with GSE requirements of a borrower for whom default may be imminent (current or less than 60 days delinquent), and 15 days after a borrower has missed a contractual payment.

Servicer shall provide within 5 business days of the designation of a single point of contact a written communication detailing the designated representative's telephone number, email address and hours of availability, or providing for the appointment of a single point of contact based upon the borrower's convenience.

27. Servicer shall provide borrowers referenced in paragraph 26 a single point of contact using the designated contact model set forth in (a) or the appointment model set forth in (b) below.

(a) Designated single point of contacts shall:

> i. Have access to all electronic and paper-based records containing current borrower information relating to (a) loss mitigation applications, (b) pending foreclosure actions, and (c) documentation requests, including details of missing or incomplete documentation.

8

ii. No later than the 5th business day after a borrower has been provided with information regarding the single point of contact, initiate an out-bound call to the borrower to introduce himself or herself. If the borrower is unreachable via telephone, the designated individual may use alternative mechanisms as outlined in Delinquency Management and Default Prevention Guidelines issued by the GSEs.

iii. Initiate outbound contact with the borrower that, at a minimum:

a. Meets the standards of the Quality Right Party Contact as outlined in Fannie Mae Announcement SVC 2011-08, issued June 6, 2011;

b. Informs the borrower of available loss mitigation alternatives, including non-foreclosure options and provide borrower with information regarding the status of borrower's account, any request for loan modification or other loss mitigation alternative, and foreclosure action, if any;

c. Informs the borrower of the preferred method of transmitting documents to the Servicer and the address to which all future communications should be directed;

d. Provides the borrower with information on the action the borrower must take to be considered for a loss mitigation alternative or non-foreclosure option, including the time frame in which the borrower must complete a specific action; and

e. Provides the borrower with reference information on where borrower may access additional information about foreclosure alternatives, including links to KnowYourOptions.com, MakingHomesAffordable.gov, Department of Housing and Urban Development and the Department's website.

iv. Within 5 days of receipt of any application or other documentation submitted ·by borrower with respect to a request for a loan modification, other loss mitigation alternatives or non-foreclosure options (*e.g.*, short sale, deed-in-lieu), provide a letter of acknowledgement to the borrower detailing:

a. A list of missing documents or the information needed to evaluate the borrower for a loss mitigation alternative;

b. A toll-free number that provides a list of government approved not-for-profit housing counselors in the homeowner's geographic area as listed on the Department's website, the Department of Housing and Urban Development's website or the Division of Housing and Community Renewal's website;

c. A statement clearly outlining the effect of the borrower's failure to submit all required documentation, including potential denial of loan modification or other loss mitigation alternatives, continuation of pending foreclosure action or referral to foreclosure; and

d. A statement outlining the action that will be taken if documentation is not received within the time period specified in the letter.

v. Coordinate with the borrower and in-house and third party service providers to facilitate compliance with loss mitigation alternatives or non-foreclosure option time frames outlined in state and federal laws and guidance and MHA and GSE program requirements;

vi. Upon the request of the borrower, escalate the borrower's loan file to a designated individual responsible for managing escalated caseloads.

(b) Alternatively, Servicer shall offer a single point of contact appointment model for borrowers' convenience as follows:

i. If borrower has not contacted Servicer within 5 business days of the written communication referenced in paragraph 26, Servicer shall initiate an out-bound call to the borrower. If the borrower is unreachable via telephone, the Servicer can use alternative mechanisms as outlined in Delinquency Management and Default Prevention Guidelines issued by the GSEs. Such contact shall meet the standards of the Quality Right Party Contact as outlined in Fannie Mae Announcement SVC 2011-08, issued June 6, 2011.

ii. At the time contact is made with the borrower, Servicer shall:

a. Inform the borrower of available loss mitigation alternatives, including non-foreclosure options and provide borrower with information regarding the status of borrower's account, any request for loan modification or other loss mitigation alternative, and foreclosure action, if any;

b. Assign a single point of contact if borrower requests more information or wishes to pursue loss mitigation alternatives, schedule an appointment with the single point of contact at a date and time convenient to the borrower, and provide written confirmation within 5 business days of the contact detailing the name of the single point of contact and a phone number for establishing future appointments with the same designated single point of contact;

c. Inform the borrower of the preferred method of transmitting documents to the single point of contact and the address to which all future communications should be directed;

