## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| NIRAV THAKKAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15 CV 10109 |
| | ) | |
| OCWEN LOAN SERVICING, LLC, | ) | Judge John J. Tharp, Jr. |
| ALTISOURCE SOLUTIONS, INC., | ) | |
| BAXOL PROPERTIES, LLC, and | ) | |
| LAUDAN PROPERTIES, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

----------------------------------------------------------------------------------------------------------------------

| | |
|---|---|
| OCWEN LOAN SERVICING, LLC, | ) |
| ALTISOURCE SOLUTIONS, INC., | ) |
| BAXOL PROPERTIES, LLC, and | ) |
| LAUDAN PROPERTIES, LLC, | ) |
| | ) |
| Third-Party Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| GREEN GROUP CORP., | ) |
| | ) |
| Third-Party Defendant. | ) |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Nirav Thakkar alleges that in October 2013, while he was not home, agents of the defendants broke into the house he was renting from his uncle, changed the locks, rummaged throughout the house, and removed his personal property. Thakkar, who before this incident had already had several previous disputes with the company servicing the mortgage on the property, defendant Ocwen Loan Servicing ("Ocwen"), became so fed up with Ocwen that he purchased the property outright in December 2013. Yet even after he bought the property, his troubles with Ocwen were not over. In early January 2014, his house was broken into a second time. Both times,

this entry was carried out by individuals working for third-party defendant Green Group Corp. ("Green Group"), at the direction of Ocwen, through several intermediaries. Thakkar alleges that the second time, too, the locks were changed, the house was ransacked, and his personal property was taken.

Thakkar responded by bringing this lawsuit against Ocwen, as well as against defendants Altisource Solutions, Inc. ("Altisource"), Baxol Properties, LLC ("Baxol"), and Laudan Properties, LLC ("Laudan"), raising a variety of state-law claims. These four defendants, in turn, have filed third-party complaints against Green Group. All four defendants have filed motions for summary judgment or partial summary judgment against Thakkar. In addition, Green Group has filed a motion for partial summary judgment against Ocwen, Altisource, Baxol, and Laudan. For the reasons set forth below, all of these motions are denied.

## BACKGROUND

In 2006, Thakkar's uncle Viresh Thakkar purchased a piece of property located on Danbury Drive in Naperville, Illinois. The uncle took out a mortgage in order to buy the property, and bought it with the intent that his nephew would live there. Beginning in 2007, the younger Thakkar effectively rented the house from his uncle; he paid the mortgage directly, along with the property taxes and utilities.

Prior to February 2013, the mortgage on the Danbury Drive property was serviced by GMAC Mortgage Company. When GMAC went out of business in February, Ocwen began servicing the loan. Thakkar alleges that at that time, the loan was not in default. He claims, however, that immediately after the transfer, he began receiving letters alleging that money was owed for "late" payments. First Am. Compl. at Law ("Am. Compl.") ¶¶ 70-71, ECF No. 88. He says that he regularly spoke with Ocwen representatives to dispute the late fees and seek a

resolution over the course of 2013, but that Ocwen continued to claim that the loan was in default, and no such resolution was reached. *See id.* ¶ 73.

In September 2013, the loan was identified in Ocwen's system as being more than forty-five days delinquent. *See* Ocwen Loan Servicing, LLC's Statement of Material Facts Pursuant to Local Rule 56.1 and This Ct.'s Standing Order ("Ocwen's Facts") ¶ 46, ECF No. 237. This triggered a property preservation referral through an electronic system called Vendor Management Services ("VMS") operated by Altisource. Altisource is a company that provides "property preservation" services on behalf of mortgage servicers. It used VMS to communicate with both mortgage servicers like Ocwen and vendors such as Baxol and Laudan. After the referral was triggered, Altisource issued a work order to Laudan through VMS for an exterior inspection and occupancy determination. Laudan's contractor, Joe Stewart, conducted an exterior inspection of the Naperville property, and Laudan completed an inspection report that described the property as vacant. *Id.* ¶ 47.

What happened next is disputed. According to Ocwen, after it received Laudan's report that the property was vacant, Ocwen mailed a letter to Thakkar on September 20, 2013. The letter stated that a recent inspection had indicated that the property was vacant, and required Thakkar to complete a return letter or call in order to confirm that it was not. *See id.* ¶ 48. Thakkar, however, denies ever seeing the letter in question, and asserts that Ocwen cannot prove that the letter was ever sent. *See* Pl.'s Local Rule 56.1(b)(3) Resp. to Def. Ocwen's Statement of Undisputed Material Facts ¶ 48, ECF No. 277. In either case, no response was received, and so a work order was generated for Altisource to secure and winterize the purportedly vacant property. Altisource then issued a work order to Baxol ordering it to secure and winterize the property; Baxol, in turn, assigned the work order to its contractor Green Group.

On October 8, 2013, Green Group executed this work order.[1] Thakkar was not at home. Green Group entered the house, changed the locks, conducted an interior inspection, and shut off the water. *See* Def. Baxol Properties, LLC's Statement of Undisputed Material Facts ("Baxol's Facts") ¶ 43, ECF No. 246. Thakkar also alleges that the house was ransacked, and that his personal property was rummaged through and thrown throughout the house. *See* Am. Compl. ¶ 91. He claims that more than $20,000 of his personal property went missing from the house, including cash, financial documents, watches, and electronics, along with his prescription medication. *Id.* ¶¶ 92-93. Upon learning of this event, Thakkar made a complaint to the Naperville Police Department in which he claimed that he had been the victim of a burglary and that his personal property, including about $6,000 in cash, had been stolen.

According to Ocwen, shortly thereafter, on October 16, 2013, the account fell into default again when Thakkar and his uncle failed to make an installment payment for October 2013. *See* Ocwen's Facts ¶ 58. Thakkar, for his part, disputes that the account was in default at this stage (or any other). In any event, a similar series of events followed. Because the account was listed as being in default in Ocwen's system, an order was again automated for another inspection of the property to determine its occupancy status. Altisource again assigned the work order to Laudan, and Laudan or its contractor conducted two more exterior property inspections in which it again determined that the property was vacant.