10

      d.  Provide borrower with information on the requirements for loss
mitigation alternatives or other non-foreclosure options, including the time
frame in which the borrower must complete required actions; and

      e.  Provide borrower with references for additional information on
foreclosure alternatives, including links to KnowYourOptions.com,
MakingHomesAffordable.gov, and the Department of Housing and Urban
Development's and the Department's website.

iii. Within 5 days of receipt of any application or other documentation submitted
by borrower with respect to a request for a loan modification, other loss mitigation
alternatives or non-foreclosure options (*e.g.*, short sale, deed-in-lieu), Servicer
shall assign a single point of contact to the borrower if one was not already
assigned. Thereafter, the single point of contact shall provide a letter of
acknowledgment to the borrower detailing:

      a.  The name of the designated representative and steps the borrower can
take to set up an appointment with the designated representative to discuss
their application;

      b.  A list of missing documents or the information needed to evaluate the
borrower for a loss mitigation alternative;

      c.  A toll-free number that provides a list of government approved not-for-
profit housing counselors in the homeowner's geographic area as listed on
the Department's website, the Department of Housing and Urban
Development website or the Division of Housing and Community
Renewal's website;

      d.  A statement clearly outlining the effect of the borrower's failure to
submit all required documentation, including potential denial of loan
modification or other loss mitigation alternatives, continuation of pending
foreclosure action or referral to foreclosure;

      e.  A statement outlining the action that will be taken if documentation is
not received within the time period specified in the letter.

iv. The single point of contact shall have access to all electronic and paper-based
records containing current borrower information relating to (a) loss mitigation
applications, (b) pending foreclosure actions, and (c) documentation requests,
including details of missing or incomplete documentation;

v. The single point of contact shall coordinate with the borrower and in-house and
third party service providers to facilitate compliance with loss mitigation
alternatives or non-foreclosure option time frames outlined in state and federal
laws and guidance and MHA and GSE program requirements;

vi. Upon the request of the borrower, the single point of contact shall escalate the borrower's loan file to a designated individual responsible for managing escalated caseloads.

28. Timelines for loan modifications referenced above shall conform to the time periods required by HAMP or by the GSEs, whichever are shorter.

29. Consistent with the Department's Mortgage Servicer Business Conduct Rules, Part 419 of the Superintendent's Regulations, Servicer shall review the complete loan modification application submitted by the borrower and shall determine the disposition of borrower's trial or preliminary loan modification request no later than 30 days after receipt of the complete loan modification application, absent compelling circumstances beyond Servicer's control.

30. Consistent with GSE and HAMP requirements, for all proprietary loan modification programs, Servicer shall allow properly submitted borrower financials to be used for 90 days from the date the documents are received, unless Servicer learns that there has been a material change in circumstances or unless investor requirements mandate a shorter time frame.

31. Change in Single Point of Contact. The single point of contact shall remain assigned to the borrower until such time as the borrower's account becomes current, unless the single point of contact is reassigned or leaves the employment of Servicer, or the number of borrowers serviced by the designated representative becomes too great to ensure appropriate borrower attention, or the borrower requests assignment to another single point of contact. In the event it becomes necessary to change the designated single point of contact for any of the above-stated reasons, Servicer must provide written notification to the borrower within 5 business days of the assignment of a new single point of contact. The communication must clearly notify the borrower of the changed information, including the single point of contact's name, telephone number, email address and hours of availability.

32. Once a single point of contact has been designated, all written communications provided to the borrower or borrower's representative relating to loss mitigation and foreclosure status must include the name of the single point of contact and identify that individual as the borrower's designated representative for inquiries and submission of documents.