Thakkar paid off the mortgage in full and purchased the property outright on December 23, 2013. *See* ECF No. 299-12. Ocwen processed this payment on December 26. For reasons that

---

[1] The day before, on October 7, Thakkar made a payment that was applied toward the June, July, August, and September installments for the loan. Under Ocwen's accounting, this brought the loan current, as Thakkar (or his uncle) had a fifteen-day grace period to pay the October installment. Baxol had already directed Green Group to secure the property before this payment was made, however. *See* Ocwen's Facts ¶¶ 53-54.

remain unclear, however, there was a delay in processing this payment information in Altisource's electronic systems. Due to the previous inspections purporting to show that the property was vacant, Altisource issued a work order to Baxol on December 31 to secure the property, and Baxol in turn assigned it again to Green Group. Once again, on or around January 2, 2014, Green Group entered the property, changed the locks, and conducted an interior inspection. Thakkar alleges that when he returned home shortly thereafter, he found that the deadbolt on the door had been drilled open. *See* Am. Compl. ¶ 110. He further asserts that approximately $75,000 in personal property was missing. *See id.* ¶ 111.

Thakkar filed this complaint in October 2015 against Ocwen and Altisource in the Circuit Court of Will County. Ocwen then removed the case to this Court, based on diversity jurisdiction.[2] Following discovery, Thakkar filed an amended complaint in which he added Baxol and Laudan as additional defendants. Each of the four defendants subsequently filed a third-party complaint against Green Group. Each of these four defendants has now filed a motion for summary judgment or partial summary judgment against Thakkar. In addition, Green Group has filed a motion for partial summary judgment against those four defendants. All of these motions are now before this Court.

## DISCUSSION

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if "the evidence is such that a reasonable jury could

---

[2] *See* Am. Suppl. Statement of Jurisdiction, ECF No. 188. Jurisdiction over third-party defendant Green Group, however, is based on supplemental jurisdiction under 28 U.S.C. § 1367(a) and (b), as it, like Thakkar, is an Illinois citizen. *See Kemper/Prime Indus. Partners v. Montgomery Watson Americas, Inc.*, 487 F.3d 1061, 1063 (7th Cir. 2007) ("[A] defendant's impleader under Fed. R. Civ. P. 14 of a party that is not diverse from the plaintiff does not destroy jurisdiction.").

return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In reviewing a motion for summary judgment, the Court "construe[s] all facts and inferences in favor of the nonmoving party." *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 701 (7th Cir. 2015).

## I. Thakkar's Complaint

Thakkar has advanced six theories of liability under which he says he is entitled to relief. He alleges that the defendants are liable for violating the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq.*, as well as for negligence, civil conspiracy, trespass to real property and chattels, conversion, and invasion of privacy. He asserts the first three of these claims against all four of the defendants, and the latter three against Ocwen, Altisource, and Baxol. Ocwen has moved for summary judgment on all of these counts, while the other three defendants have moved for partial summary judgment.[3]

Before addressing each of the theories of liability individually, the Court addresses one key disputed fact and two overarching legal issues, each of which has consequences for the legal analysis that follows. The factual dispute between the parties, and particularly between Thakkar and Ocwen, is over whether the September 20, 2013, letter to Viresh Thakkar informing him that the recent inspection had indicated that the property was vacant was ever actually mailed. Ocwen asserts that it was; Thakkar denies that it was ever sent or received. The two legal issues are (1) whether Ocwen (or any party acting at its direction) was legally entitled to enter the property

---

[3] Specifically, Altisource has moved for summary judgment on the issues of the supposed ICFA violation, conversion, and civil conspiracy. Baxol has moved for summary judgment on the issues of the ICFA violation, trespass to real property and chattels, conversion, and invasion of privacy. Laudan did not file its own briefs, but it has moved to join in the arguments made by Baxol and Altisource with respect to the ICFA issue; the Court granted that motion. *See generally* Laudan Properties, LLC's Mot. for Leave to Join Summ. J. Mots. of Baxol Properties, LLC and Altisource Solutions, Inc., ECF No. 251; Min. Entry, ECF No. 253.

in October 2013, and (2) whether and to what degree an agency relationship existed between any of the defendants in this case.

### A.      Mailing of the September 2013 Inspection Letter

Ocwen's evidence that the letter was mailed is that an account of its mailing appears in its business records. One of Ocwen's witnesses testified that those records, which are kept on a platform called REAL Servicing, populated with the date on which the letter was printed and mailed. *See* Dep. of Gina Feezer 102:4–104:20, ECF No. 237-8; *see also* Ocwen's Resp. to Pl. Nirav Thakkar's Local Rule 56.1(b)(3)(C) Statement of Material Facts ¶ 25, ECF No. 290. Ocwen has also provided a copy of the letter itself. As far as the Court can determine, however, the records indicating that the letter was mailed do not actually appear in the record of this case. In addition, as Thakkar points out, there have been issues with the accuracy of Ocwen's records, particularly related to REAL Servicing, in the past. Thakkar has attached as an exhibit a consent order agreed to by Ocwen and the New York State Department of Financial Services in December 2014. *See generally* Consent Order Pursuant to New York Banking Law § 44, ECF No. 282-5. The order reflects that a compliance monitor who reviewed Ocwen's operations concluded that "Ocwen's information technology systems are a patchwork of legacy systems and systems inherited from acquired companies, many of which are incompatible." *Id.* ¶ 14. As a result, "Ocwen regularly gives borrowers incorrect or outdated information, sends borrowers backdated letters, unreliably tracks data for investors, and ***maintains inaccurate records***." *Id.* (emphasis added).

Ocwen objects to the consideration of this information on multiple grounds; namely, it argues that it is not material and that Thakkar has no right to enforce the consent agreement. Ocwen's Resp. to Pl. Nirav Thakkar's Local Rule 56.1(b)(3)(C) Statement of Material Facts ¶ 16. But Thakkar is not seeking to enforce that agreement. He is merely pointing to the existence of the consent order as evidence that Ocwen has had widespread problems with maintaining inaccurate

records in the past. That is surely relevant to the question whether Ocwen's REAL Servicing records are accurate in this case and whether the letter was in fact mailed. Taking the record as a whole, and construing all disputed facts and making all reasonable inferences in Thakkar's favor, as it must, the Court concludes that a jury could reasonably determine that the letter was never mailed. For the purposes of this opinion, then, the Court assumes that it was not mailed.