33. If Servicer wishes to provide borrowers with additional customer care personnel to assist the borrower with loss mitigation at times when the borrower's single point of contact is not available, it must ensure that the additional personnel have full access to the borrower's most recently updated records and that the additional personnel immediately update the borrower's records to reflect all communication with the borrower.

34. Documentation of Escalated Cases. Servicer shall ensure that any escalated case received is properly documented with: (1) the date the escalated case is received, (2) the borrower's name; (3) the referring party; (4) the name of the requestor, if any, and (5) a

brief reason for the referral. At a minimum, escalated cases shall be handled within the following guidelines:

(a) Within 3 business days of receiving the case, Servicer shall send the requestor and the borrower a written acknowledgement detailing: (1) contact name and department; (2) case reference name or number (3) a proposed resolution date, which must be no more than 15 days from the date the inquiry was received; and (4) a toll-free escalation contact phone number. Servicer shall use best efforts to resolve the case within 15 days of receiving the case. The resolution date may be extended an additional 15 days, but under no circumstances can the total time to resolve the case exceed 30 days. Servicer shall not be deemed to violate this provision if Servicer has informed the requestor and the borrower of the information required to resolve the case and such information has not been provided.

(b) Within 5 business days of identifying the proposed resolution, Servicer must communicate to the requestor and the borrower in writing outlining the proposed resolution and action required of the borrower, if any.

35. Complaints. Regardless of account status, all complaints received from borrowers must be recorded with the date received, name of individual assigned to investigate the complaint, and nature of the complaint and complaint tracking number. The individual designated to investigate the complaint shall: (1) provide the complainant with written acknowledgment within 5 business days of receiving the complaint; (2) inform the borrower of any additional information required to accurately identify the borrower's account; (3) provide the borrower with a list of additional documentation required to facilitate a proper review of the borrower's complaint; and, if applicable, (4) inform the borrower that the complaint has been reassigned to (a) borrower's single point of contact, or (b) escalated to a supervisor.

36. Complaint Resolution. Within 30 days of the receipt of a complaint, if all information required to make a final determination with respect to the complaint is provided to the Servicer, the Servicer shall notify the borrower of the final determination with respect to the complaint.

37. Complaint Record. All communication and information pertaining to the current status and resolution of complaints must be maintained in servicing files as well as a separate complaint history file detailing: date complaint received, name of individual assigned, nature of complaint, status of complaint (*e.g.*, open, resolved), and action taken. *Independent Evaluation of Loan Modification Denials*

38. Servicer shall perform or cause to be performed an independent review of each denial of a request for a loan modification. Such evaluation shall be performed by an independent entity or group of Servicer staff that is independent from the staff that initially evaluated the borrower for a loan modification.

39. If the independent review concludes that the loan modification denial was correct, Servicer shall promptly send a written non-approval notice to the borrower. Such notice

shall state with the specificity the reason the loan modification was denied and the information considered in Servicer's decision to deny the loan modification.

40. If borrower is not satisfied with the independent review, the matter will be referred to an independent escalation unit for a second review.

41. Servicer shall not initiate or advance foreclosure until the independent review process is complete.

42. Servicer shall promptly make available account history to the borrower upon request.

*Restrictions on Dual Tracking*

43. Servicer will ensure that borrowers who are engaged in pursuing loan modifications or other loss mitigation are not referred to foreclosure, to the extent consistent with FHFA guidelines for GSE loans.

*Application of Payments*

44. Servicer shall promptly apply all payments received from borrowers, including but not limited to full monthly mortgage payments and trial modification payments, except to the extent that such application conflicts with the borrower's loan documents or applicable law.

45. For any loan on which interest is calculated based on a daily accrual or daily interest method, Servicer shall promptly accept and apply all borrower payments, including cure payments (where authorized by law or contract), trial modification payments, and payments by or on behalf of a borrower in bankruptcy to cure any pre-petition default and to maintain payments while the case is pending, as well as non-conforming payments. Payments shall be posted no more than 2 business days after receipt and credited as of the date received to borrower's account. Each monthly payment shall be applied first to interest and then to principal, provided that where mortgage insurance premiums, taxes and insurance or other payments must, as required by statute, be paid prior to interest and principal, such application shall continue.