### B. Whether the October 2013 Entry Was Legally Justified

The first overarching legal dispute between the parties deals with whether Ocwen was entitled, under the terms of the mortgage, to enter the property (or order other entities to do so) in October 2013. Thakkar contends that the entry was prohibited by the Illinois Mortgage Foreclosure Law ("IMFL"), 735 ILCS 5/15-1101 *et seq.* Thakkar points to Section 1701 of the IMFL, which governs the "right to possession" of mortgaged real estate during foreclosure, and provides that "[p]ossession under this Article includes physical possession of the mortgaged real estate to the same extent to which the mortgagor, absent the foreclosure, would have been entitled to physical possession." 735 ILCS 5/15-1701(a). It also states that, except as authorized by the IMFL, no mortgage or other instrument may supersede its provisions. 735 ILCS 5/15-1701(f). As Ocwen notes, however, by its own terms, the IMFL "shall govern the right to possession of the mortgaged real estate ***during foreclosure.***" 735 ILCS 5/15-1701(a) (emphasis added). In the present case, no foreclosure proceedings had been initiated at the time of either of the two entries. Because Thakkar has not cited any authority that would suggest that Section 1701 applies prior to the initiation of foreclosure proceedings—and because the case law demonstrates that it does not—the IMFL does not apply here. *See Cocroft v. HSBC Bank USA, N.A.*, 796 F.3d 680, 688 (7th Cir. 2015); *Fed. Nat'l Mortg. Ass'n v. Obradovich*, No. 14-cv-4664, 2016 WL 1213920, at *4 (N.D. Ill. Mar. 29, 2016) ("[A]ny violation of the Obradoviches' alleged right of possession occurred before, not during, the foreclosure, and therefore is not governed by the statute.").

8

That does not mean, however, that Ocwen had an absolute right to enter the Danbury Drive property whenever it wanted. Rather, Ocwen's rights to enter were governed by the language of the mortgage. Two sections of the mortgage are particularly relevant, and Ocwen points to them as authority for the actions it took. The first is Section 7, which reads: "Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an inspection specifying such reasonable cause." Mortgage ¶ 7, ECF No. 237-10. The second is Section 9, which states that if the borrower "has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the property." *Id.* ¶ 9. This may include "entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off." *Id.*

Ocwen contends that it "acted consistently with Sections 7 and 9 of the Mortgage in ordering the reportedly vacant Property secured." Ocwen Loan Servicing, LLC's Reply in Supp. of Its Mot. for Summ. J. ("Ocwen's Reply") 10, ECF No. 294. Section 7 might have provided Ocwen with authority to make "reasonable entries" or "inspections," but it could not justify the securing of the property, changing of the locks, and disposing of personal property found in the house. That authority would have to come from Section 9. That provision, however, provided Ocwen with authority to take those steps only if the borrower "has abandoned the property." As is clear from the record, Thakkar had not in fact abandoned the property. Moreover, because as discussed above, the Court assumes for the purposes of this decision that no letter was ever sent to

9

Thakkar or his uncle notifying them of the vacancy inspection, under those facts it was unreasonable for Ocwen to assume that it was abandoned.[4] In short, depending on the facts, one could fairly conclude that the entry was not "reasonable" under Section 7, and one could certainly conclude that Ocwen did not have the authority to take any of the steps contemplated under Section 9. The Court therefore assumes, for the sake of the legal analysis that follows, that Ocwen exceeded its legal authority in ordering the entry that took place in October 2013.

It should also be clear that ***no one*** other than Thakkar had the legal right to enter the property in January 2014, after he had purchased the property outright. The defendants may argue that the January 2014 entry was justifiable as a mistake, in that their electronic systems had not updated to reflect that the mortgage had been paid off before they processed the work orders to enter the property. But while this may function as a defense to certain torts, it is clear that it cannot function as proof that any defendant had a legal right to enter the property in the first place.

### C.    Agency Relationships

Another overarching issue that affects all of the individual claims that Thakkar makes is the degree to which an agency relationship existed between the various defendants or third-party defendants. Ocwen has argued that there was simply no agency relationship between it and Altisource, Baxol, Laudan, or Green Group, and that therefore it cannot be vicariously liable for any of the actions of those parties. *See* Ocwen Loan Servicing, LLC's Mem. in Supp. of Its Mot. for Summ. J. ("Ocwen's MSJ") 7-11, ECF No. 238. Altisource and Baxol make similar, but more limited, arguments. That is, Altisource and Baxol both contend that, even if Green Group acted as their agent, it exceeded its authority in a number of the actions it took, particularly in removing

---

[4] In addition, one might alternately conclude that, even if the letter had been mailed, it is unreasonable for a mortgage servicer to determine that a property has been abandoned merely because the owner did not respond to a single letter within the span of fifteen days.

Thakkar's property from the house. Accordingly, they assert that they cannot be held liable for any actions that Green Group took that were outside the scope of its authority.

In Illinois law, an agency relationship is one "in which the principal has the right to control the agent's conduct and the agent has the power to act on the principal's behalf." *Amcore Bank, N.A. v. Hahnaman-Albrecht, Inc.*, 326 Ill. App. 3d 126, 134, 759 N.E.2d 174, 181 (2001). An agent's authority "may be either actual or apparent, and actual authority may be either express or implied." *Id.* The primary test of whether an agency relationship exists "is whether the alleged principal has the right to control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationships of the principal." *Chemtool, Inc. v. Lubrication Techs., Inc.*, 148 F.3d 742, 745 (7th Cir. 1998) (citations and internal quotation marks omitted). To prevail on a claim of actual agency, a plaintiff must also demonstrate that the alleged conduct fell within the scope of the agency relationship. *See Hammer v. Barth*, 2016 IL App (1st) 143066 ¶ 15, 48 N.E.3d 769, 774. "Under Illinois law the existence and scope of an agency relationship are questions of fact, unless the relationship is so clear as to be undisputed." *Om v. Weathers*, No. 91 C 4005, 1993 WL 408359, at *3 (N.D. Ill. Oct. 12, 1993).

Thakkar's evidence supporting the existence of an agency relationship among the chain of defendants consists primarily of a series of contracts. The first is Ocwen's contract with Altisource, and the second is Altisource's contract with Baxol. *See generally* ECF No. 299-6; ECF No. 299-7. Baxol, in turn, also had an arrangement with Green Group that does not appear to have been formalized in a written contract, but Thakkar points to the deposition testimony of Green Group's president about the nature of their relationship. The way these arrangements worked together is as follows. If a borrower failed to respond to a vacancy letter within fifteen days, Ocwen's policy was to deem the property vacant. *See* Altisource Solutions, Inc.'s Mem. of Law in Supp. of Its

11

Mot. for Partial Summ. J. 6, ECF No. 240. This would then automatically trigger a work order to Altisource to secure the property, perform a lock change, remove exterior debris, and perform an initial property review and winterize the property. *See id.* at 6-7. Altisource would then issue those work orders to vendors such as Baxol, which would in turn assign them to subcontractors such as Green Group. *See* Ocwen's Facts ¶¶ 51-52.