46. For all other loans, Servicer shall promptly accept and apply all borrower payments, including cure payments (where authorized by law or contract), trial modification payments, and payments by or on behalf of a borrower in bankruptcy to cure any pre-petition default and to maintain payments while the case is pending, as well as non-conforming payments to the extent provided in the next paragraph. Payments shall be posted no more than 2 business days after receipt and credited as of the date received to borrower's account. Each monthly payment shall be applied as of the scheduled due date and will be applied first to interest and then to principal, provided that where mortgage insurance premiums, taxes and insurance or other payments must, as required by statute, be paid prior to interest and principal, such application shall continue.

47. Except to the extent prohibited by existing agreements, Servicer shall accept and apply non-conforming payments when the payment, whether on its own or when combined with a payment made by another source, comes within $50.00 of the scheduled principal and interest amount.

48. For payments that are not within $50.00 of the scheduled principal and interest payment amount, Servicer may post such payment to a suspense or unapplied funds account, provided that Servicer (1) discloses to the borrower the existence of and any activity in the suspense or unapplied funds account; (2) credits the borrower's account with a full payment as of the date that the funds in the suspense or unapplied funds account are sufficient to cover such full payment; and (3) applies payments from the suspense or unapplied funds account as outlined above. Servicer shall not take funds from suspense or unapplied funds accounts to pay fees until all unpaid contractual interest, principal, and escrow amounts are paid and brought current.

49. Notwithstanding the provisions above, Servicer shall not be required to accept payments which are insufficient to pay the full balance due after the borrower has been provided written notice that the contract has been declared in default and the remaining payments due under the contract have been accelerated.

*Servicing Fees.*

50. Schedules of Fees: Servicer shall maintain and keep current a schedule of fees as outlined in Part 419.10(a) of the Superintendent's Regulations. The schedule shall: (1) list standard or common fees charged to borrowers, regardless of whether such fees are charged by Servicer directly or indirectly; (2) be made available on Servicer's website and to the borrower or borrower's authorized representative upon request; (3) identify each fee; (4) provide a plain language explanation of the fee; and (5) state the maximum amount of the fee or how the fee is calculated.

51. Authorized Fees. Servicer may only collect a fee if the fee is for services actually rendered and such services were reasonable and appropriate and one of the following conditions as outlined in Part 419.10(b) of the Superintendent's Regulations is met: (a) the fee is expressly authorized and clearly and conspicuously disclosed by the loan instruments and not prohibited by law; (b) the fee is expressly permitted by law and not prohibited by the loan instruments; or (c) the fee is not prohibited by law or the loan instruments and is a reasonable fee for a specific service requested by the borrower that is assessed only after clear and conspicuous disclosure of the fee is provided to the borrower and the borrower expressly consents to pay the fee in exchange for the services.

52. Attorney's Fees. In addition to the limitations in Paragraph 50, attorney's fees charged in connection with a foreclosure action shall not exceed reasonable and customary fees for such work. The maximum foreclosure attorney's fees imposed should be consistent with guidelines published in Fannie Mae Allowable Attorney and Trust Fee Schedule, as updated from time to time. In the event the foreclosure action is terminated prior to final judgment and sale for a loss mitigation option, a reinstatement or payment in full, the borrower shall only be liable for reasonable and customary fees for work actually

performed as required by Part 419.10(c) of the Superintendent's Regulations.

53. Late Fees and Delinquency Charges. Servicer shall not impose any late fee or delinquency charge when the only delinquency is attributable to late fees or delinquency charges assessed on an earlier payment, and the payment is otherwise a full payment for the applicable period and is paid on its due date or within any applicable grace period. For the purposes of this provision and solely to determine whether a late payment could be assessed, payment should be applied first to the current installment and then to the delinquent installment and then to delinquency and other charges.