As Thakkar points out, the key element of this set of arrangements is that virtually no discretion was built into this chain of events at any stage. As far as the Court can determine, no actor had any discretion to decline a work order. And the set of contractual agreements provided detailed requirements for how the work was to be carried out. For example, according to Altisource's contract with Baxol, when Altisource issued a work order, Baxol was required to accept it "as promptly as possible but in no event later than twenty-four (24) hours" from the submission of the order. *See* Field Vendor Agreement, Addendum A ¶ 2.1.3, ECF No. 299-7. Failure to accept such an order was a material breach of the agreement. The work orders were to be completed "as promptly as possible," meaning either within a time frame to be specified in the work order or within twenty-four hours if not. *Id.* ¶ 2.2.1. Baxol agreed to comply with a long set of requirements spelled out in the master field vendor agreement in addition to any "Special Instructions" provided in a particular work order. It was not authorized to complete tasks beyond those spelled out in such "Special Instructions." *See* Baxol's Facts ¶ 26. The same was broadly true for Baxol's relationship with Green Group. While there was no written contract in that relationship, Green Group's president, Russell Kalchbrenner, testified that Green Group had no choice but to complete any work assigned to it. *See* Dep. of Russell Kalchbrenner 19:5-6, ECF No. 236-9 ("We had to complete all work they gave to us.") He agreed that his understanding of the

arrangement was that Green Group "pretty much had to comply with whatever [Baxol] requested." *Id.* at 19:16-18.

The Court determines that a jury could reasonably conclude that a series of agency relationships existed among the defendants because in each relationship, one party possessed ***actual, express authority*** over another. *See Restatement (Third) of Agency* § 2.01 (2006) ("An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act."). Viewing the facts in the light most favorable to Thakkar, the state of these relationships was such that in each dyad of two parties, one party had the ability to issue an order to the other to carry out a task. The second party, in turn, was contractually obligated to accept the order and perform the task, and it would have reasonably understood that the assigning party wanted it to complete that task. Moreover, the second party had little to no discretion when it came to ***how*** it would complete the task. It had to perform the task within specific time frames, according to specific instructions. This set of governing contractual agreements meant that the party issuing the order possessed a significant degree of control over the manner in which the work would be carried out.

A person or entity that is appointed by an agent to perform functions assigned to the agent by the principal is known as a "subagent." *See id.* § 3.15. If an agent is authorized to do so, it may "appoint subagents to perform those tasks or functions the agent has undertaken to perform for the principal." *AYH Holdings, Inc. v. Avreco, Inc.*, 357 Ill. App. 3d 17, 33, 826 N.E.2d 1111, 1126 (2005). With respect to third parties, "an action taken by a subagent carries the legal consequences for the principal that would follow were the action instead taken by the appointing agent." *Restatement (Third) of Agency* § 3.15, cmt. d. Whether a subagency relationship exists "has

13

generally been found to be a question of fact based on the particular circumstances of the case and, accordingly, improperly determined on summary judgment." *AYH Holdings*, 357 Ill. App. 3d at 34, 826 N.E.2d at 1127. In the present case, no defendant appears to have argued that any other defendant to whom it issued a work order was not authorized to appoint a subagent to carry out that task. Indeed, it seems that this type of delegation reflected the defendants' standard practice. Thus, a jury could reasonably conclude that a series of subagency relationships existed among the defendants, in addition to ordinary agency relationships. In other words, one could conclude, for example, that Green Group was a subagent of Ocwen and Altisource, in addition to being an agent of Baxol.

Ocwen argues that these conclusions are at odds with the decisions of other judges on this Court in *Jackson v. Bank of N.Y.*, 62 F. Supp. 3d 802 (N.D. Ill. 2014), and *Mighty v. Safeguard Props. Mgmt., LLC*, No. 16 C 10815, 2018 WL 5619451 (N.D. Ill. Oct. 30, 2018). It argues that "*Jackson*'s and *Mighty*'s Analyses of Liability Control" this case. Ocwen's Reply 5. As Ocwen must surely recognize, however, these decisions are merely persuasive authority rather than controlling precedent; no district court opinion has precedential value. *See, e.g.*, *Howard v. Wal-Mart Stores, Inc.*, 160 F.3d 358, 359 (7th Cir. 1998). Those cases are also distinguishable in that, as the facts are presented in those opinions, it does not appear that the purported principals had the degree of control over the manner of execution of the tasks at hand as the defendants in this case did. Moreover, even if this were not true, to the extent that *Jackson* or *Mighty* would suggest a different result in this particular case, the Court does not find them persuasive.

The other, subsidiary dispute between the parties is, assuming that an agency relationship existed, how far the scope of that relationship stretched. In particular, the parties dispute whether the removal of Thakkar's personal property from the house could have fallen within the scope of

the agency relationship. The defendants note that the contract between Ocwen and Altisource provided that while "[w]aste material" and "debris" would be "removed from the premises and properly disposed," "[p]ersonal property will not be disposed. If personal property is present in the premises, these will be moved and secured within the property." ECF No. 299-6 at 54. Similarly, the work order that was issued by Altisource to Baxol, and then assigned by Baxol to Green Group, specifically stated that "No Personal Property is to be removed," and provided for "debris removal only." *See* Ex. K at 3, ECF No. 243-3.

Thakkar responds by contending that, whatever the language of the contracts or work orders might actually say, it was understood that personal property would in fact be removed. He points, again, to the testimony of Kalchbrenner, Green Group's president. At his deposition, Kalchbrenner, when asked what it meant when his company was directed to remove "debris," defined it as "anything in the house, trash-out, any of that that needs to be removed." Dep. of Russell Kalchbrenner 14:18-21. He confirmed that his understanding was that such an order was an instruction "basically to clean the house wall to wall." *Id.* at 20:1-9. Kalchbrenner later added that "[i]f we get an approval to remove any debris, whatever it is, it gets thrown out. That is our policy. We stick strongly by it. It's not our stuff. It gets thrown out." *Id.* at 122:4-7. Thakkar also points out that Altisource acknowledged in 2013 that claims for improper removal of personal property were the largest source of claims against it. *See* Pl. Nirav Thakkar's Local Rule 56.1(b)(3)(C) Statement of Additional Material Facts in Resp. to Altisource's Mot. for Summ. J. ("Thakkar's Additional Facts") ¶ 51, ECF No. 281. Altisource admits this, though it contends that it has determined that most such claims had no basis or merit. *See* Resp. to Pl. Nirav Thakkar's Local Rule 56.1(b)(3)(C) Statement of Material Facts in Resp. to Altisource's Mot. for Summ. J. ¶ 51, ECF No. 292.