54. Late charges shall not be (a) in an amount greater than the past due amount; (b) collected from the escrow account or from escrow surplus without the approval of the borrower; (c) deducted from any regular payment; or (c) assessed after the borrower has submitted a complete loan modification application for evaluation; (d) assessed if the borrower is making timely trial modification payments; or (e) assessed while a short sale request is under evaluation.

55. Property Valuation. With the exception of GSE loans, property valuation (*e.g.*, "BPO") fees shall not be imposed on a borrower more than once in a 12 month period unless the property valuation is to facilitate the borrower's application for an alternative to foreclosure (*e.g.*, HAMP modification) or other non-foreclosure option (*e.g.*, short sale). The timing of property valuation for GSE loans shall conform to GSE guidelines. The amount of the fee for non-GSE loans shall be consistent with the reimbursement rates established in GSE's Preforeclosure Valuation Provider Information as updated from time to time.

56. Mark-up and Referral Fees. No mark-up shall be imposed on third-party default related foreclosure services. Referral fees shall not be paid to or accepted from third-party default or foreclosure related service providers, or in relations to third-party default or foreclosure services, regardless of whether such payment are made direct or indirectly.

57. Periodic Evaluation of Fees Charged. A periodic evaluation of fees charged shall be conducted to evaluate whether the frequency at which fees were assessed to any delinquent borrower's account was excessive under the terms of the borrower's loan documents, applicable federal and state laws and whether such fees exceed guidelines and standards established by the GSEs or applicable to federally insured transactions.

*Force-Placed Insurance*

58. Servicer shall take all commercially reasonable steps to continue or reestablish the existing homeowner's property hazard policy if there is a lapse in payment. Servicer shall ensure that force-placed insurance is not obtained for a borrower unless the borrower fails to provide evidence that property hazard insurance has been maintained as required by the mortgage loan contract following notices provided, at a minimum over two months, sent by Servicer, by first class mail, reminding the borrower that property hazard insurance must be maintained, stating that evidence that the borrower maintains such insurance is lacking, describing how the borrower may provide evidence of such

coverage, and explaining that if such coverage is not obtained, force-placed insurance may be obtained that will be significantly more costly and may provide less protection for the borrower.

59. Any force-placed insurance obtained for a borrower by Servicer shall be the lower of the last known amount of the borrower's coverage that was compliant with the requirements of the mortgage loan or the outstanding balance of the borrower's loan, provided further, that in no circumstances shall the amount of force-placed insurance exceed the replacement cost of the improvements on the mortgaged property.

60. Upon receipt of evidence of a borrower's existing property hazard insurance coverage, Servicer shall ensure that any force-placed insurance is terminated and that any unearned premiums are returned to the borrower.

61. To the extent Servicer purchases a master hazard insurance policy for force-placed insurance, it shall only purchase a policy that is reasonably priced in relation to the claims that may be incurred. In no event shall Servicer purchase a master hazard insurance policy from an affiliated entity.

_Compliance with Federal and State Law_

62. If adherence to any of these Servicing Practices would render compliance with any provision of federal law or state law relating to the same subject matter impossible, then compliance with such provision of federal or state law shall be deemed compliance with the relevant provision of these Servicing Practices. Servicer shall provide written notice to the Department within 15 days of its determination that a provision of these Servicing Practices is rendered impossible by federal or state law. If the Department disagrees with Servicer's determination, it shall notify Servicer of its disagreement within 10 days of its receipt of Servicer's notice, in which case, Servicer shall continue to adhere to the relevant Servicing Practices.

IT IS FURTHER AGREED that unless otherwise specified in the Servicing Practices, Ocwen and Litton shall have 60 days from the date of the Acquisition to implement the provisions and requirements of this Agreement; and

IT IS FURTHER AGREED that if any party to this Agreement agrees with any other regulator to adopt greater consumer protections or other more rigorous standards than are contained in this Agreement, such other provisions shall be incorporated by reference herein with respect to such party.

17

IT IS FURTHER AGREED that nothing in this Agreement shall preclude the Department from pursuing any examination, enforcement action or additional agreement with Servicer(s) regarding the subject of the above-described Servicing Practices.

IT IS FURTHER AGREED that this Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one instrument.