Finally, Thakkar points to an exhibit labeled with the work order number "WI6198706." *See generally* ECF No. 299-2. It identifies the "Details of the Debris" to be removed from the Danbury Drive house with the following description:

> chemicals, soaps, paints, papers, boxes, aerosol cansin the garage old cleaning supplies, 2 propanetanks in the garage, in the pantry-3 cans of beans in a bag, a bag of toothpaste an a box of bathroom item's, 2bottles of pop, 2 buckets of donut mix, in the kitchen-seasoning in containers, food in refrigerator and cabinets,cleaning supplies under the sink in kitchen,in basement-3 paint cans, 1 bottle of washing liquid, upstairs-box of soap, box of soap, in bathroom-usual bathroom items, in the bedroom 1 bag of medication [*sic*].

*Id.* at 2. Baxol responds that these are in fact descriptions written by Green Group of what its workers found at the house, rather than orders from Altisource of what items were supposed to be removed from the property. *See* Def. Baxol Properties, LLC's Reply in Supp. of Its Mot. for Partial Summ. J. 6 n.1, ECF No. 289. The Court agrees that this must be a list of items removed from the house. It is difficult to imagine that a work order could anticipate the contents of the house at this level of detail (two buckets of donut mix?). But whether an anticipatory order or a list of what was actually removed, this list clearly confirms the removal of items suggesting that the house was not abandoned and that the property removed was not "debris." Moreover, the fact that an agent may perform the work carelessly does not mean that the conduct falls outside the scope of the agency. *Cf. Restatement (Third) of Agency* § 7.07, cmt. c. Principals might have a cause of action against the agent for this type of poor execution, but they are not automatically absolved from liability to third parties under such circumstances.

It is also very much relevant that, as alleged by Thakkar, there were ***two*** unauthorized entries in this case, and his personal property was taken on ***both*** occasions. The work order reflects that on the first occasion, a series of items that could not plausibly be understood to be debris—and would have qualified as Thakkar's personal property—were removed. There is no evidence in

16

the record that reflects that, after (presumably) seeing and reviewing that work order, Ocwen, Altisource, or Baxol ever expressed any displeasure with Green Group or directed it to perform its job differently in the future. Indeed, Thakkar alleges that much the same thing happened again during the second entry, as roughly $75,000 in personal property went missing. *See* Am. Compl. ¶ 111. At a minimum, this sequence of events shows a lack of supervision or monitoring of Green Group's activities on the part of the other defendants. One could plausibly infer from this chronology that the other defendants did not see anything wrong with the fact that Green Group had taken the items listed in the work order from Thakkar's house.

The Court thus concludes that a jury could reasonably determine that the removal of Thakkar's property fell within the scope of the agency relationships notwithstanding the contractual prohibitions. The combination of Kalchbrenner's testimony, the previous complaints against Altisource, and the work order could provide sufficient support for one to conclude that the term "debris," as it was used in the various contracts and work orders, was routinely interpreted by the parties involved to sweep in items that were not truly debris and constituted an individual's personal property. For the purpose of evaluating the summary judgment motions, therefore, the Court rejects the contention that the removal of Thakkar's property fell outside of the parties' various agency and subagency relationships as a matter of law. This does not, of course, prevent any defendant from challenging either the existence or scope of any agency relationship in this case at trial.

### D.     The ICFA

815 ILCS 505/2, which is part of the ICFA, contains the following proscription:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or

17

> omission of such material fact, or the use or employment of any
> practice described in Section 2 of the "Uniform Deceptive Trade
> Practices Act", approved August 5, 1965, in the conduct of any trade
> or commerce are hereby declared unlawful whether any person has
> in fact been misled, deceived or damaged thereby.

Thakkar alleges that all of the defendants have committed unfair acts within the meaning of this statute. There are three elements of an ICFA claim: "(1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir. 2010). A plaintiff "may allege that conduct is unfair under ICFA without alleging that the conduct is deceptive." *Id.* at 935. When the claim sounds in unfairness rather than deception, factors to be considered include "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers." *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417-18, 775 N.E.2d 951, 961 (2002). A practice need not satisfy all three of these criteria to be deemed unfair. *See id.* at 418, 775 N.E.2d at 961.

In addition, an ICFA plaintiff must possess statutory standing; that is, the plaintiff must be within the class of people entitled to bring a suit under the statute. The ICFA provides that "[a]ny person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person." 815 ILCS 505/10a(a). The courts, however, have generally required ICFA plaintiffs to demonstrate either that they are "consumers" under the meaning of the statute or that they have satisfied the "consumer nexus" test. *See Liston v. King.com, Ltd.*, 254 F. Supp. 3d 989, 1005-06 (N.D. Ill. 2017). To satisfy the "consumer nexus" test, a plaintiff must show "(1) that their actions were akin to a consumer's actions to establish a link between them and consumers; (2) how defendant's representations . . . concerned consumers other than [plaintiff]; (3) how defendant's particular [activity] involved consumer protection

18

concerns; and (4) how the requested relief would serve the interests of consumers." *Id.* at 1006 (citations omitted).

Thakkar has statutory standing under the "consumer nexus" test. The ICFA defines a "consumer" as "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household." 815 ILCS § 505/1(e). The first element of the "consumer nexus" test is satisfied because Thakkar was in a position akin to that of a consumer. His uncle, who bought the house and took out the mortgage, was surely a consumer. Thakkar, by renting the house from his uncle and making the mortgage payments, effectively stepped into his shoes, even if he was not directly contracting with Ocwen or any of the other defendants. With respect to all of the various actions taken by the defendants toward the Danbury Drive property, Thakkar was for all purposes in the same position as an ordinary consumer.

The rest of the requirements of the "consumer nexus" test are also satisfied, as Thakkar has presented evidence of a scheme designed to take advantage of consumers in which all of the defendants participated. In short, according to Thakkar, this scheme involves drive-by vacancy determinations and letters requiring responses on short notice, which are likely to lead to inaccurate conclusions that a property is vacant. Then, the defendants communicate a series of orders to one another, with the ultimate result that ground-level vendors such as Green Group enter individuals' property without their consent and without any legal authorization. This scheme plainly implicates consumer protection concerns. While "the scope of what constitutes consumer protection concerns is under debate, courts have generally required some allegations of sharp practices designed to mislead consumers about a competitor, or an implication of public health, safety or welfare issues." *Credit Ins. Consultants, Inc. v. Gerling Glob. Reinsurance Corp. of Am.*, 210 F. Supp. 2d 980, 985

19

(N.D. Ill. 2002). As the claims at issue raise the prospect of unwanted home invasions, they plausibly present issues relating to public safety. Further, as Thakkar has alleged that these are general practices followed by the defendants, the defendants' policies concern mortgage holders other than Thakkar (or his uncle). Relief would also serve the interests of these other consumers in that it would serve as a deterrent against other misconduct by the defendants and other mortgage servicers or property preservation companies. Thakkar thus has statutory standing under the ICFA.