Dated: ~~August~~ September 1, 2011

**New York State Banking Department**

By: _____

Benjamin M. Lawsky
Acting Superintendent of Banks
Confirmed Superintendent of Financial Services

Dated: August 31, 2011

**Ocwen Financial Corporation**

By: _____

Ronald M. Faris
President and CEO

Dated: August ___, 2011

**Goldman Sachs Bank USA**

By: _____

Kevin Byrne
Chief Financial Officer

Dated: August ___, 2011

**Litton Loan Servicing, LP**
By Litton Consumer and Corporate Servicing, LLC
Its General Partner

By: _____

Thomas Halverson
Its President

18

IT IS FURTHER AGREED that nothing in this Agreement shall preclude the Department from pursuing any examination, enforcement action or additional agreement with Servicer(s) regarding the subject of the above-described Servicing Practices.

IT IS FURTHER AGREED that this Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one instrument.

Dated: ~~August~~ September 1, 2011

**New York State Banking Department**

By: _____
    Benjamin M. Lawsky
    Acting Superintendent of Banks
    Confirmed Superintendent of Financial Services

Dated: August ___, 2011

**Ocwen Financial Corporation**

By: _____
    Ronald M. Faris
    President and CEO

Dated: August 31, 2011

**Goldman Sachs Bank USA**

By: _____
    Kevin Byrne
    Chief Financial Officer

Dated: August 3/, 2011

**Litton Loan Servicing, LP**
By Litton Consumer and Corporate Servicing, LLC
Its General Partner

By: _____
    Thomas Halverson
    Its President

18

**STATE OF NEW YORK**
**DEPARTMENT OF FINANCIAL SERVICES**

**AMENDMENT #1 TO**
**THE AGREEMENT ON MORTGAGE SERVICING PRACTICES BETWEEN THE**
**NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES AND OCWEN**
**FINANCIAL CORPORATION DATED SEPTEMBER 1, 2011**
**(hereinafter, the "Agreement")**

WHEREAS, the parties have agreed to amend the Agreement,

NOW THEREFORE, the parties agree that the Agreement shall be amended as follows:

1.      Paragraph 26(c) of the Agreement is hereby deleted, and the following shall be added in its place and stead:

"(c) Thereafter, as to all loans, within 15 days of Servicer's identification of a borrower in default or, consistent with GSE guidelines, of a borrower for whom default may be imminent."

2.      Paragraph 43 of the Agreement is hereby deleted, and the following shall be added in its place and stead:

"43. Servicer will ensure that borrowers who are engaged in pursuing loan modifications or other loss mitigation are not referred to foreclosure, including for GSE loans to the extent consistent with FHFA guidelines for GSE loans."

3.      The following paragraphs shall be added immediately following Paragraph 62 of the Agreement:

"IT IS FURTHER AGREED that as to those borrowers' files advanced to foreclosure, which files have been referred to the Steven J. Baum P.C. law firm (the "Baum firm"), Servicer agrees not to charge borrowers any penalties, fees, costs or interest accrued for any delays in court appearances including settlement conferences by substituted counsel, as a direct result of the closing of the Baum firm and the substitution of counsel; and,

IT IS FURTHER AGREED that Servicer will require adherence to this Agreement on Servicing Practices as a condition to any agreement with a sub-servicer or third-party to perform some or all of the servicing activities with respect to Servicer's servicing portfolio; and,

IT IS FURTHER AGREED that Servicer shall adhere to this Agreement for any loans acquired or otherwise added to Servicer's portfolio subsequent to the signing of this Agreement; and,"

4.      This amendment and its provisions shall be effective and binding only when it is signed by all parties.

1

WHEREFORE, the signatures evidencing assent to this amendment have been affixed hereto on the dates set forth below.

Dated: December 15, 2011

**New York State Department of Financial Services**

By: _____

Benjamin M. Lawsky
Superintendent of Financial Services

Dated: December 14, 2011

**Ocwen Financial Corporation**

By: _____

Ronald M. Faris
President and CEO

2