Moving on from the standing issue, both Ocwen and Baxol have argued that they are entitled to summary judgment on the ICFA claim because there is no genuine issue of material fact as to whether they violated the statute. In particular, they both contend that they did not commit any unfair or deceptive acts within the meaning of the statute. The analysis in the previous paragraph demonstrates why this is not the case. The scheme that Thakkar has alleged, if corroborated, would violate public policy by encroaching on individuals' property rights, in violation of the law. It is at least arguably "immoral, unethical, oppressive, or unscrupulous," *Robinson*, 201 Ill. 2d at 417-18, 775 N.E.2d at 961, and can lead to potential injuries to individuals such as Thakkar whose property is entered without their consent. This set of potentially unfair practices surely takes place during a course of conduct involving trade or commerce. *See* 815 ILCS 505/1(f) (defining "trade" and "commerce" as "the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated"). And finally, Thakkar has credibly alleged that he "relied upon" the defendants' actions and so was "deceived into questioning his legal occupancy rights in the property." Am. Compl. ¶ 142. This led to his "doubting his right to reside in his own home free of invasions," as well as "becoming afraid to live at the property" and "paying to repair and secure the property." *Id.* Based on all of these claims,

the Court concludes that there is a genuine issue of material fact as to whether all of the defendants violated the ICFA. The defendants' motions on this claim are therefore denied.

### E. Negligence

Ocwen is the only defendant to move for summary judgment on the negligence claim. Under Illinois law, in a negligence action, a plaintiff "must plead and prove the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and injury proximately resulting from that breach." *Bruns v. City of Centralia*, 2014 IL 116998 ¶ 12, 21 N.E.3d 684, 688-89. Ocwen makes three main arguments as to why it is entitled to summary judgment on this claim: first, that it owed no duty to Thakkar, because he was not the mortgagor of the property; second, that it is not responsible for the actions of other defendants; and third, that there was no proximate causation. *See* Ocwen's MSJ 15-16.

Ocwen's first argument must be rejected. It is true that Thakkar's uncle took out the mortgage on the property. Yet the Supreme Court of Illinois has "long recognized" that all people or entities owe "a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonably probable and foreseeable consequence of an act, and such a duty does not depend upon contract, privity of interest or the proximity of relationship, but extends to remote and unknown persons." *Simpkins v. CSX Transp., Inc.*, 2012 IL 110662 ¶ 19, 965 N.E.2d 1092, 1097 (citations and internal quotation marks omitted). The fact that Ocwen and Thakkar were not in privity with each other does not mean that Ocwen owed no duties to Thakkar. It was a reasonably probable and foreseeable consequence of Ocwen's actions that they might have effects on any individuals who happened to be living at the property, whether or not they were listed on the mortgage. Ocwen thus owed Thakkar a duty of ordinary care.

Likewise, Ocwen's second and third arguments must also be rejected because one could determine that **its own actions**—not those of other defendants—were the **proximate cause** of some

21

of Thakkar's injuries. As noted above, a jury could reasonably conclude that the mortgage was never in default and that Ocwen failed to ever give notice to Thakkar or his uncle of the vacancy determination. As a result, a jury could also reasonably conclude that the defendants acted unreasonably in entering the Danbury Drive property in the first place. These entries were the direct and proximate result of Ocwen's own acts in ordering the property to be secured. Those entries, in turn, directly led to some of the injuries that Thakkar is alleging. For example, in executing both entries, Green Group entered the Danbury Drive property and changed the locks. *See* Baxol's Facts ¶¶ 43, 50. As a result, Thakkar was forced to hire a locksmith to replace deadbolts and fix his patio door. Thakkar's Additional Facts ¶ 80.

The harms of being locked out of his house and having to expend money to reenter the property and replace the locks are cognizable legal injuries. A jury could fairly determine that these injuries were proximately caused by Ocwen's order to secure the property. Once the order was issued it became clear that, at a minimum, the entries and the changing of locks would follow. Thakkar's negligence claim against Ocwen—and all of the other defendants, who have not challenged it—may thus proceed to a jury.

### F.    Trespass to Real Property and Chattels

In his amended complaint, Thakkar has asserted claims for both trespass to real property and trespass to chattels under the heading of "Count III." These are distinct theories of liability, and both are valid tort claims under Illinois law. *See* Mem. Op. and Order 11, ECF No. 202; *Matthews v. Homecoming Fin. Network*, No. 03 C 3115, 2005 WL 2387688, at *8 (N.D. Ill. Sept. 26, 2005). Both Ocwen and Baxol have moved for summary judgment on "Count III," but in reality, each appears to target only one of the two theories of liability under this heading (trespass to real property for Ocwen, and trespass to chattels for Baxol).

With respect to trespass to real property, under Illinois law, to prevail on such a claim "a plaintiff must plead and prove negligent or intentional conduct by the defendant which resulted in an intrusion on the plaintiff's interest in exclusive possession of land." *Sak v. CitiMortgage, Inc.*, 940 F. Supp. 2d 802, 804 (N.D. Ill. 2013). A defendant need not trespass on the property personally to be liable for this tort. One "can be liable in trespass for an intrusion by a third party if he acts with knowledge that his conduct will, with a substantial degree of certainty, result in the intrusion," meaning that "a person who aids, abets, assists, or directs the commission of a trespass by another is liable for trespass." *Id.*

Ocwen makes two primary arguments as to why it is not liable for trespass, neither of which is persuasive. First, it argues that it was within its legal rights to order that the Danbury Drive property be secured. As discussed earlier, however, the Court has already determined that there is a material fact dispute as to this issue. *See supra* at 8-10. Second, it argues that it is not liable for any trespass that may have occurred. Green Group, after all, was the entity that actually intruded into Thakkar's land. As the Court has already concluded, however, there is a material fact dispute as to the existence of an agency relationship among all of the defendants in this case. Ocwen, which was at the top of the agency chain, may therefore be liable for Green Group's trespass. One could alternately and reasonably conclude that, even in the absence of an agency relationship, in issuing the order to secure the property, Ocwen was "direct[ing] the commission of a trespass" and so is directly as well as vicariously liable for trespass. Ocwen's motion for summary judgment on this claim is accordingly denied.

Baxol's argument that it is not liable for trespass to chattels fares no better. "A trespass to a chattel may be committed by intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another." *Sotelo v. DirectRevenue, LLC*, 384

F. Supp. 2d 1219, 1229 (N.D. Ill. 2005) (citation omitted). With regard to this point, Baxol makes an argument that applies to its responses to the claims for trespass, conversion, and invasion of privacy. That is, Baxol writes that it did not take any "affirmative action" to "convert or interfere with Plaintiff's personal property or invade Plaintiff's privacy." Def. Baxol Properties, LLC's Mem. of Law in Supp. of Mot. for Partial Summ. J. 13, ECF No. 245. All of these torts, according to Baxol, require an "intentional act" to interfere with an individual's property, possession, or privacy. *Id.* at 12. All that Baxol did, it says, was to convey Altisource's work orders to Green Group for execution. Thus, it did not commit an intentional act, because it acted "not with the intention to dispossess Plaintiff of his personal property, but as compelled by contract." *Id.* at 14.

The problem for Baxol is that these two options are not mutually exclusive. Baxol cites no legal authority at all for the proposition that an act is not intentional if it is compelled by contract. The fact that a party may be required by contract to take a certain step does not mean that it is doing so unintentionally. Baxol does not attempt to argue, for example, that it was not aware that it was conveying the orders to Green Group, or that it did so unintentionally via some kind of mistake or accident. The act of conveying the work order to Green Group qualifies as an intentional act.

Baxol's next, and related, argument is that even if it did convey the order to Green Group, and even if there is an agency relationship between Baxol and Green Group, the removal of Thakkar's personal property was outside of the scope of the agency relationship. As the Court has already addressed, however, *see supra* at 17, Baxol is not entitled to this presumption at this stage in the proceedings. As previously discussed, depending on the facts, a jury could reasonably conclude that the orders to remove "debris" were bound to sweep in some of Thakkar's personal property. Baxol, if found to be Green Group's principal, would be liable for Green Group's

intentionally tortious activity. Baxol is therefore not entitled to summary judgment on the trespass claim.

### G.    Conversion

The elements of the torts of conversion and trespass to chattels are quite similar. To establish conversion under Illinois law, a plaintiff must demonstrate that "(1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *Cirrincione v. Johnson*, 184 Ill. 2d 109, 114, 703 N.E.2d 67, 70 (1998).

Ocwen, Altisource, and Baxol have all moved for summary judgment on this claim, and all three of these defendants have made more or less the same central argument. All of them again point to the fact that the only entity to enter Thakkar's property and allegedly remove his personal property was Green Group. They argue that any taking of Thakkar's property was outside of the scope of any agency relationship. Once again, the Court has already rejected the argument that this is true as a matter of law. Making all reasonable inferences in Thakkar's favor, a jury could reasonably determine that the taking of his property fell within the scope of the various agency relationships.

Thakkar has alleged that on two different occasions, Green Group entered his property and took his personal property worth roughly $95,000. A jury could reasonably conclude that these events did in fact take place as alleged. No defendant has even tried to argue that Green Group would have had any legal right to take these actions. Under Thakkar's account, he had a right to possess this property, and Green Group wrongfully assumed control over it. This would be a straightforward case of conversion. Because of the potential agency relationships, Baxol,

Altisource, and Ocwen would all then in turn be responsible for the conversion. For this reason, the defendants' respective motions for summary judgment on this claim are denied.

### H.        Invasion of Privacy

The Illinois courts recognize four ways to state a cause of action for invasion of privacy: intrusion upon seclusion, appropriation of another's name or likeness, public disclosure of private facts, and placing another in a false light. *Cooney v. Chi. Pub. Sch.*, 407 Ill. App. 3d 358, 366, 943 N.E.2d 23, 31-32 (2010). Thakkar appears to invoke only the tort of intrusion upon seclusion. This tort requires a plaintiff to demonstrate that (1) there has been an unauthorized intrusion into seclusion; (2) the intrusion would be highly offensive to a reasonable person; (3) the matter intruded upon was private; and (4) the intrusion caused the plaintiff anguish and suffering. *Id.* at 366, 943 N.E.2d at 32. Ocwen and Baxol have each moved for summary judgment on this claim. As with the claims for trespass and conversion, however, Baxol's primary argument regarding why it is not liable for invasion of privacy is that it did not take any "intentional act." For the reasons already stated above, this is incorrect, as the act of conveying the work order to Green Group was an intentional act.

Ocwen has made a series of arguments in favor of summary judgment on this claim. First, Ocwen argues that it did not enter the property at any time, and as such it did not commit any intentional act that could subject it to liability for an intentional tort. Again, however, as the Court has already held, a jury could reasonably conclude that Green Group was acting as Ocwen's agent, through a series of intermediaries. It is undisputed that Green Group did in fact enter the property. This is sufficient to raise a genuine issue of material fact as to the first element of the tort. *See Lovgren v. Citizens First Nat'l Bank of Princeton*, 126 Ill. 2d 411, 417, 534 N.E.2d 987, 989 (1989) (describing "invading someone's home" as one of the archetypical examples that form "the basis for the tort of intrusion into the seclusion of another").

26

Second, Ocwen contends that Thakkar has not established that the matter intruded upon was private, but merely that his possessions were taken. As Ocwen recognizes, even quoting this language in its briefing, "[e]xamples of inherently private facts include a person's financial, medical, or sexual life, or a particularly private fact of an intimate, personal nature." *Acosta v. Scott Labor LLC*, 377 F. Supp. 2d 647, 650 (N.D. Ill. 2005) (citations and internal quotation marks omitted). Thakkar testified in his deposition that after the first break-in, certain financial documents such as credit card statements and bank statements were missing. *See* Dep. of Nirav Thakkar 100:23–101:8, ECF No. 236-1. Thakkar has also alleged that his prescription medication was taken from the house, and that his medical records were accessed as well. *See* Am. Compl. ¶¶ 93, 172. The work order stemming from that entry corroborates that a bag of his medicine was taken. *See* ECF No. 299-2 at 2. Ocwen contends that these were not "private facts" because Thakkar "has not demonstrated that any compromising or embarrassing information was accessed, let alone disseminated." Ocwen's MSJ 19. Ocwen cites *Busse v. Motorola, Inc.*, 351 Ill. App. 3d 67, 813 N.E.2d 1013 (2004), in support of this point. In *Busse*, however, the personal information involved included, most importantly, social security numbers. The court held that social security numbers were not inherently private, and that the plaintiffs had not established that they were private in the context of that case. *See id.* at 72-73, 813 N.E.2d at 1017-18. As the quotation from *Acosta* earlier in this paragraph indicates, however, facts regarding a person's financial or medical life ***are*** inherently private. The allegations regarding Thakkar's financial and medical records, along with his medication—which a jury could fairly credit—are thus enough for a court to conclude that the matter intruded upon in this case was private.

Finally, Ocwen contends that it cannot be liable because the tort of intrusion upon seclusion requires that the harm that a plaintiff suffers must come from the intrusion or the act of prying

27

itself. *See* Ocwen's MSJ 20; *see also Jackson*, 62 F. Supp. 3d at 817-18 (rejecting a plaintiff's invasion-of-privacy claim where there was "no evidence that the intrusion into his property caused [his] loss"). According to Ocwen, any damage that Thakkar may have suffered did not come from the intrusion or prying into his property, but rather "from the removal of his personal property and/or alterations to the Property." Ocwen's MSJ 20. This Court, however, has already rejected a similar argument in its opinion on Baxol's previous motion to dismiss. The core of Thakkar's theory with respect to the invasion-of-privacy issue, as the Court wrote, is that Thakkar "became aware of the intrusion immediately upon returning home and felt so unsafe as a result that he stayed with his parents and eventually moved out of the property altogether." Mem. Op. and Order 12-13. The Court concluded that this "fear of future invasions is sufficient to state a claim." *Id.* at 13. So, too, it is sufficient to survive a motion for summary judgment. The anguish that Thakkar alleges that he suffered—and no defendant has challenged the existence of the anguish—is related not just to the removal of his property but also to the feeling of insecurity associated with having unknown actors enter the property and rummage through his house.

In short, Thakkar has created a genuine issue of material fact as to all of the elements of intrusion upon seclusion. A jury could reasonably conclude that the intrusion was unauthorized; that it was highly offensive; that some of the material intruded upon was private; and that the intrusion caused him anguish and suffering. For this reason, the motions are denied with respect to the invasion-of-privacy claim.

## I.    Civil Conspiracy

"Under Illinois law, a civil conspiracy is defined as: (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Vulcan Golf, LLC v. Google Inc.*, 552 F. Supp. 2d

752, 782 (N.D. Ill. 2008) (citations and internal quotation marks omitted). In the present case, the network of contractual arrangements between the defendants (as well as Green Group) would certainly qualify as a combination of two or more persons. Similarly, Thakkar has demonstrated that there is at least a genuine issue of material fact as to whether the parties to this combination have committed one or more tortious or unlawful acts. The key question regarding his civil-conspiracy claim, then, is whether the contracts were made for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means. Ocwen and Altisource have both argued that Thakkar has not raised a genuine issue of material fact as to whether this element has been satisfied.

Their argument is unpersuasive. As this Court noted in its opinion denying Baxol's motion to dismiss, the complaint in this case "clearly contemplates a scheme in which the defendants knowingly take part in a contractual scheme intended to force homeowners out of their homes without judicial process." Mem. Op. and Order 13. It is true, of course, that there is nothing unlawful about entering into agreements to provide property preservation services. But Thakkar has alleged that the defendants engage in a number of questionable practices in carrying out these contracts. These practices include conducting perfunctory, drive-by vacancy inspections that may often lead to inaccurate vacancy determinations. They also include sending only a single letter to "confirm" that the property is vacant—which may not have even been sent in this particular case. Finally, it appears that even after Thakkar bought the property outright, the defendants had no mechanism in place to issue a stop order to prevent his property from being entered a second time. In short, Thakkar has put forward sufficient evidence to allow a jury to conclude that the way in which these agreements were operationalized was designed to violate individuals' property rights.

For this reason, Ocwen's and Altisource's motions for summary judgment on the civil-conspiracy claim are denied.

## II.    The Third-Party Complaints

The last remaining motion is third-party defendant Green Group's motion for partial summary judgment. As a reminder, all four defendants named in the amended complaint—Ocwen, Altisource, Baxol, and Laudan—filed third-party claims for contribution against Green Group. Green Group's motion for partial summary judgment asks the Court to enter an order stating two things: first, that the third-party plaintiffs are not entitled to any contribution from Green Group for any intentional violations of the ICFA or other intentional torts, and second, that they are not entitled to contribution for any punitive damages awarded against them. *See* Third-Party Def. Green Group Corp.'s Mem. of Law in Supp. of Mot. for Partial Summ. J. 2-3, ECF No. 249.

As all of the third-party plaintiffs argue in their responses, such an order is unnecessary. The third-party complaints do not seek contribution for intentional torts or punitive damages, but rather for the degree to which Green Group's negligence may have responsible for Thakkar's damages. For example, Ocwen's third-party complaint states that if Ocwen were found to be liable in any manner, that liability would "arise in whole or in part as a result of one or more of the foregoing *negligent acts and/or omissions* of Green Group." Ocwen Loan Servicing, LLC's Third-Party Compl. Against Green Group Corp. ¶ 15, ECF No. 118 (emphasis added). Ocwen asserts that it is entitled to contribution from Green Group "in an amount commensurate with the relative degree of *negligence* attributable" to Green Group. *Id.* (emphasis added). Altisource's and Laudan's third-party complaints each contain virtually identical language. *See* Altisource Solutions, Inc.'s Third-Party Compl. Against Green Group Corp. ¶ 15, ECF No. 117; Laudan Properties, LLC's Third-Party Compl. Against Green Group Corp. ¶ 15, ECF No. 135.

In other words, Green Group is asking for the entry of an order on an issue that is not properly before this Court. There is no need for an order that merely restates the status of the existing law. Such an order would effectively be an advisory opinion, which this Court is not empowered to give. Perhaps recognizing this, Green Group has declined to even file a reply brief in response to the third-party plaintiffs' responses. Accordingly, Green Group's motion is denied.

*     *     *

For the reasons stated above, Ocwen's motion for summary judgment, Altisource's motion for partial summary judgment, and Baxol's motion for partial summary judgment are all denied. To the extent that Laudan has joined in the arguments made by Altisource and Baxol, its motion is also denied. Green Group's motion for partial summary judgment with respect to the third-party complaints is denied as well.

Dated: May 17, 2019

John J. Tharp, Jr.
United States District Judge